FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
*DECEMBER 2, 2022*
BROOKLYN OFFICE

DCP:JPL/NMA
F. #2019R001465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JAVIER AGUILAR,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 20-390 (S-1) (ENV)
(T. 15, U.S.C., § 78dd-2; T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.     The Defendant and Relevant Entities and Individuals

    A.    The Defendant and Vitol

       1.    The defendant JAVIER AGUILAR was a citizen of Mexico and a resident of Houston, Texas.  AGUILAR was an oil and commodities trader at Vitol Inc.  AGUILAR was a "domestic concern" and an "employee" of a "domestic concern," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

       2.    Vitol Inc. ("Vitol") was a United States company with its principal place of business in Houston, Texas.  Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).  Vitol was beneficially owned by Vitol Holding BV, a company based in the Netherlands.  These companies, together with their

affiliates, including Switzerland-based Vitol S.A. (collectively, the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

3.      Co-Conspirator #1, an individual whose identity is known to the Grand Jury, was a citizen of Switzerland and Spain, and an employee of Vitol S.A.

B.      State-Owned Oil and Gas Companies and Government Officials

4.      Empresa Pública de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador. Petroecuador was wholly-owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of a foreign government, and Petroecuador's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

5.      Nilsen Arias Sandoval was a citizen of Ecuador and senior manager at Petroecuador in or about and between 2010 and May 2017. Arias was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

6.      Ecuadorian Official #1, an individual whose identity is known to the Grand Jury, was a citizen of Ecuador and held various positions in the Ecuadorian Ministry of Hydrocarbons in or about and between 2013 and 2016. Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

7.      Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX and its wholly-owned subsidiaries were wholly-owned and controlled by the government of Mexico and performed functions that Mexico treated as its own. PEMEX and its

wholly-owned subsidiaries were "instrumentalities" of a foreign government, and PEMEX's and its wholly-owned subsidiaries' officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

8.      PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of PEMEX headquartered in the United States that handled the acquisition of goods and services on behalf of PEMEX. PPI was an "instrumentality" of a foreign government, and PPI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

9.      Gonzalo Guzman Manzanilla was a citizen of Mexico and a resident of Houston, Texas. Guzman worked at PPI in or about and between 1999 and 2020. In or about and between 2016 and 2020, Guzman was a procurement manager at PPI. In addition, at all relevant times, Guzman acted in an official capacity for and on behalf of PEMEX. Guzman was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

10.      Carlos Espinosa Barba was a citizen of Mexico and a resident of Houston, Texas. Espinosa worked at PPI in or about and between 2006 and 2019. In or about and between 2017 and 2019, Espinosa was a procurement manager at PPI. In addition, at all relevant times, Espinosa acted in an official capacity for and on behalf of PEMEX. Espinosa was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

11.      State-Owned Entity, an entity the identity of which is known to the Grand Jury, was a state-owned and controlled oil and gas entity located in the Middle East.

C. Intermediaries and Shell Companies

12. Antonio Pere Ycaza was a citizen of Ecuador, Spain and the United States who resided in the United States and acted as an agent for various energy trading companies, including Vitol. Along with Enrique Pere Ycaza, Antonio Pere Ycaza owned and controlled several shell companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials. Antonio Pere Ycaza was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

13. Enrique Pere Ycaza was a citizen of Ecuador and Spain who acted as an agent for various energy trading companies, including Vitol. Along with Antonio Pere Ycaza, Enrique Pere Ycaza owned and controlled several shell companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials. Enrique Pere Ycaza was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

14. Oil Pacific Ventures Corp. ("OPV") was a shell company formed in the British Virgin Islands by Antonio Pere Ycaza and Enrique Pere Ycaza. OPV was used to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Vitol.

15. Energy Intelligence & Consulting Corp. ("EIC") was a shell company formed in Panama by Antonio Pere Ycaza and Enrique Pere Ycaza. EIC was used to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Vitol and other companies.

16.     Lionel Hanst was a citizen of the Netherlands and a resident of Curaçao who owned and maintained several shell companies and bank accounts used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Ecuadorian and Mexican officials, among others.

17.     Lion-Oil B.V. ("Lion Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst.  Lion Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Ecuadorian and Mexican officials, among others.

