DCP:JPL/NMA
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                          Docket No. 20-CR-390 (ENV)

JAVIER AGUILAR,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
MOTION *IN LIMINE* TO ADMIT EVIDENCE OF OTHER ACTS

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Jonathan P. Lax
Nick M. Axelrod
Assistant United States Attorneys

Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs, Fraud Section
Clayton P. Solomon
Trial Attorney, Fraud Section
    (Of Counsel)

Adam Schwartz
Deputy Chief, Money Laundering and Asset Recovery Section
D. Hunter Smith
Trial Attorney, Money Laundering and Asset Recovery Section
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 1

I.  Background ........................................................................................................................ 1

    A.  The Ecuador Bribery Scheme ..................................................................................... 2

    B.  The Mexico Bribery Scheme ...................................................................................... 4

II. The Superseding Indictment .............................................................................................. 5

III. Aguilar's Personal Use of Illicit Proceeds ....................................................................... 5

ARGUMENT ................................................................................................................................ 7

I.  The Legal Standard ............................................................................................................ 7

II. Application ....................................................................................................................... 11

CONCLUSION ........................................................................................................................... 15

PRELIMINARY STATEMENT

The defendant Javier Aguilar is charged with multiple crimes for his participation in interrelated schemes to bribe Ecuadorian and Mexican officials in order to improperly obtain and retain business for his employer, Vitol, Inc. ("Vitol"), a Houston, Texas based energy trading company, with and related to Petroecuador, PEMEX and PPI.[1]  The government respectfully submits this memorandum in support of its motion in limine to admit at trial certain conduct as direct evidence of the charged crimes and/or pursuant to Rule 404(b) of the Federal Rules of Evidence.  As described in detail below, the government seeks to admit evidence of Aguilar's participation in a contemporaneous scheme to divert money for his own personal benefit from the same pool of funds used, and using the same methods and means employed by him, to further the charged bribery and money laundering schemes.

For the reasons set forth below, the government's motion in limine should be granted.[2]

STATEMENT OF FACTS

I.     BACKGROUND

The defendant Aguilar was an oil and commodities trader at Vitol since approximately 2012.  As a Vitol trader, Aguilar was paid an annual salary and received additional forms of compensation including annual bonuses and shares in company stock.  Vitol was

---

[1]  Empresa Pública de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned and controlled oil company of Ecuador.  Petróleos Mexicanos ("PEMEX") was the state-owned and controlled oil company of Mexico; and PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of PEMEX that handled the acquisition of goods and services on behalf of PEMEX.

[2]  The government respectfully reserves its right to supplement this motion and to file additional motions in limine in advance of trial.

beneficially owned by Vitol Holding BV, a company based in the Netherlands.  These companies, together with their affiliates, including Switzerland-based Vitol S.A. (collectively, the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

As alleged in the Superseding Indictment, from in or about and between 2015 and July 2020, Aguilar, together with others, engaged in international bribery and money laundering schemes in which he knowingly, willfully and corruptly offered, paid and agreed to offer and pay bribes to and for the benefit of Ecuadorian and Mexican officials in order to obtain and retain business for the Vitol Group with and related to Petroecuador, PEMEX and PPI.  See ECF Dkt. No. 120 ("Superseding Indictment") ¶ 22.  In furtherance of the schemes, Aguilar and his co-conspirators caused wire transfers of bribe and other corrupt payments to numerous domestic and offshore bank accounts through a complex network of shell companies and intermediaries.  Id. ¶ 23.  Aguilar and his co-conspirators took various steps to conceal and disguise the true nature of these transfers including by creating and causing the creation of sham consulting agreements and invoices, among other things.  Id. ¶ 24.

Aguilar and his co-conspirators also took steps to conceal their involvement in the schemes by, for example, creating and using pseudonymous email accounts.  See id.  Aguilar utilized two such email accounts, "perezmarcos007@gmail.com" (the "First Aguilar 007 Account") and "sixtotomas007@gmail.com" (the "Second Aguilar 007 Account," and together with the First Aguilar 007 Account, the "Aguilar 007 Accounts").  See id. ¶¶ 24, 35, 43.

