UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
UNITED STATES OF AMERICA           :
                                   :
                                   :
                                   :   MEMORANDUM & ORDER
            -against-              :
                                   :   1:20-cr-390 (ENV)
                                   :
JAVIER AGUILAR,                    :
                                   :
                     Defendant.    :
--------------------------------------------------------------- x

VITALIANO, D.J.

Count Three of the Redacted Indictment charges defendant Javier Aguilar with conspiring to launder money "with the intent to promote the carrying on of," among other things, an "offense[] against a foreign nation involving bribery of a public official . . . in violation of the . . . Mexican Penal Code."[1] Redacted Indictment, Dkt. 244, at 23–24. The parties contest the appropriate interpretation of the relevant provisions of Mexico's criminal law relevant to this charge; more particularly, whether the individuals the government contends Aguilar bribed are covered by the anti-corruption net cast by the Mexican penal code. For the reasons discussed below, the Court concludes that those individuals, who are employees of PPI, a wholly-owned affiliate of PEMEX, the sovereign corporate entity created by the Republic of Mexico to own and control Mexico's oil industry, are not "public servants" for purposes of the relevant bribery provision set forth in

---

[1] Count Three charges additional other "specified unlawful activities," including felony violations of the Foreign Corrupt Practices Act ("FCPA") related to bribery of Ecuadorian and Mexican officials, as well as an offense "against a foreign nation involving bribery of a public official . . . in violation of the Ecuadorian Penal Code." *Id.* All agree that principles of Mexican law will be relevant to the jury's determination of whether the entities involved in the charged scheme— Petroecuador, Petróleos Mexicanos ("PEMEX"), and Pemex Procurement International, Inc. ("PPI")—constitute "instrumentalities" for purposes of the FCPA. *Compare* Gov't Foreign Law Exhibits Mot., Dkt. 246, at 2, *with* Def.'s Foreign Law Experts Letter, Dkt. 212, at 1; *see generally United States v. Esquenazi*, 752 F.3d 912, 925–27 (11th Cir. 2014).

1

Mexico's penal code.

## Legal Standard

"Issues of foreign law are questions of law" and therefore are within the court's, and not the jury's, province. Fed. R. Crim. P. 26.1; *United States v. Bankman-Fried*, No. 22-cr-0673 (LAK), 2023 WL 6162865, at *1 (S.D.N.Y. Sept. 21, 2023). A court deciding a foreign law question "may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." Fed. R. Crim. P. 26.1.

## Discussion

To determine whether the government has made out a *prima facie* case on this aspect of Count Three, and if so, to instruct the jury on that charge, the Court must necessarily determine the elements of the relevant applicable bribery offense under Mexico's penal code. The parties agree that the relevant bribery provision is set forth at Article 222(II) of the Mexican Federal Penal Code ("CPF"). *Compare* Gov't Foreign Law Letter, Dkt. 271, at 1, *with* Def.'s Foreign Law Mem., Dkt. 270-1, at 5.[2] That provision criminalizes paying bribes to "public servants." Gov't Foreign Law Letter at 2; Def.'s Foreign Law Mem. at 5. Article 212 of the same Title defines "public servant" to include, in relevant part, "any person who holds a job, position or commission of any nature in the centralized Federal Public Administration or that of the Federal District, decentralized agencies, majority state-owned companies, organizations and entities assimilated to them, [and] . . . state productive companies." DX 474-A-T (CPF, Art. 212), Dkt. 270-24; Gov't Foreign Law Letter at 2–3; Def.'s Foreign Law Mem. at 5.

The parties agree, as they must, that employees of PEMEX itself fall within the ambit of

---

[2] Page citations to the parties' filings are with reference to ECF pagination rather than internal pagination.

Article 212: PEMEX is classified as a "state productive company" included in the list of entities within Article 212's definition.  It is further undisputed that for employees of PPI to be "public servants," PPI must be either a "majority state-owned company" or an "organization or entity assimilated to" one.  Gov't Foreign Law Letter at 3–4; Def.'s Foreign Law Mem. at 4.  All are also in accord that the terms "majority state-owned company" and "organizations or entities assimilated to them" are undefined by the CPF.  Gov't Foreign Law Letter at 4; Def.'s Foreign Law Mem. at 5.  The interpretation of those terms is where the parties' positions diverge.