18.     Zanza Oil B.V. ("Zanza Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst.  Lion Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Ecuadorian and Mexican officials, among others.

19.     Intermediary #1, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Intermediary #1 controlled several shell or front companies and bank accounts that were used to facilitate the payment of bribes to Mexican officials.

20.     Shell Company #1, Shell Company #2 and Shell Company #3, entities the identities of which are known to the Grand Jury, were shell or front companies formed in Mexico and used or controlled by Intermediary #1.  Shell Company #1, Shell Company #2 and Shell Company #3 were used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials.

II.     The Foreign Corrupt Practices Act

21.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or

payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

III.     The Bribery and Money Laundering Schemes

     A.     Overview

        22.     From in or about and between 2015 and July 2020, the defendant JAVIER AGUILAR, together with others, engaged in international bribery and money laundering schemes in which he knowingly, willfully and corruptly offered, paid and agreed to offer and pay bribes to and for the benefit of Ecuadorian and Mexican officials in order to obtain and retain business for Vitol with and related to Petroecuador, PEMEX and PPI.

        23.     To promote the bribery schemes and to conceal the proceeds derived from them, the defendant JAVIER AGUILAR and his co-conspirators, including the intermediaries described above, caused wire transfers of bribe and other corrupt payments to numerous domestic and offshore bank accounts through a network of shell companies and intermediaries. Many of the wires were sent to bank accounts in the United States or processed through United States-based correspondent banks.

        24.     To further promote the bribery schemes and to conceal the proceeds derived from them, the defendant JAVIER AGUILAR and his co-conspirators, including the intermediaries described above, created and caused the creation of sham consulting agreements and invoices, communicated about the corrupt payments through the use of alias and non-business email accounts and encrypted messaging platforms, and used code names and code words to describe co-conspirators and to refer to corrupt funds used in furtherance of and derived from the schemes.

B.    The Ecuador Bribery Scheme

25.    Beginning in or about 2015, the defendant JAVIER AGUILAR, Antonio

Pere Ycaza, Enrique Pere Ycaza and Nilsen Arias Sandoval, together with others, engaged in a

bribery and money laundering scheme involving the payment of bribes to Ecuadorian officials,

including Arias and Ecuadorian Official #1, in exchange for, among other things, securing

improper advantages for Vitol in obtaining and retaining business in connection with a

December 2016 contract between Petroecuador and the State-Owned Entity (the "Fuel Oil

Contract").

26.    Under the Fuel Oil Contract, Petroecuador agreed to supply the State-

Owned Entity with fuel oil over a period of 30 months in exchange for a $300 million up-front

payment.  The State-Owned Entity made the payment using funds provided by Vitol Group for

that purpose.

27.    Vitol stood to benefit from the Fuel Oil Contract between Petroecuador

and the State-Owned Entity because a Vitol affiliate entered into a separate but related agreement

with the State-Owned Entity to market, sell and transport the oil products delivered pursuant to

the Fuel Oil Contract with Petroecuador.

28.    In furtherance of the scheme, Nilsen Arias Sandoval and his co-

conspirators provided, and agreed to provide, improper advantages including: (a) helping to

direct Petroecuador to award the Fuel Oil Contract to the State-Owned Entity for the ultimate

benefit of Vitol; (b) providing confidential, non-public information about Petroecuador that

assisted the defendant JAVIER AGUILAR, Antonio Pere Ycaza, Enrique Pere Ycaza and others

in corruptly obtaining and retaining business for, and directing business to, Vitol in connection

with Petroecuador; and (c) helping Vitol collect oil from Petroecuador at times convenient for

Vitol, which minimized late fees and other fees levied against Vitol and thereby increased Vitol's profits.

29.     To promote the bribery scheme and to conceal the proceeds derived from it, the defendant JAVIER AGUILAR caused wire transfers to be made from one or more Vitol S.A. bank accounts in the United Kingdom to bank accounts in Curaçao held in the names of Lion Oil and Zanza Oil, which were controlled by Lionel Hanst.  Thereafter, AGUILAR and others caused Hanst to transfer funds from those accounts to bank accounts in the Cayman Islands and Curaçao held in the names of OPV and EIC, which were controlled by Antonio Pere Ycaza and Enrique Pere Ycaza.