A.  The Ecuador Bribery Scheme

The Ecuador Bribery Scheme, beginning in or around 2015, involved the payment of bribes to Ecuadorian officials, including Nilsen Arias Sandoval ("Arias") and "Ecuadorian Official #1," in exchange for, among other things, securing improper advantages for the Vitol Group in obtaining and retaining business in connection with a December 2016 contract (the "Fuel

Oil Contract") between Petroecuador and a state-owned entity in the Middle East (the "State-Owned Entity"). See id. ¶¶ 6, 25. Under the Fuel Oil Contract, Petroecuador agreed to supply the State-Owned Entity with fuel oil in exchange for an up-front payment. Vitol Group benefitted from the Fuel Oil Contract because it entered into a separate, but related, agreement with the State-Owned Entity to market, sell and transport the fuel oil delivered pursuant to the Fuel Oil Contract. Id. ¶¶ 26, 27.

Aguilar used a complex web of shell companies, intermediaries and bank transfers to funnel money originating from the Vitol Group to the Ecuadorian officials. First, Aguilar caused money to move from Vitol Group bank accounts in the United Kingdom to bank accounts in Curaçao held in the names of Lion Oil B.V. ("Lion Oil") and Zanza Oil B.V. ("Zanza Oil"), shell entities controlled by an intermediary in Curaçao named Lionel Hanst ("Hanst"). The money was transferred pursuant to a series of sham agreements and periodic invoices between Vitol S.A. and Lion Oil and Vitol S.A. and Zanza Oil (respectively, the "Sham Vitol Agreements" and "Hanst Invoices"), executed and issued by Hanst at the direction of Aguilar. Id. ¶¶ 29, 31-32.

Next, with Aguilar's authorization, Hanst transferred funds to bank accounts held in the name of additional shell companies controlled by two additional intermediaries named Antonio Pere Ycaza and Enrique Pere Ycaza (together, the "Peres"). Id. ¶¶ 29, 31. Like the transfers from the Vitol Group to Hanst, the transfers from Hanst to the Peres were similarly concealed and purportedly justified by sham consulting service agreements and invoices between the various shell entities. Id. ¶¶ 33-34.

Finally, the Peres, in turn, caused a portion of those payments to be wired to accounts controlled by or for the benefit of Arias and Ecuadorian Official #1. Id. ¶ 30. Aguilar

also authorized bribe payments to be sent by Hanst directly to Ecuadorian Official #1 (without passing through the Peres) in connection with the scheme. Id.

Aguilar also used the Aguilar 007 Accounts to further the scheme, including to discuss payment instructions, amounts and timing with Hanst. See id. ¶¶ 35, 49(h)-(i). On such communications, Hanst sometimes copied "Co-Conspirator #1," a Vitol S.A. employee, who, like Aguilar, used an alias and non-business email address. See, e.g., id. ¶¶ 3, 49(f).

Between approximately August 2015 and November 2018, Aguilar caused the payment of approximately at least $650,000 in bribes to Arias, and $270,000 in bribes to Ecuadorian Official #1. Id. ¶ 36.

B. The Mexico Bribery Scheme

The Mexico Bribery Scheme, beginning in or around 2017, involved the payment of bribes to Mexican officials, including Gonzalo Guzman Manzanilla ("Guzman") and Carlos Espinosa Barba ("Espinosa"), in exchange for, among other things, securing improper advantages for Vitol in obtaining business with PEMEX and PPI including a contract to supply ethane to PPI (the "Ethane Supply Contract"). Id. ¶¶ 37-38.

Aguilar used a complex web of shell companies, intermediaries and bank transfers to funnel money originating from the Vitol Group to the Mexican officials. The first step in the series of financial transactions for the Mexico Bribery Scheme was identical to that of the Ecuador Bribery Scheme – transfers from the same Vitol Group bank accounts in the United Kingdom to the same Lion Oil and Zanza Oil accounts in Curaçao, concealed by the same Sham Vitol Agreements and Hanst Invoices. See id. ¶¶ 40-41.

Next, at Aguilar's instruction, Hanst transferred funds to bank accounts held in the names of various shell companies controlled by "Intermediary #1." Id. ¶¶ 19-20, 40. The true

4

purpose of these transfers was also concealed and purportedly justified by sham service agreements and invoices between the various entities controlled by Hanst and Intermediary #1. Id. ¶¶ 42-43.

Intermediary #1, in turn, caused a portion of those payments to be wired to accounts controlled by or for the benefit of Guzman and Espinosa. Id. ¶ 40. Intermediary #1 also arranged for bribe payments to be paid to Guzman in cash. Id.