I. Statutory Interpretation

Right off the start, the government and defendant are at loggerheads over a fundamental issue: the handling of undefined terms in the relevant portions of Mexican statutes.  The government contends that the terms are not vague and thus should be left as they stand for the jury's deciphering.  *See* Gov't Foreign Law Letter at 4.  Should the Court conclude that the terms are vague, the government suggests the Court turn to definitions found in various Mexican dictionaries.  *See* Gov't Foreign Law Resp. Br., Dkt. 283, at 6.  Singing from a different hymnal, defendant proposes that the terms be given the meanings ascribed to them by other provisions of Mexican law, as a court in Mexico would.[3]  Def.'s Foreign Law Mem. at 5; Mureddu Decl., Dkt. 270-4, at ¶ 4.[4]

At any rate, though Mexican law is foreign, its construction for application in American

---

[3] While the government argues that Aguilar provides no case in which a court looked to other statutes to apply definitions to Article 212, *see* Gov't Foreign Law Resp. Br. at 5, it likewise provides no case in which a Mexican court looked to dictionary definitions to define the CPF.  In any event, the defense *did* provide such a case, albeit in a response brief filed contemporaneously with the government's own responsive submission.

[4] As further reason to define the undefined terms, Aguilar relies on a principle in Mexico called *taxatividad*, akin to the American law's void-for-vagueness doctrine, which requires that a court look elsewhere in the federal statutory regime to define vague terms so as to not render the criminal law unconstitutionally vague.  Def.'s Foreign Law Mem. at 5, 10-11; Mureddu Decl. ¶¶ 5–8.

3

courts and causes of action is not.  Indeed, the Second Circuit has provided express guidance on the interpretation of Mexican law in such circumstances, explaining that, "Mexican law is much different [than American law], and its sources do not lie in precedent cases.  As a civil law jurisdiction, Mexican courts consider the text of the constitution, civil code and statutory provisions as the primary source of law and given them preponderant consideration.  Likewise, Mexican courts give substantial weight to administrative regulations."  *Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998) (internal citations omitted).  That is because "[a] civil code is not a list of special rules for particular situations; it is rather a body of general principles carefully arranged and closely integrated."  *Id.* (citations omitted); *accord Delaune v. United States*, 143 F.3d 995, 1002 n.6 (5th Cir. 1998) (discussing civil code interpretation and noting that consideration is to be afforded to "[t]he logical interdependence of the various texts, ethical notions, systematic considerations, contextual influences, historical factors, consequential effects, and the like").  Thus, "[i]t is only when no evidence of foreign law has been presented that the courts will decide cases in accordance with New York law."  *Curley*, 153 F.3d at 14.  Putting its guidance on the proper construction of Mexican law into practical effect, the Second Circuit in *Curley* referenced numerous Mexican codes—both civil and criminal—in its analysis of the Mexican law issue before it.  *Id.* at 14–16.

With those principles in mind, the Court turns to other Mexican statutory provisions to determine the meaning of "majority state-owned companies" and "organizations and entities assimilated to them" as used in Article 212 of CPF.  The only statutory text that defines those terms is the Organic Law of the Federal Public Administration (*Ley Orgánica de la Administración Pública Federal* "LOAPF"), enacted by Mexico's Congress in 1976 "in response to a constitutional directive to define the various constituents of Mexico's" executive branch.  Def.'s

4

Foreign Law Resp., Dkt. 282, at 2; Mureddu Decl. ¶ 10 n.*.  Since LOAPF's enactment, the Mexican legislature has enacted numerous other statutes using the terms defined in LOAPF without then redefining those same terms in the new statutes.  Def.'s Foreign Law Resp. at 2.  More to the point, just six years after LOAPF's enactment, upon constitutional amendment directing the legislature to provide criminal penalties for acts of corruption by "public servants," Mexico's Congress enacted Article 212 of CPF (the definition of "public servant") and incorporated into that definition LOAPF's terms.  *Id.* at 2–3.