30.     In turn, after receiving the funds from Vitol Group via entities controlled by Lionel Hanst, Antonio Pere Ycaza and Enrique Pere Ycaza caused a portion of such payments to be transferred via wire to international bank accounts for the benefit of Nilsen Arias Sandoval and Ecuadorian Official #1.  On at least two occasions, Hanst, at the direction of the defendant JAVIER AGUILAR, caused payments that he received from Vitol S.A. to be wired directly from a Lion Oil bank account to Ecuadorian Official #1's bank account in the United States.

31.     In order to further conceal and disguise the payments the defendant JAVIER AGUILAR and others caused the Vitol Group to make to Lionel Hanst in furtherance of the schemes, Hanst used Lion Oil and Zanza Oil to enter into a series of sham brokerage and commodity swap agreements with Vitol S.A. (together, the "Sham Vitol Agreements").  At the defendant JAVIER AGUILAR's direction, Hanst signed the Sham Vitol Agreements on behalf of Lion Oil and Zanza Oil even though AGUILAR and Hanst knew that Hanst would not perform any of the services described in the agreements.  Hanst then faxed the agreements to Vitol S.A. at a Swiss fax number provided by AGUILAR.

32.     To further conceal and disguise the corrupt and fraudulent transactions with Vitol S.A., Lionel Hanst, at the defendant JAVIER AGUILAR's direction, prepared and submitted to Vitol S.A. sham invoices (the "Hanst Invoices") on a periodic basis.  AGUILAR provided Hanst with the information to include in the Hanst Invoices as purported justification for the payments, even though AGUILAR knew that Hanst, Lion Oil and Zanza Oil did not provide any services in connection with any such payments.

33.     In turn, to conceal and disguise the payments from Lion Oil and Zanza Oil to third parties, including OPV and EIC, Lionel Hanst agreed with the defendant JAVIER AGUILAR to draft and execute sham consulting service agreements between Lion Oil and OPV and Zanza Oil and OPV (the "Sham Consulting Services Agreements").  Pursuant to the Sham Consulting Services Agreements, Lion Oil and Zanza Oil, through Hanst, agreed to pay companies controlled by Antonio Pere Ycaza and Enrique Pere Ycaza a purported commission per barrel of fuel oil secured from Petroecuador in connection with the Fuel Oil Contract.  The actual purpose of the purported commissions, however, was to facilitate bribe payments to Ecuadorian officials, including Nilsen Arias Sandoval and Ecuadorian Official #1.  Additionally, AGUILAR, Hanst and others knew that the services detailed in the Sham Consulting Services Agreements would not be performed.

34.     Antonio Pere Ycaza and Enrique Pere Ycaza subsequently provided bank routing instructions and sham invoices from OPV and EIC (the "Sham Consulting Services Invoices") to Lionel Hanst, who then initiated wire transfers to those companies after receiving authorization from the defendant JAVIER AGUILAR.

35.     Since in or about late 2014 or early 2015, to further and conceal the scheme and the laundering of proceeds related thereto, the defendant JAVIER AGUILAR

communicated with Lionel Hanst and others using the email address

"perezmarcos007@gmail.com," (the "First Aguilar 007 Account") instead of AGUILAR's

official Vitol email address.  In or about February 2019, AGUILAR began to communicate with

Hanst using a new non-Vitol email address, "sixtotomas007@gmail.com" (the "Second Aguilar

007 Account," and together with the First Aguilar 007 Account, the "Aguilar 007 Accounts").

   36. In or about and between August 2015 and November 2018, the defendant

JAVIER AGUILAR, together with others, caused the payment of approximately at least

$650,000 and $270,000 in bribes to Nilsen Arias Sandoval and Ecuadorian Official #1,

respectively.

   C. The Mexico Bribery Scheme

   37. Beginning in or about August 2017, the defendant JAVIER AGUILAR,

together with others, engaged in a bribery and money laundering scheme involving the payment

of bribes to Mexican officials, including Gonzalo Guzman Manzanilla and Carlos Espinosa

Barba, in exchange for, among other things, securing improper advantages for Vitol in obtaining

and retaining business with PEMEX and PPI.