Aguilar also used the Aguilar 007 Accounts to further the scheme, including to discuss payment instructions, amounts and timing with Hanst and Co-Conspirator #1, and to send sham invoices between Hanst and Intermediary #1. See id. ¶¶ 43, 52(c)-(d).

Between approximately October 2017 and January 2020, Aguilar caused the payment of approximately at least $370,000 in bribes to Guzman, and $255,000 in bribes to Espinosa. Id. ¶¶ 45-46.

## II.     THE SUPERSEDING INDICTMENT

The Superseding Indictment charges Aguilar in Counts One and Three with conspiracy to violate and violating the Foreign Corrupt Practices Act ("FCPA") in relation to the Ecuador Bribery Scheme, in Counts Two and Four with conspiracy to violate and violating the FCPA in relation to the Mexico Bribery Scheme, and in Count Five with money laundering conspiracy in relation to the promotion of and concealment of the proceeds of both the Ecuador and Mexico Bribery Schemes.

## III.    AGUILAR'S PERSONAL USE OF ILLICIT PROCEEDS

As alleged in the Superseding Indictment and described above, throughout the relevant period, Aguilar, together with others, caused the Vitol Group to transfer funds to bank accounts held in the name of Lion Oil and Zanza Oil, which accounts where controlled by Hanst. Id. ¶¶ 29, 40. The transfers were concealed and purportedly justified by the Sham Vitol Agreements and Hanst Invoices, even though Aguilar and Hanst knew that Hanst would not

5

perform any of the services described in the agreements or invoices.  Id. ¶¶ 31-32.  The evidence will show that in this manner and during the relevant period, the Vitol Group wired approximately $21 million to Lion Oil and Zanza Oil.  Portions of these payments were ultimately used to pay bribes to Ecuadorian officials, primarily via the Peres, and to Mexican officials, primarily via Intermediary #1, as currently alleged.

The evidence will also show that portions of these payments received by Hanst were also paid to or for the benefit of Aguilar.  At Aguilar's direction, Hanst, from the same Curaçao-based Lion Oil and Zanza Oil bank accounts used to further the Ecuador and Mexico Bribery Schemes, which accounts were almost entirely funded by the Vitol Group, also transferred funds to bank accounts in Mexico in the names of numerous additional shell companies controlled by another intermediary (hereinafter, "Intermediary #2").

Intermediary #2 retained a portion of the money and caused the remainder of the corrupt funds to be transferred to other shell companies in Mexico, and then on to the personal bank accounts of Aguilar, one or more of Aguilar's family members, and others for Aguilar's benefit or otherwise at his direction.  Aguilar used the money for various purposes, including to purchase fine art, cover his own personal expenses, and repay personal loans including one or more such loans requested and obtained by Aguilar in or about 2019 in relation to his divorce.

To conceal and disguise the source and the proceeds of this scheme, Aguilar and his co-conspirators created, executed, and caused to be created and executed sham service agreements between Lion Oil, Zanza Oil and various Mexican shell companies controlled by co-conspirators, as well as sham invoices from those shell companies addressed to Lion Oil and Zanza Oil.  Aguilar's co-conspirators emailed some of the sham invoices to Aguilar at the Aguilar 007 Accounts.  In turn, using the Aguilar 007 Accounts, Aguilar forwarded the sham invoices to Hanst,

and directed Hanst to make the payments into bank accounts controlled or monitored by Intermediary #2. In some cases, Hanst provided the sham invoices to his bank in Curaçao in order to justify the transfers. Aguilar, Intermediary #2, and their co-conspirators also maintained a spreadsheet tracking the illicit payments paid and owed to Aguilar and others, and the amounts owed to or retained by Intermediary #2 and others associated with the Mexican shell companies. In total, Aguilar diverted at least approximately $1 million into his own bank accounts, the bank accounts of his family members, or to other third parties for Aguilar's benefit.

## ARGUMENT

### I. THE LEGAL STANDARD

Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of the crimes charged in the indictment. See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989). In Towne, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense:

> Evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'

Towne, 870 F.2d at 886 (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)); see also Carboni, 204 F.3d at 44; United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997); United States v. Khan, 591 F. Supp.2d 202, 205 (E.D.N.Y. 2008) (quoting Carboni).