## II. Majority State-Owned Company

As teased above, one way that employees of PPI may be considered "public servants" under Article 212 is if they hold a job, position, or commission at a "majority state-owned company." As part of its argument that the Court need not look to Mexican law to determine the meaning of that term, the government urges that PEMEX—itself wholly owned by the Mexican government—wholly owns PPI; therefore, PEMEX's ownership of PPI indirectly renders PPI an entity wholly owned by the Mexican government.  *See* Gov't Foreign Law Exhibits Mot. at 8.  Put simply, according to the government, PPI is state-owned by virtue of its parent being wholly owned by the government of Mexico.[5]

Notwithstanding any precedential requirement to consider Mexican law, *see Curley*, 153 F.3d at 14, the government's theory comes with an already rejected tag.  In *Del Castillo v. PMI Holdings North America Inc.*, the Southern District of Texas analyzed whether another of

---

[5] The defense contends that such an argument flouts ordinary principles of corporate law that the holder of a corporation's shares does not also hold the corporation's assets.  As applied here, the Mexican government's ownership of PEMEX's shares does not make it the holder of PEMEX's assets, including PPI.  Def.'s Foreign Law Mem. at 14 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S. Ct. 1655, 1660, 155 L. Ed. 2d 643 (2003)).

PEMEX's subsidiaries, PMI Comercio,[6] was an "instrumentality of a foreign state" under the Foreign Sovereign Immunities Act by having the "majority of [its] shares . . . owned by a foreign state."  No. 4:14-cv-3435, 2016 WL 3745953, at *7, 10 (S.D. Tex. July 13, 2016).  After concluding that PEMEX itself was an instrumentality of a foreign state, the court rejected the argument that PMI Comercio could also be an instrumentality of a foreign state merely by virtue of being wholly owned by an instrumentality of a foreign state (PEMEX).  *Id.*

In any event, whether in harmony with *Curley* or by persuasion of *Del Castillo*, it is necessary here to turn substantively to the definition of "majority state-owned" under Mexican law.  As mentioned, LAOPF defines the terms used in Article 212's definition of "public servant." The definition of "majority state-owned" appears in Article 46 of LOAPF, which states that to be a majority state-owned company, the "Federal Government [of Mexico] or one or more parastatal entities" must "contribute or own more than 50% of the capital stock of the company."  DX 472-A-T (LOAPF, Art. 46), Dkt. 270-14.  Because PEMEX—not the Federal Government—owns PPI, *see Del Castillo*, 2016 WL 3745953, at *10, PPI arguably might fall within Article 46's definition of majority state-owned only if PEMEX is considered a "parastatal entity" under Mexican law, another question the parties vehemently contest.

A brief primer on the structure of Mexican government will, hopefully, prove beneficial. Like the United States government, the national government of Mexico has three branches, including an executive branch, known as the Federal Public Administration, which is spliced into a centralized sector consisting of the President and the cabinet departments, and a parastatal sector, akin to the United States's administrative state.  DX 472-C-T (LOAPF, Art. 1), Dkt. 270-16, at 1.

---

[6] PMI Comercio is classified by PEMEX as a "subsidiary company," also called an "affiliate"— a classification shared by PPI.  *See* PEMEX, Annual Report (Form 20-F), at F-34.  The significance of that classification is discussed further *infra*.

As part of the constitutional directive that Mexico's Congress define the executive branch constituents, *see* DX 473-A-T (CP, Art. 90), Dkt. 270-21, Articles 1 and 3 of LOAPF define the parastatal state and provide the types of entities that "make up the parastatal public administration," including "decentralized organizations, state participation companies," and others. LOAPF, Art. 1; DX 472-D-T (LOAPF, Art. 3), Dkt. 270-17. The Third Title of LOAPF then sets forth various definitions for the parastatal public administration. DX 472, Dkt. 270-13. Within the Third Title sits Article 46, the definition of "majority state-owned company."

Prior to a legislative overhaul of Mexico's domestic energy market that began in 2013, PEMEX was classified as a "decentralized organization," fitting comfortably in Article 3's definition of the parastatal public administration. LOAPF, Art. 3. However, pursuant to Mexico's transformation of its energy market, the legislature enacted a bundle of new laws "and amendments to existing laws," including the Organic Law of Petróleos Mexicanos ("PEMEX Law"). Def.'s Foreign Law Mem. at 8; *see also* PEMEX, 2016 Annual Report (Form 20-F), at 21. The PEMEX Law changed PEMEX's status from a "decentralized organization"—a classification included in Article 1 and 3 of LOAPF as a parastatal entity—to a "state productive company" (also called a "productive state company"). DX 471-A-T (PEMEX Law, Art. 2), Dkt. 270-8; DX 573-T (Decree, Official Gazette of the Federation, Dec. 20, 2013), Dkt. 270-30, at 3; PEMEX, Annual Report (Form 20-F), at 22; Lopez Decl., Dkt. 207-2, at ¶ 4.1.