   38. In or about August 2017, the defendant JAVIER AGUILAR was

introduced to Gonzalo Guzman Manzanilla, then a procurement manager at PPI, by a Vitol

Group employee and mutual acquaintance.  Shortly thereafter, AGUILAR met with Guzman and

Carlos Espinosa Barba, also a procurement manager at PPI, in Houston, Texas.  At the meeting,

and at subsequent meetings that took place in Houston, Texas in or about and between

September 2017 and April 2018, AGUILAR agreed to pay bribes to Guzman and Espinosa for

confidential, inside information to assist Vitol in winning business from PPI, including a contract

to supply ethane to PPI (the "Ethane Supply Contract").  In particular, AGUILAR agreed to

make payments to Guzman and Espinosa totaling approximately $600,000 if Vitol ultimately won the Ethane Supply Contract.

39.    In or about June 2018, PPI awarded the Ethane Supply Contract to Vitol.

40.    To promote the bribery scheme and to conceal the proceeds derived from it, the defendant JAVIER AGUILAR and his co-conspirators caused the bribes offered and promised to Gonzalo Guzman Manzanilla and Carlos Espinosa Barba to be paid through a series of transactions.  AGUILAR first caused the wire transfers to be sent from Vitol S.A. bank accounts in the United Kingdom to bank accounts in the names of Lion Oil and Zanza Oil in Curaçao that were controlled by Lionel Hanst.  Then, at the instruction of AGUILAR, Hanst made payments from Lion Oil and Zanza Oil bank accounts in Curaçao to bank accounts in Mexico in the names of shell and front companies controlled by Intermediary #1, including Shell Company #1 and Shell Company #2.  Finally, Intermediary #1 made payments from shell and front companies Intermediary #1 controlled, including Shell Company #1, Shell Company #2, Shell Company #3 and others, to bank accounts in the United States and Mexico controlled by and for the benefit of Guzman and Espinosa.  Some of the payments were also delivered to Guzman in cash by Intermediary #1 in the United States and in Mexico.  Guzman also directed Intermediary #1 to make several payments to Guzman's relatives in Mexico in cash or to their bank accounts.

41.    To further promote the bribery scheme and conceal the proceeds derived from it, the defendant JAVIER AGUILAR and his co-conspirators utilized the Sham Vitol Agreements and Hanst Invoices to justify the corrupt transfers from Vitol S.A to Lion Oil and Zanza Oil, even though AGUILAR and others knew that Hanst did not perform any of the services described in the agreements and invoices.

42.     The defendant JAVIER AGUILAR and his co-conspirators also created, executed, and caused to be created and executed sham service agreements between entities controlled by Intermediary #1 and Lionel Hanst, including sham service agreements between Lion Oil and Shell Company #1, between Zanza Oil and Shell Company #1, between Lion Oil and Shell Company #2, and between Zanza Oil and Shell Company #2.  Intermediary #1 also caused sham service agreements to be created and executed between Shell Company #2 and Gonzalo Guzman Manzanilla, and between Shell Company #3 and Guzman.

43.     To further promote the bribery scheme and conceal the proceeds derived from it, Intermediary #1 and others caused sham invoices to be created from various companies, including Shell Company #1 and Shell Company #2, and issued to Lion Oil and Zanza Oil. Intermediary #1 caused the sham invoices to be sent to the defendant JAVIER AGUILAR who, via the Aguilar 007 Accounts, forwarded them to Lionel Hanst, and directed Hanst to make the payments into bank accounts controlled by Intermediary #1, including accounts in the names of Shell Company #1 and Shell Company #2.  At times, AGUILAR copied Co-Conspirator #1 who, like AGUILAR, used an alias and non-business email address.  Hanst then wired money pursuant to the sham invoices into bank accounts AGUILAR had provided to Hanst.