The Second Circuit has stated that evidence is "not other-act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the defendant's]

7

propensity to commit a crime[.]" United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). Relevant evidence is "not confined to that which directly establishes an element of the crime," but "need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Gonzalez, 110 F.3d at 941; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Superseding Indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)). Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when it is offered for any purpose other than the defendant's criminal propensity. See United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b); see also Levy, 731 F.2d at 1002. Such evidence is also admissible

to corroborate the testimony of cooperating witnesses. See United States v. Everett, 825 F.2d 658, 660-61 (2d Cir. 1987).

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application. Levy, 731 F.2d at 1002 ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

Moreover, the Second Circuit has repeatedly permitted the admission of evidence under Rule 404(b) to provide background information to inform the jury of the complete story relating to the crimes charged, how the conspiracy was formed and how the relationship of trust between a defendant and his co-conspirators developed. See United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that evidence of co-conspirators' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two had developed"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed."). It does not matter whether the proffered acts occurred before or after the charged crime as long as relevancy is shown. United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed

prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."). Indeed, to the extent that evidence of uncharged crimes includes inculpatory admissions by cooperating witnesses who participated in the uncharged crimes jointly with the defendant, such evidence is also admissible to corroborate the witness's testimony. See Everett, 825 F.2d at 659-61; United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the Rule 404(b). First, the evidence must be offered for a purpose other than to prove the defendant's bad character or criminal propensity. See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (quoting United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)). Second, the evidence must be relevant under Rules 401 and 402 and more probative than prejudicial in accordance with Rule 403. See Mickens, 926 F.2d at 1328; Levy, 731 F.2d at 1002. Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction. See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.[3]

Evidence admissible pursuant to Rule 404(b) should not be excluded on the ground of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]". United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006). Thus, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally

---

[3]   In Huddleston v. United States, 485 U.S. 681 (1988), the Supreme Court enunciated a four-part test where balancing under Rule 403 was given its own prong. The Second Circuit subsequently collapsed those requirements into a three-part test. See Mickens, 926 F.2d at 1328-29.

10

admissible under the Rule 403 balancing test.  See, e.g., id.; United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).

## II. APPLICATION

Evidence of Aguilar's use of funds supplied by the Vitol Group to Lion Oil and Zanza Oil for his own personal benefit is admissible as direct evidence of Aguilar's control, through Hanst, over the Lion Oil and Zanza Oil bank accounts and the proceeds that followed through them.  Aguilar's effective control over how those accounts were used is a necessary, component part of the charged bribery and money laundering schemes and conspiracies.  Indeed, between 2015 and 2020, Aguilar and Hanst caused approximately $21 million to be wired from Vitol Group's bank accounts in the United Kingdom to Hanst's companies Lion Oil and Zanza Oil.  The Sham Vitol Agreements and Hanst Invoices that Hanst sent to the Vitol Group to obtain and purportedly justify the payments he received were prepared, executed and sent at Aguilar's direction.  None of the purported services Hanst claimed he provided for those funds were legitimate.  After receiving the money, also at Aguilar's direction and during the same time period, Hanst wired approximately $19.9 million to dozens of bank accounts in the United States, Mexico and elsewhere.  Using the secretive Aguilar 007 Accounts and other shared means and methods, the actions that Aguilar took to transfer funds out of Lion Oil's and Zanza Oil's accounts, through Intermediary #2, for Aguilar's own personal benefit, are direct evidence of the charged crimes in that they establish that Aguilar purposefully and knowingly dispersed funds from Lion Oil and Zanza Oil as he intended, and that he had the power to do so.

Moreover, the funds obtained from the Vitol Group for Aguilar's personal benefit are inextricably intertwined with evidence of the charged offenses.  See Carboni, 204 F.3d at 44.  In effect, Aguilar and his co-conspirators used Hanst, Lion Oil and Zanza Oil to create a slush fund that Aguilar was able to disperse for his own purposes.  One of those purposes was to send money

11

to the Peres so that they could bribe Ecuadorian officials in order to obtain advantages related to the Fuel Oil Contract.  Another purpose was to send money to Intermediary #1 so that he could bribe Guzman and Espinosa in order to obtain advantages related to the Ethane Supply Contract.  A third purpose was to send money to Intermediary #2 to be used to, among other things, pay Aguilar's personal expenses and debts.  It is impossible to pull these various schemes and payments apart and consider them in isolation because they all arise from the same source, namely, the approximately $21 million dollars sent from the Vitol Group to Lion Oil and Zanza Oil pursuant to the Sham Vitol Agreements and Hanst Invoices, and involve Aguilar and Hanst, as well as Co-Conspirator #1.