This change, the defense argues, strips PEMEX of its status as part of the parastatal apparatus, particularly where the legislature did not subsequently amend Articles 1 and 3 of LOAPF to include "state productive company" within the definition of parastatal entities. Def.'s Foreign Law Mem. at 16; *see also* LOAPF, Art. 3. This non-amendment is especially salient in light of the changes the legislature *did* make. For example, the legislature amended other

7

provisions of LOAPF, including Article 17, by adding the following italicized language: "parastatal entities of the Federal Public Administration, *as well as the productive companies of the State*, will provide spaces and services" in certain facilities irrelevant here. DX 472-B-T (LOAPF, Art. 17(iv)), Dkt. 270-15; Def.'s Foreign Law Mem. at 17. Thus, the inclusion of "productive companies of the State" indicates a clear demarcation between state productive companies—which PEMEX now is—and the parastatal entities. If "parastatal entities" encompassed "productive state companies," the new inclusion of the latter would be surplusage.

Ultimately, however, whether PEMEX is a parastatal entity is not outcome-determinative to the Court's conclusion as to whether PPI is or is not a majority state-owned company for purposes of Article 212. Simply put, there appears to be a separate statutory carve-out for PPI notwithstanding PEMEX's classification. Among the changes effected by Mexico's mid-2010s energy reform was to classify PEMEX's subsidiaries as *either* "subsidiary productive companies" on one hand, *or* "affiliates" on the other. DX 471-M-T (PEMEX Law, Art. 59), Dkt. 270-12 ("[PEMEX] may have subsidiary productive companies and affiliate companies in terms of this Act."); *see also* PEMEX, Annual Report (Form 20-F), at 23; Lopez Decl. ¶ 5.2. Article 15 of the PEMEX Law establishes the "subsidiary productive companies," and states that those "majority state-owned companies" would "maintain their nature and operating regime."[7] DX 471-J-T (PEMEX Law, Art. 15), Dkt. 270-11; *accord* PEMEX, 2018 Annual Report (Form 20-F), at F-2. Article 15 explicitly lists four entities—PPI is not among them.

To the contrary, PPI is classified as an "affiliate" pursuant to Article 61 of the PEMEX

---

[7] Indeed, in *Del Castillo*, the court discussed those specific subsidiary entities (separately from its determination as to PMI Comercio mentioned *supra*) and deemed them "organs" of majority state-owned entities for purposes of the Foreign Sovereign Immunities Act. *Del Castillo*, 2016 WL 3745953, at *7–10.

Law (as is PMI Comercio, *see Del Castillo*, 2016 WL 374593, at *7–10).[8]  DX 471-D-T (PEMEX Law, Art. 61), Dkt. 270-9; *accord* PEMEX, 2018 Annual Report (Form 20-F) at F-35.  And this makes sense, since "affiliates" are entities that "have the legal nature and [are] organized in accordance with the private law of the place of their incorporation or creation."  PEMEX Law, Art. 61.  PPI is incorporated in Delaware and has its headquarters in Houston.  *See Public Procurement Review of Mexico's state-owned oil company PEMEX*, OECD Convention (Sept. 29, 2016) ("Incorporated in Delaware and authorized to carry out business in Texas, PPI is therefore out of the realm of Mexican law.").  Accordingly, it would be antithetical to read the delineation between PEMEX's subsidiary productive companies (definitionally majority state-owned companies) and affiliates (like PPI) to permit a conclusion that affiliates are also majority state-owned companies.  At bottom, the PEMEX Law permits two mutually exclusive subsidiary classifications: if PPI is one, it cannot be the other.

Furthermore, should there be any lingering doubt, Article 61 specifically *carves out* of the parastatal state "affiliates": "[they] shall not be parastatal entities."  PEMEX Law, Art. 61.  Majority state-owned companies, however, are parastatal.  *See* Mureddu Decl. ¶ 21.  To embrace the conclusion that PPI, an affiliate, is majority state-owned (and thus parastatal), would render yet another section of Mexican law meaningless.

Though under Mexico's rules of statutory construction it can play no role in the context of a subsequent case, the Court does observe that during its consideration of this issue, a Mexican judge in what is considered a non-precedential opinion dismissed a criminal case against employees of a company called CFE International LLC, an affiliate of Mexico's Federal Electricity

---

[8] In fact, and properly so, the government does not dispute that PPI is classified as an affiliate.  Gov't Foreign Law Exhibits Mot. at 10 n.13; Gov't Foreign Law Resp. at 7; Lopez Decl. ¶ 5.1.