44.     After receiving the funds from Lionel Hanst, Intermediary #1 would typically alert Gonzalo Guzman Manzanilla that the money had arrived, referring to the bribes in Spanish as "shoes," "medicine," "invitations," "coffee" and other code words meant to obscure the nature of the illicit payments.  As agreed by Guzman, Carlos Espinosa Barba and Intermediary #1, Intermediary #1 typically retained a percentage of the money Intermediary #1 received from Lionel Hanst, and wired the rest of the money to bank accounts controlled by or for the benefit of Guzman and Espinosa, respectively, or delivered payments in cash.

45.      In or about and between October 2017 and January 2020, the defendant JAVIER AGUILAR, together with others, caused at least seven bribe payments totaling approximately $371,466 to be paid to or for the benefit of Gonzalo Guzman Manzanilla.

46.      In or about and between October 2017 and September 2019, the defendant JAVIER AGUILAR, together with others, caused at least eight bribe payments totaling approximately $255,895 to be paid to or for the benefit of Carlos Espinosa Barba.

<u>COUNT ONE</u>
(Conspiracy to Violate the FCPA – Ecuador Bribery Scheme)

47.      The allegations contained in paragraphs one through 46 are realleged and incorporated as if fully set forth in this paragraph.

48.      In or about and between March 2015 and July 10, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)      being a domestic concern and an employee of a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party;

(iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist AGUILAR, Vitol and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2; and

        (b)     while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Enrique Pere Ycaza and others in obtaining and retaining business for and with, and directing business to Vitol and others, contrary to Title 15, United States Code, Section 78dd-3.

49.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, committed and caused the commission of, among others, the following:

### OVERT ACTS

(a)     On or about April 15, 2015, at AGUILAR's direction, Lionel Hanst executed a sham brokerage agreement with a Vitol Group company on behalf of Zanza Oil.

(b)     On or about December 27, 2016, AGUILAR forwarded an email to Antonio Pere Ycaza that was originally sent by legal representatives working at the direction of Vitol in New York, New York, through the Eastern District of New York to executives at Vitol and others requesting that they notify AGUILAR that Petroecuador would contact him to confirm that Petroecuador would recognize Vitol as State-Owned Entity's agent for purposes of the Fuel Oil Contract.

(c)     On or about January 3, 2018, Enrique Pere Ycaza sent an email to Lionel Hanst attaching draft Sham Consulting Services Agreements between Lion Oil and OPV and between Zanza Oil and OPV and asking Hanst, in sum and substance, to sign and return the contracts as soon as possible so that he could send them to the bank and open an account.

(d)     On or about March 7, 2018, Enrique Pere Ycaza sent an email to Lionel Hanst attaching 39 Sham Consulting Services Invoices from OPV to Lion Oil.  The 39 invoices covered the period between approximately January 2017 and January 2018.

(e)     On or about March 7, 2018, Enrique Pere Ycaza sent an email to Lionel Hanst attaching 39 sham invoices from OPV to Zanza Oil.  The 39 invoices covered the period between approximately January 2017 and January 2018.

    (f)  On or about March 7, 2018, Lionel Hanst forwarded to AGUILAR at the First Aguilar 007 Account and to Co-Conspirator #1, via an alias and non-business email account, an email that Hanst received from Enrique Pere Ycaza, attaching 39 sham invoices from OPV to Zanza Oil.  The 39 invoices covered the period between approximately January 2017 and January 2018, and included 13 invoices with invoice numbers 10021-24, 10028-30, 10032, 10036-38 and 10043-44.  In the email, which was written in Spanish, Hanst told AGUILAR, in sum and substance, that he had received the attached invoices for purported consulting services from "los Equatorenos," a reference to Antonio Pere Ycaza and Enrique Pere Ycaza, and asked AGUILAR how he should proceed.

    (g)  On or about April 20, 2018, Vitol S.A. wired approximately $750,000 from a bank account located in the United Kingdom to a bank account located in Curaçao in the name of Zanza Oil.

    (h)  On or about May 18, 2018, Lionel Hanst sent an email (the "Hanst May 18 Email") to AGUILAR at the First Aguilar 007 Account attaching a spreadsheet and stating in Spanish, in part, "I received quite a few invoices from Ecuador, basically, the invoices up until October 2017.  The total is 1,434K, 510K was already paid, so it is still necessary to pay 924K . . . .  And give me the OK if everything is correct so I can start making the payments in batches."

    (i)  On or about May 18, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Lionel Hanst in response to the Hanst May 18 Email.  AGUILAR stated, in Spanish, and in part, "That's correct... move ahead[.] But make payments for no more than 150k .... and do them every 15 days..... they need to be patient...."

(j)     On or about and between May 28, 2018 and June 25, 2018, both dates being approximate and inclusive, Zanza Oil wired three payments totaling approximately €201,306 and one payment totaling approximately $19,283 to bank accounts for OPV located in the Cayman Islands and Curaçao.  OPV's bank statements showing these wires referenced the same 13 invoices, including invoices with number 10021-24, 10028-30, 10032, 10036-38 and 10043-44, as referenced in sub-paragraph (f) above.

(k)     On or about July 5, 2018, Antonio Pere Ycaza, who resided in the United States, and Enrique Pere Ycaza, while in the United States, sent instructions to a bank to wire approximately $225,000 from an account owned by Antonio Pere Ycaza and Enrique Pere Ycaza located in the Cayman Islands to an account located in Portugal for the benefit of Nilsen Arias Sandoval.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
(Conspiracy to Violate the FCPA – Mexico Bribery Scheme)

50.     The allegations contained in paragraphs one through 46 are realleged and incorporated as if fully set forth in this paragraph.

51.     In or about and between 2017 and July 10, 2020, both dates being approximate and inclusive, within the Southern District of Texas, the defendant JAVIER AGUILAR, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)     being a domestic concern and an employee of a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign

official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist AGUILAR, Vitol and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)     while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political

party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Intermediary #1 and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-3.

52.     In furtherance of the conspiracy and to effect its objects, within the Southern District of Texas, the defendant JAVIER AGUILAR, together with others, committed and caused the commission of, among others, the following:

OVERT ACTS

(a)     In or about August 2017, AGUILAR met with Gonzalo Guzman Manzanilla and Carlos Espinosa Barba in Houston, Texas.  At the meeting, AGUILAR agreed to pay bribes to Guzman and Espinosa for confidential, inside information that Guzman and Espinosa would provide to assist Vitol in winning business from PPI, including the Ethane Supply Contract.

(b)     On or about September 27, 2017, AGUILAR, via the First Aguilar 007 Account, sent an email to Lionel Hanst and to Co-Conspirator #1, via an alias and non-business email account, attaching a sham Shell Company #1 invoice, stating it was "for the equivalent of 75k."

(c)     On or about October 6, 2017, Lionel Hanst sent an email to AGUILAR at the First Aguilar 007 Account (the "Hanst Oct. 6 Email"), in Spanish, with the subject line, "[Shell Company #1] Contract" and writing, in part, "I need this signed contract back so that the bank will make the transaction.  It is requested by the correspondent bank."

(d)     On or about October 6, 2017, in response to the Hanst Oct. 6 Email, AGUILAR, via the First Aguilar 007 Account, sent an email to Lionel Hanst attaching an executed sham services agreement between Lion Oil and Shell Company #1.

(e)     On or about October 12, 2017, Intermediary #1 and others caused approximately $32,278 to be wired from a bank account in Mexico in the name of Shell Company #1 to a bank account controlled by Carlos Espinosa Barba in the United States.

(f)     On or about December 13, 2017, AGUILAR, via the First Aguilar 007 Account, forwarded an email to Lionel Hanst and Co-Conspirator #1, via an alias and non-business email account, attaching a sham invoice and writing, in Spanish and in part, "Can you process it, please?" The attached sham invoice was dated December 6, 2017, issued from Shell Company #1 to Lion Oil and requested approximately €43,977.27.

(g)     On or about February 23, 2018, Intermediary #1 sent a text message to AGUILAR, via the encrypted messaging platform WhatsApp, asking him, in Spanish, "Do you have the payment receipt to hand? They are requesting it from me." AGUILAR responded, "I'll send it next week."

(h)     On or about March 16, 2018, Intermediary #1 and others caused approximately $42,695 to be wired from a bank account in Mexico in the name of Shell Company #3 to a United States bank account controlled by and for the benefit of Gonzalo Guzman Manzanilla.

(i)     On or about May 11, 2018, AGUILAR communicated with Carlos Espinosa Barba, via WhatsApp, and asked Espinosa for confidential, inside information to assist Vitol in winning business with PPI. Specifically, in sum and substance and in part, AGUILAR

requested information concerning Vitol's competitors in connection with a bidding process for business with PPI.

(j)     On or about July 4, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Lionel Hanst and Co-Conspirator #1, via an alias and non-business email account, writing in Spanish, and in part, "We finally have the bbls of ETHANE..... for the long term.... We need to make a movement of 350 Kbls...... divided into 3....." Attached to the email was a spreadsheet containing bank account information and routing instructions for bank accounts in the names of three shell companies, including Shell Company #2.

(k)     On or about July 19, 2018, Intermediary #1 and others caused approximately $37,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account controlled by Carlos Espinosa Barba in the United States.

(l)     On or about August 6, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Lionel Hanst attaching various documents, including an executed, sham services agreement between Lion Oil and Shell Company #2.

(m)     On or about October 31, 2018, members of the conspiracy caused approximately $36,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by, and for the benefit of, Gonzalo Guzman Manzanilla.

(n)     On or about October 31, 2018, members of the conspiracy caused approximately $40,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by, and for the benefit of, Carlos Espinosa Barba.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNTS THREE AND FOUR
(Foreign Corrupt Practices Act)

53.     The allegations contained in paragraphs one through 46 are realleged and incorporated as if fully set forth in this paragraph.

54.     On or about the dates set forth below, within the Southern District of Texas, the defendant JAVIER AGUILAR, together with others, being a domestic concern and an employee of a domestic concern, did willfully make use of, and aid, abet and willfully cause others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist AGUILAR, Vitol and others in

obtaining and retaining business for and with, and directing business to, Vitol and others, as set forth below:

| Count | Approx. Date | Scheme | Description |
|-------|--------------|--------|-------------|
| THREE | May 18, 2018 | Ecuador | Email sent by AGUILAR, via the First Aguilar 007 Account, from within the Southern District of Texas, replying to an email sent by Lionel Hanst, writing to Hanst, in Spanish, "That's correct... move ahead[.] But make payments for no more than 150k .... and do them every 15 days..... they need to be patient...." |
| FOUR | August 6, 2018 | Mexico | Email sent by AGUILAR, via the First Aguilar 007 Account, from within the Southern District of Texas, to Lionel Hanst attaching various documents including a sham executed services agreement between Lion Oil and Shell Company #2 |

(Title 15, United States Code, Section 78dd-2; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FIVE
### (Conspiracy to Commit Money Laundering)

55.     The allegations contained in paragraphs one through 46 are realleged and incorporated as if fully set forth in this paragraph.

56.     On or about and between March 1, 2015 and July 10, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Section 1956, to wit:

(a)     to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more

places outside the United States, with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of the Ecuadorian Penal Code and the Mexican Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv) (collectively the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b)     to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, knowing that such monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmissions and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of one or more of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE THROUGH FOUR

57.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to

forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

58.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred or sold to, or deposited with a third party;

    (c)  has been placed beyond the jurisdiction of the court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

    (Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
<u>AS TO COUNT FIVE</u>

59.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

60.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the above-described forfeitable property.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))


                         A TRUE BILL

                         _____
                         FOREPERSON


_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISON, U.S. DEPT. OF JUSTICE

_____
BRENT WIBLE
ACTING CHIEF, MONEY LAUNDERING AND
  ASSET RECOVERY SECTION
CRIMINAL DIVISON, U.S. DEPT. OF JUSTICE

F.# 2019R01465

FORM DBD-34
JUN. 85

No. 20-CR-390 (S-1) (ENV)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

## JAVIER AGUILAR,

Defendant.

# SUPERSEDING INDICTMENT

(T. 15, U.S.C. § 78dd-2; T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____          _____
                                                                         *Clerk*

*Bail, $* _____

*Jonathan P. Lax and Nick M. Axelrod, Assistant U.S. Attorneys, (718) 254-6139/6883;*
*Derek J. Ettinger, Jonathan P. Robell, Adam Schwartz, Clayton P. Solomon and D. Hunter*
*Smith, Trial Attorneys, U.S. Dept. of Justice*