This evidence is also independently admissible under Rule 404(b) for many reasons.  This evidence should be admitted as proof of Aguilar's preparation, plan, motive and knowledge because it shows that the means and methods underlying the Ecuador Bribery Scheme and the Mexico Bribery Scheme were well-known to Aguilar – that he had a wide ranging understanding of the relevant money flows, and a deliberate plan to conceal his involvement, to falsely justify corrupt payments at nearly every stage of the transactions, and to move money through intermediaries and shell company accounts in order to conceal its origin and destination.  This evidence also shows that none of the charged conduct was the result of mistake or by accident.

This evidence should also be admitted under Rule 404(b) to explain the relationship of trust between Aguilar and his co-conspirators.  Here, Aguilar trusted that Hanst and all the other intermediaries with whom he conspired would redistribute, at Aguilar's direction, millions of dollars after being moved into shell companies that the intermediaries owned or controlled, whether the distributions were to Ecuadorian officials, to Mexican officials or to Aguilar himself.

12

See Pitre, 960 F.2d at 1119. This evidence is also admissible under Rule 404(b) to prove that Aguilar operated and controlled the Aguilar 007 Accounts.

Admitting additional evidence of Aguilar's control over the Lion Oil and Zanza Oil accounts through payments to himself is also critical to provide the full narrative of the scheme to the jury. Given the importance and direct involvement of these accounts in the charged schemes, the government will elicit information about them from witnesses, including cooperating witnesses, and the defendant will certainly seek to cross-examine those witnesses about their involvement in transferring or causing the transfer of funds to and through Lion Oil and Zanza Oil. Without eliciting evidence of Aguilar's involvement in directing the transfers of funds to himself, in addition to the direct evidence of how he created and submitted the Sham Vitol Agreements, Hanst Invoices, and other sham consulting agreements and invoices between Hanst's entities and the other conspiring intermediaries, the jury would be left with an incomplete picture of the relationship between Aguilar and the cooperating witnesses, and the false impression that the cooperating witnesses acted alone, rather than being directed to do so by Aguilar.

Finally, the probative value of this evidence is not substantially outweighed by any unfair prejudice. Here, the evidence pertaining to Aguilar's control of the relevant funding pool and that he diverted some of the funds to his own pockets is highly probative of whether he acted with the requisite knowledge and intent. By contrast, the prejudicial effect of these acts is minimal: the conduct involved in this scheme and in the charged offenses are largely similar in that they both involve the corrupt misuse of funds to achieve improper economic gain. See Pitre, 960 F.2d at 1120 (admitting evidence of prior narcotics transaction in narcotics case where other acts evidence was no more "sensational or disturbing" than the crimes charged) (citation omitted). In addition, this evidence is certainly not more "sensational" than the charged international bribery

13

and money laundering schemes. This evidence will come primarily from the testimony of one or more cooperating witnesses, bank records and other documentary evidence. Therefore, the quality of the evidence is no more prejudicial than that offered with regard to the charged crimes. Nor is there any likelihood the jury will convict Aguilar because they confuse his personal use of funds with those used to bribe foreign officials. See Paulino, 445 F.3d at 223 (explaining that "unfair prejudice" involves evidence that "lure[s] the factfinder into declaring guilt on a ground different from proof specific to the offense charged" (quoting Old Chief, 519 U.S. at 180)). Furthermore, any prejudicial effect could be further reduced with a limiting instruction. Huddleston, 485 U.S. at 691-92. Such an instruction would sufficiently mitigate the probability that the jury might draw improper inferences from this evidence.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the motion in limine should be granted.

Dated: Brooklyn, New York
March 3, 2023

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Jonathan P. Lax
Nick M. Axelrod
Assistant U.S. Attorneys

GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice

By: /s/
Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs, FCPA Unit
Clayton P. Solomon
Trial Attorney, FCPA Unit

BRENT WIBLE
Chief, Money Laundering & Asset Recovery Section
Criminal Division, U.S. Dept. of Justice

By: /s/
Adam Schwartz
Deputy Chief, International Unit
D. Hunter Smith
Trial Attorney, International Unit