Commission ("CFE"), on grounds that the employees were not public servants under Article 212 of the CPF. App'x A-T (decision of District Judge, *Centro de Justicia Penal Federal* (Federal Criminal Justice Center)), Dkt. 282-2, at 6. CFE, like PEMEX, is wholly owned by the government and classified as the only other productive state company alongside PEMEX. *See* Comision Federal de Electricidad (CFE), Notes Offering Memorandum (2017), at 1. In other words, CFE International is to CFE as PPI is to PEMEX—the two have the same legal status and relationship vis-á-vis the respective parent companies. *Id.* at 79 (listing CFE International as affiliate). And CFE International, like PPI, is incorporated in Delaware with headquarters in Houston. In the case, employees of CFE International were charged with violating Article 217(I)(d) of the CPF, which makes it a crime for a "public servant" as defined in Article 212 to grant illegal discounts, exemptions, or deductions on amounts due to the government. CPF, Art. 217. The judge dismissed the case on grounds that, *inter alia*, the employee defendants signed the alleged illegal contracts as employees of CFE International, "which is a private company for commercial purposes incorporated in the United States [], which is entirely separate and independent from CFE. Hence, it cannot be considered that those who signed the contracts did so as public servants." App'x A-T at 6.

      The similarities are striking. What's more, the CFE International employees were also CFE employees, *id.*, a role that would have qualified them as public servants under the CPF. But because they signed the contracts at issue on behalf of CFE International, the affiliate company, they were not acting as public servants in that capacity and could thus not be held criminally liable under Mexico's penal code. *Id.* Regardless that the decision is without precedential bearing in deciding the issue presented here, it is squarely on all fours with this Court's conclusion that PPI is not a majority state-owned company for purposes of Article 212.

III. "Assimilated to" a Majority State-Owned Entity

The government does not easily give up the ghosts. It grasps at the straw that, although PPI is not a majority state-owned company, its employees should be considered public servants because PPI is an "organization" or "entit[y]" "assimilated to" a majority state-owned company. CPF, Art. 212; *see* Gov't Foreign Law Exhibits Letter at 9; Gov't Foreign Law Resp. Br. at 14.

Without itself defining the term, the government contends that PPI is "assimilated to" a majority state-owned company because its parent company is PEMEX. Gov't Foreign Law Exhibits Letter at 9; Gov't Foreign Law Resp. at 16. Even were the Court to accept the parent-subsidiary relationship as sufficient to satisfy the definition of "assimilated to," PEMEX itself is a state productive company, *see* Art. 2, PEMEX Law, which is distinct from majority state-owned companies. Indeed, prior to PEMEX's reclassification as a state productive company, the list of entities in Article 212's definition of "public servant" included "majority state-owned companies." When PEMEX became a "state productive company," the legislature amended Article 212 and added "state productive company" to the list of entities, while maintaining "majority state-owned companies" in the same list. If PEMEX was a majority state-owned entity, the addition would be without meaning or effect.

In any event, the same provision of LOAPF that defines "majority state-owned company," Article 46, also defines "those assimilated to majority state-owned companies" as "civil partnerships and associations in which the majority of the partners are agencies or entities of the Federal Public Administration." *See also* Mureddu Decl. ¶¶ 34, 36. According to Aguilar's expert, Dr. Mureddu, who, the Court finds, is credible and her opinions persuasive, legal entities in Mexico may be either civil or commercial, but not both. *Id.* at ¶ 38. PPI, a commercial entity, cannot likewise be civil, and therefore does not fall within Article 46's definition of "those assimilated

11

to" majority state-owned companies. *Id.* at ¶ 39–41. Additionally, PPI is not a partnership, nor is it a "civil association" whose primary purpose is non-economic. DX 637-B-T (Federal Civil Code, Art. 2688 ("civil partnerships")), Dkt. 270-33; DX 637-A-T (Federal Civil Code, Art. 2670 ("civil association")), Dkt. 270-32. Accordingly, PPI is not "assimilated to" a majority state-owned entity and that language does not provide an alternate basis to find that employees of PPI are "public servants" under Article 212 of CPF.

## Conclusion

In line with the foregoing analyses, the Court concludes that, because PPI is neither itself a majority state-owned entity nor assimilated to one, its employees are not "public servants" under Article 212 of CPF, as required for Article 222(II), Mexico's criminal bribery provision.

So Ordered.

Dated: Brooklyn, New York
      February 16, 2024

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge