24

```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - -    X
3
    UNITED STATES OF AMERICA,    :    20-CR-390(ENV)
4
5        -against-               :    United States Courthouse
                                      Brooklyn, New York
6
    JAVIER AGUILAR,              :
7                                     January 5, 2024
             Defendant.         :    10:00 o'clock a.m.
8
    - - - - - - - - - - - -    X
9
                        TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE ERIC N. VITALIANO
            UNITED STATES DISTRICT JUDGE, and a jury.
11
    APPEARANCES:
12
    For the Government:          BREON PEACE
13                               United States Attorney
                                 BY: JONATHAN LAX
14                                   MATTHEW GALEOTTI
                                 Assistant United States Attorneys
15                               271 Cadman Plaza East
                                 Brooklyn, New York
16
                                 DEPARTMENT OF JUSTICE
17                               1400 New York Avenue
                                 Washington, D.C. 20001
18                               BY:  DEREK ETTINGER
                                     CLAYTON P. SOLOMON
19                                   D. HUNTER SMITH
20
    For the Defendant:          QUINN EMANUEL URQUHART & SULLIVAN
21                               51 Madison Avenue - 22nd Floor
                                 New York, New York  10010
22
                                 BY:  DANIEL KOFFMANN, ESQ.
23                                   MICHAEL PACKARD, ESQ.
                                     WILLIAM PRICE, ESQ.
24                                   WILLIAM WEINREB, ESQ.
                                     NEIL PHILLIPS, ESQ.
25                                   ABRAHAM MOUSSAKO, ESQ.
```

Proceedings                                    25

1    APPEARANCES:   (Continued)

2

     Court Reporter:              Charleane M. Heading
3                                 225 Cadman Plaza East
                                  Brooklyn, New York
4                                 (718) 613-2643

5

     Proceedings recorded by mechanical stenography, transcript
6    produced by computer-aided transcription.

7

8                       *      *      *      *      *

9

10            (In open court; outside the presence of the jury.)

11            THE CLERK:  The case on the calendar is USA versus

12   Javier Aguilar.  Case number 20 CR 390, on for a jury trial.

13            Will the attorneys please note their appearance,

14   beginning with government counsel.

15            MR. LAX:  Good morning, Your Honor.  Jonathan Lax,

16   Clayton Solomon, Matthew Galeotti, Derek Ettinger, Hunter

17   Smith, and Laura Arif, on behalf of the United States.

18            THE COURT:  Good morning, Mr. Lax, and your entire

19   table.

20            MR. KOFFMANN:  Good morning, Your Honor.  Daniel

21   Koffmann, Michael Packard, William Price, William Weinreb,

22   Abraham Moussako, Gabriella Trevino, and Raymond McLeod here,

23   on behalf of Mr. Javier Aguilar.

24            THE COURT:  And good morning, to you, Mr. Koffmann,

25   and your entire table, and Mr. Aguilar.

Proceedings                                          26

1        THE CLERK:  We also have a stand-by in-house Spanish

2   interpreter.  Please note your appearance for the record.

3        THE INTERPRETER:  Good morning, Your Honor.  Sean

4   McCarthy, S-E-A-N, staff Spanish interpreter, previously

5   sworn.

6        THE COURT:  Good morning to you.

7        THE CLERK:  All counsel are present, including the

8   defendant.

9        THE COURT:  Everyone may be seated.

10        We can start with some housekeeping.  Hopefully we

11   seem to be off to a better start already.  The deputy clerk

12   has advised me that the juror who had the medical appointment

13   for next Monday has taken, been able to reschedule that

14   appointment.  So we will have a full day on Monday, beginning

15   at the regular time.

16        That doesn't cause any confusion or trouble to, I

17   assume, the government's table?

18        MR. LAX:  No, Your Honor.

19        THE COURT:  That's the extent of my housekeeping.

20        Does either side have anything that we need to

21   address before we bring the jury in?

22        MR. LAX:  Nothing from the government, Your Honor.

23        MR. KOFFMANN:  Nor the defense.

24        THE COURT:  All right.  So I understand it,

25   Mr. Solomon is handling the opening for the government?

Proceedings                                      27

1          MR. LAX:  That's correct, Your Honor.

2          THE COURT:  And, Mr. Koffmann, is the defense going

3    to open and, if so, who?

4          MR. KOFFMANN:  We anticipate we will, and it will be

5    Mr. Price.

6          THE COURT:  Okay.  And, again, given my vision

7    limitations, when there's a handoff please let me know who you

8    are because I will not be able to recognize you otherwise.

9          All right.  With that, then we will bring in the

10   jury, swear the jury, and have our opening instructions.

11         (Jury enters.)

12         THE COURT:  Be seated, please.

13         Good morning.  Counsel will stipulate that the jury

14   you all selected is present and properly seated?

15         MR. LAX:  Yes, Your Honor.

16         MR. KOFFMANN:  Yes, Your Honor.

17         THE COURT:  Thank you very much.  That being the

18   case, we will have the deputy clerk swear the jury.

19         THE CLERK:  Please raise your right hand.

20         (Jury sworn by the clerk of the court.)

21         THE CLERK:  Thank you.

22         THE COURT:  Thank you, Mr. Villanueva.  The jury is

23   sworn.

24         Ladies and gentlemen of the jury, welcome to our

25   formal start of the trial, the production of evidence during

Proceedings                                                    28

1    the course of this trial.  I am privileged to preside over the

2    trial.  I am Judge Eric Vitaliano.  I'm happy to welcome you

3    to the Eastern District of New York and to the friendly

4    confines of the Brooklyn Federal Courthouse.

5             We will be giving you instructions throughout the

6    trial, and many times there will be reminders of those

7    instructions.  By the end of the trial, you probably can give

8    them back to me, but we want to underscore the fact that we

9    make so many reminders about how you, as jurors, are to

10   conduct yourself, that we do so because it's extremely

11   important to ensure the fairness of the trial and that we have

12   a trial according to the laws of the United States.

13            I cannot impress upon you how important your

14   services and your functions and duties are.  There are many,

15   many nations around the globe whom, I think, everyone in this

16   room would consider to be free and democratic societies, but

17   most of them do not provide justice, not only criminal

18   justice, as the case here, but also even civil justice relying

19   on the services of jurors; and jurors under our system are

20   average, everyday people.  We bring in average, everyday

21   people to make some of the toughest decisions that a justice

22   system is ever asked to make, but we rely on the common sense,

23   the intelligence, the honesty, the commitment of the jurors

24   that we select to provide that service.

25            I tell jurors this because I firmly believe it, and

Proceedings                                              29

1   that is other than putting on a uniform and depending your

2   country in a time of war, there is no greater service or

3   demand of citizenship than to serve on a jury.  It is an

4   essential function.

5        We hear the expression "the rule of law" time and

6   time again.  We extol it as a virtue of our democracy, but we

7   don't have it without you.  Hundreds of thousands of men and

8   women have shed their blood around the globe to protect the

9   rule of law, and the torch that they brought home is now

10  passed to you.  You decide whether the torch stays lit or

11  whether it's blown out.

12       Each of you now have taken on, by oath, a duty to

13  provide that service, to be faithful to your oath, and to be

14  faithful to each other.  This is a combined effort.

15       I often will say that a jury is like an army.  It

16  can only move as fast as its slowest unit.  So that we need

17  everybody here at the same time.  There are no days off.

18  Everybody comes at the same time and leaves at the same time.

19       And we work as a unit to achieve what?  We achieve

20  justice.  That's the assignment that all of us have.  We owe

21  it to the parties, not only to the defense but also to the

22  government, and we owe it to, overall, to our system of

23  justice.

24       We understand that it is an imposition on your time.

25  We understand that, and we are asking you to put aside other

Proceedings                                              30

1    things that are extremely important to you personally.  That's

2    why I say it is like defending your country in a time of war.

3    You have to put the other stuff aside to get the job done.

4    That's what we ask, that's what we expect; and there have been

5    hundreds of thousands good American citizens who have sat in

6    chairs like yours, the ones you're sitting in now, who have

7    been able to provide that service and keep the torch of

8    justice lit and burning brightly.

9            So with that, I'm going to ask now my deputy clerk

10   of court and law clerk, Catherine Cazes, to read to you the

11   instructions I have prepared that will give you a preview of

12   what we're doing and also to give you the first set of

13   instructions of how you conduct yourself, not only while

14   you're here in the courthouse, but even outside the

15   courthouse.

16           Ms. Cazes?

17           THE LAW CLERK:  Members of the jury, we are about to

18   start the trial of this case, about which you have heard some

19   detail during jury selection.  Before the trial begins,

20   however, there are certain instructions you should have in

21   order to understand what you will hear and see and how you

22   should conduct yourself during the trial.

23           To begin with, you are here to administer justice in

24   this case according to the law and the evidence with complete

25   fairness and impartiality, and without bias, prejudice, or

Proceedings                                    31

1   sympathy for or against the government or the defendant.

2           This is important to the defendant, who is charged

3   with a crime and has the constitutional right to receive a

4   fair trial.  The case is also important to the government,

5   since the enforcement of the criminal laws is important.

6           There are three basic rules about a criminal case

7   that you must keep in mind.

8           First, the defendant is presumed innocent unless and

9   until proven guilty at the conclusion of the case.  The

10  indictment against the defendant brought by the government is

11  only an accusation, nothing more.  It is not proof of guilt or

12  anything else.  The defendant therefore starts out with a

13  clean slate.

14          Second, the burden of proof is on the government

15  throughout the case.  The defendant has no burden to prove his

16  innocence, or to present any evidence, or to testify.  Since

17  the defendant has the right to remain silent, the law

18  prohibits you from arriving at your verdict by considering

19  that the defendant may not have testified.

20          Third, the government must prove the defendant's

21  guilt beyond a reasonable doubt.  I will give you further

22  instructions on this point later, but bear in mind that in

23  this respect, a criminal case is different from a civil case.

24          The case is based on an indictment.  I will not read

25  the full indictment to you, but, as Magistrate Judge Marutollo

Proceedings                                          32

1    did during jury selection, I will summarize it for you now.

2            Keep in mind, however, that an indictment is the

3    document by which a criminal action is commenced and is merely

4    an accusation, a charge.  It is not evidence of a defendant's

5    guilt.

6            The indictment contains three counts.

7            Count One charges that:

8            In or about and between March 2015 and July 2020,

9    both dates being approximate and inclusive, within the Eastern

10   District of New York and elsewhere, the Defendant Javier

11   Aguilar, together with others, did knowingly and willfully

12   conspire to commit one or more offenses against the United

13   States, to wit:

14           A, being a domestic concern and employee of a

15   domestic concern, to make use of the mails and means and

16   instrumentalities of interstate commerce corruptly and in

17   furtherance of an offer, payment, promise to pay and

18   authorization of the payment of any money, offer, gift,

19   promise to give and authorization of the payment of any money

20   to a foreign official, to a foreign political party and

21   official thereof, and to a person while knowing that all or a

22   portion of such money and thing of value would be and had been

23   offered, given, and promised to a foreign official and to a

24   foreign political party and official thereof, for purposes of,

25   one, influencing acts and decisions of such foreign official,

Proceedings                                                    33

1    foreign political party and official thereof, in his, her, or

2    its official capacity; two, inducing such foreign official,

3    foreign political party and official thereof to do and omit to

4    do such acts in violation of the lawful duty of such official

5    and party; three, securing any improper advantage; and, four,

6    inducing such foreign official, foreign political party and

7    official thereof to use his, her or its influence with a

8    foreign government and agencies and instrumentalities thereof

9    to affect and influence acts and decisions of such government

10   and agencies and instrumentalities, in order to assist

11   Aguilar, Vitol, and others in obtaining and retaining business

12   for and with, and directing business to Vitol and others,

13   contrary to Title 15, United States Code, Section 78dd-2.

14           And, B, while in the territory of the United States,

15   corruptly to make use of the mails and means and

16   instrumentalities of interstate commerce and to do any act in

17   furtherance of an offer, payment, promise to pay and

18   authorization of the payment of any money, offer, gift,

19   promise to give and authorization of the giving of anything of

20   value to a foreign official, to a foreign political party and

21   official thereof, and to a person while knowing that all or a

22   portion of such money and thing of value would be and had been

23   offered, given and promised to a foreign official and to a

24   foreign political party and official thereof, for purposes of,

25   one, influencing acts and decisions of such foreign official,

Proceedings                                    34

1   foreign political party and official thereof, in his, her or

2   its official capacity; two, inducing such foreign official,

3   foreign political party, and official thereof to do and omit

4   to do acts in violation of the lawful duty of such official

5   and party; three, securing any improper advantage; and, four,

6   inducing such foreign official, foreign political party and

7   official thereof to use his, her or its influence with a

8   foreign government and agencies and instrumentalities thereof

9   to effect and influence acts and decisions of such government

10  and agencies and instrumentalities, in order to assist Enrique

11  Pere Ycaza and others in obtaining and retaining business for

12  and with, and directing business to Vitol and others, contrary

13  to Title 15, United States Code, Section 78dd-3.

14          Count Two charges that:

15          On or about May 18, 2018, within the Southern

16  District of Texas, the Defendant Javier Aguilar, together with

17  others, being a domestic concern and an employee of a domestic

18  concern, did willfully make use of, and aid, abet and

19  willfully cause others to make use of, the mails and means and

20  instrumentalities of interstate commerce corruptly in

21  furtherance of an offer, payment, promise to pay and

22  authorization of the payment of any money, offer, gift,

23  promise to give and authorization of the giving of anything of

24  value to a foreign official, to a foreign political party and

25  official thereof, and to a person while knowing that all or a

Proceedings                                                    35

1    portion of such money and thing of value would be and had been

2    offered, given and promised to a foreign official and to a

3    foreign political party and official thereof, for purposes of:

4    One, influencing acts and decisions of such foreign official,

5    foreign political party and official thereof in his, her or

6    its official capacity; two, inducing such foreign official,

7    foreign political party and official thereof to do and omit to

8    do acts in violation of the lawful duty of such official and

9    party; three, securing any improper advantage; and, four,

10   inducing such foreign official, foreign political party and

11   official thereof to use his, her or its influence with a

12   foreign government and agencies and instrumentalities thereof

13   to affect and influence acts and decisions of such government

14   and agencies and instrumentalities, in order to assist

15   Aguilar, Vitol and others in obtaining and retaining business

16   for and with, and directing business to, Vitol and others.

17              Count Three charges that:

18              On or about and between March 1, 2015, and July 10,

19   2020, both dates being approximate and inclusive, within the

20   Eastern District of New York and elsewhere, the Defendant

21   Javier Aguilar, together with others, did knowingly and

22   intentionally conspire to commit offenses under Title 18,

23   United States Code, section 1956, to wit:

24              A, to transport, transmit and transfer monetary

25   instruments and funds from one or more places in the United

Proceedings                                                36

1   States to and through one or more places outside the United

2   States, and to one or more places in the United States from

3   and through one or more places outside the United States, with

4   the intent to promote the carrying on of one or more specified

5   unlawful activities, to wit:  One, felony violations of the

6   FCPA, in violation of Title 15, United States Code, Sections

7   78dd-2 and 78dd-3; and, two, one or more offenses against a

8   foreign nation involving bribery of a public official, and the

9   misappropriation, theft and embezzlement of public funds by

10  and for the benefit of a public official, in violation of the

11  Ecuadorian Penal Code and the Mexican Penal Code, as defined

12  in Title 18, United States Code, Section 1956(c)(7)(B)(iv),

13  collectively the specified unlawful activities, contrary to

14  Title 18, United States Code, Section 1956(a)(2)(A); and

15           B, to transport, transmit and transfer monetary

16  instruments and funds from one or more places in the United

17  States to and through one or more places outside the United

18  States, and to one or more places in the United States from

19  and through one or more places outside the United States,

20  knowing that such monetary instruments and funds involved in

21  the transportation, transmissions and transfers represented

22  the proceeds of some form of unlawful activity, and knowing

23  that such transportation, transmissions and transfers were

24  designed in whole and in part to conceal and disguise the

25  nature, the location, the source, the ownership and the

1    control of the proceeds of one or more of the specified

2    unlawful activities, contrary to Title 18, United States Code,

3    Section 1956(a)(2)(B)(i).

4            Since the defendant has pleaded not guilty, the

5    government has the burden of proving each of the essential

6    elements of each charge of the indictment beyond a reasonable

7    doubt.  The purpose of the trial is to determine whether the

8    government meets this burden.

9            I will repeat:  The defendant does not have to prove

10   his innocence.  On the contrary, the defendant is presumed to

11   be innocent of the accusations against him contained in the

12   indictment.

13           The trial will proceed in the following order.

14           First, the parties have the opportunity to make

15   opening statements.  The government will make such a

16   statement.  Then the defendant, though he is not obliged to do

17   so, may make an opening statement, or may defer it until the

18   end of the government's case.  What is said in these

19   statements is not evidence, but simply an introduction to the

20   evidence that the parties intend to produce.

21           Next, the government will introduce evidence in

22   support of the charges.

23           Then the defendant may present evidence, but he is

24   not required to do so.  The burden is always on the government

25   to prove every element of each offense charged beyond a

Proceedings                                      38

1   reasonable doubt.  The law never imposes on the defendant in a

2   criminal case the burden of calling any witnesses or

3   introducing any evidence.

4          After all of the evidence has been presented, each

5   party has the opportunity to present an argument in support of

6   their case.  What is said in these arguments is not evidence.

7   They simply present to you the contentions of the parties as

8   to what the evidence has shown and what inferences may be

9   drawn from the evidence.  The government has the right to open

10  and close the argument.

11         Lastly, The Court will instruct you on the

12  applicable law, and you will then retire to consider your

13  verdict.  Your verdict must be unanimous.

14         You have a tremendously important task as jurors.

15  It is to determine the facts.  Our constitution gives the

16  defendant a right to have you, who are members of the

17  community, find those facts.  You, and not The Court, are the

18  sole and exclusive judges of the facts, and nothing I say or

19  do should be taken by you as any indication of my opinion as

20  to the facts.

21         As to the facts, neither I nor anyone else may

22  invade your area of responsibility.  I will preside

23  impartially and will not express any opinion concerning the

24  facts.  Any opinions of mine on the facts would, in any event,

25  be entirely irrelevant because the facts are for you to

Proceedings                                          39

1   decide.

2            On the other hand, and with equal emphasis, I

3   instruct you that, in accordance with the oath you took as

4   jurors, you are required to accept the rules of law that I

5   give you, whether you agree with them or not.  You are not to

6   ask anyone else about the law.  You should not consider or

7   accept any advice about the law from anyone else but me.

8            The evidence from which you will find the facts will

9   consist of the testimony of witnesses, as well as documents or

10  other things received on the record as exhibits in evidence.

11  Evidence also includes any facts that the lawyers agree to or

12  stipulate to or that The Court may instruct you to find.

13           There are two kinds of evidence:  Direct and

14  circumstantial.  Direct evidence is a direct proof of a fact,

15  such as testimony of an eye witness.

16           Circumstantial evidence is proof of facts from which

17  you may infer or conclude that other facts exist.  I will give

18  you further instructions on these as well as other matters at

19  the end of the case, but keep in mind that you may consider

20  both kinds of evidence.

21           Ultimately, when it comes to the testimony of

22  witnesses, it will be up to you to decide which witnesses to

23  believe, which witnesses not to believe, and how much of any

24  witness's testimony to accept or reject.  I will give you some

25  guidelines for determining the credibility of witnesses at the

Proceedings                                                          40

1   end of the case.

2          Certain things you may hear or see are not evidence

3   and must not be considered by you.  I will list them for you

4   now.

5          One:  Statements, arguments and questions by lawyers

6   are not evidence.

7          Two:  Objections to questions are not evidence.

8   Lawyers have an obligation to their clients to make objections

9   when they believe evidence being offered is improper under the

10  rules of evidence.  You should not be influenced by the

11  objections or by The Court's rulings on them.  These rulings

12  deal with questions of law and not fact.

13         Objections and rulings have nothing do with your

14  role as jurors.  They are for The Court to decide.

15         If the objection is sustained, ignore the question.

16  If it is overruled, treat the answer like any other.  If you

17  are instructed that some item of evidence is received for a

18  limited purpose only, you must follow that instruction.

19         Testimony, three:  Testimony that The Court has

20  excluded or told you to disregard is not evidence and must not

21  be considered.

22         Four:  Anything you may have seen or heard outside

23  the courtroom is not evidence and must be disregarded.  You

24  are to decide the case solely on the evidence presented here

25  in the courtroom.

Proceedings                                                    41

1        There are several rules that should govern your

2    conduct during any recess, that is, when you are not in the

3    courtroom.  You will not be required to remain together while

4    court is in recess, but you are required to follow these

5    instructions about recesses.

6        Do not discuss the case among yourselves or with

7    anyone else.  This includes discussing the case in person, in

8    writing, by phone, or electronic means, via text messaging,

9    e-mail, Facebook, X, formerly known as Twitter, Instagram,

10   Snapchat, TikTok, blogging, or any internet chat room,

11   website, or other feature.

12       You should keep an open mind, reaching your

13   conclusion only during your final deliberations after all the

14   evidence is in and you have heard the attorneys' summations

15   and The Court's instructions on the law, and then only after

16   an exchange of views with the other members of the jury.

17       Do not try to do any research or make any

18   investigation on your own about the case or any individuals or

19   entities involved in the case.  Do not read, listen to, or

20   watch any accounts of this case should it be covered by any

21   media.  The case is to be decided only by the evidence you see

22   and hear in the courtroom during trial.

23       Do not permit any other person to discuss the case

24   in your presence, and if anyone does so, even though you tell

25   him or her not to, report that fact to me.  You should not,

Proceedings                                                    42

1    however, discuss with your fellow jurors either that fact or

2    any other fact that you feel necessary to bring to my

3    attention.

4           Though it is a normal human reaction to talk with

5    people with whom one is thrown together in contact, please do

6    not talk with any of the parties or their attorneys or any

7    witness, whether in the courtroom, in the hallways, in the

8    elevator, outside, or anywhere else.  By this I mean do not

9    only do not talk about the case, but do not talk at all, even

10   to pass the time of the day.

11          Under the law, only twelve jurors will deliberate on

12   this case when it is submitted for consideration.

13          We have selected additional jurors, called

14   alternates.  Alternate jurors are selected to serve because a

15   regular juror may be prevented from continuing to serve by

16   some emergency, such as a serious illness or death.  Although

17   this seldom happens during a trial, there are cases where we

18   do call on the services of alternates.  Alternates are

19   required to pay the same careful attention to the trial as the

20   regular jurors, so that if needed they will be fully familiar

21   with the case.

22          The fact that there are alternate jurors does not

23   mean that any regular jury is free to excuse himself or

24   herself from the case.  As a duly chosen juror, it is your

25   obligation to be available throughout the trial.

1        The description of trial procedure, the rules
2   governing your conduct, and the legal principles governing a
3   criminal case I have just discussed with you, will, I believe,
4   make it easier for you to understand the trial as it goes on
5   and to reach a proper and just result at its conclusion.
6            Now, ladies and gentlemen, we are ready to proceed
7   with the next phase of the trial.
8            THE COURT:  Thank you Ms. Cazes.
9            Ladies and gentlemen, I refer to these generally as
10  the building blocks of a trial, and, as outlined in the
11  instructions that Catherine just read to you, that next to
12  those building blocks are opening statements.
13           The government will make an opening statement, and I
14  call on Mr. Clayton Solomon to make those remarks on behalf of
15  the government.
16           MR. SOLOMON:  Thank you, Your Honor.
17           THE COURT:  Mr. Solomon.
18           MR. SOLOMON:  Thank you.
19           Nearly a million dollars in bribes.  That's how much
20  money the Defendant Javier Aguilar paid to foreign officials
21  as part of a sprawling international scheme to win lucrative
22  oil and gas contracts from the governments of Ecuador and
23  Mexico.
24           The defendant bribed officials who held positions of
25  influence, in public trust.  They were responsible for

1  managing their country's most valuable natural resources and

2  for buying the oil and gas products that the people of Ecuador

3  and Mexico relied upon every day in their lives, in their

4  businesses and in their homes.

5          The evidence in this case will show that in exchange

6  for the bribes, many of which were paid into accounts right

7  here in the United States, those officials helped the

8  defendant and his company win contracts involving over a half

9  a billion dollars in oil and gas, over a half a billion

10 dollars in corrupt deals.

11         To avoid getting caught, the defendant paid the

12 bribes through a web of middleman all over the world.  He and

13 his partners in crime used code words to describe the

14 payments.  They referred to each other using aliases, and they

15 used anonymized e-mail accounts to communicate about the

16 things they wanted to hide.

17         What was in it for him?  As you'll see, when the

18 defendant's company made money, he made money, often more than

19 a million dollars a year in salary and bonus.  And that's not

20 all.  His interests as a shareholder in the company was many,

21 many times that amount.

22         Ladies and gentlemen, the defendant orchestrated his

23 bribery and money laundering scheme from right here in the

24 United States, where he lived and where he worked, and whether

25 it's for access or influence or for greed, it is a federal

1    crime for people who live and work in the United States to

2    bribe foreign government officials for business.  That is why

3    we are here.

4           My name is Clayton Solomon.  I'm an attorney with

5    the United States Department of Justice, and with me today are

6    Assistant United States Attorneys Jonathan Lax and Matthew

7    Galeotti, Department of Justice Trial Attorneys Derek Ettinger

8    and Hunter Smith, and, last but not least, one of our

9    paralegal specialists Laura Arif.

10          Together, we have the privilege of representing the

11   United States.  On behalf of our whole team, I would like to

12   thank you for your time and service as jurors and for your

13   time and careful attention during this important trial.

14          With our time together this morning, I'd first like

15   to give you some background on the national oil companies of

16   Ecuador and Mexico and the two deals, one in each of those

17   countries, that the evidence will show that the defendant won

18   by bribing foreign government officials.

19          The defendant worked as a trader at the United

20   States office of a company called Vitol, one of the largest

21   energy trading companies in the world.  Vitol buys and sells

22   millions of barrels of oil every single day and, as a global

23   energy trader, some of Vitol's business partners are

24   government-owned oil companies.

25          You'll hear about two of those oil companies many

1    times in this case.  The first is called Petroecuador, the

2    national oil company of the Republic of Ecuador.  The other is

3    called Petroleos Mexicanos, or Pemex, along with its

4    100 percent owned subsidiary Pemex Procurement International.

5              Let's begin with Ecuador.  Ecuador's most important

6    natural resource is its oil.  Its oil is owned by the

7    government and the Ecuadorian people.  The country produces

8    more oil than it uses.  Petroecuador is responsible for

9    selling that extra oil to other governments and to private

10   companies all over the world.  Ecuador's economy quite

11   literally depends on it.

12             The evidence will show that Petroecuador's employees

13   are government officials.  One of those officials, who the

14   defendant and his co-conspirators paid hundreds of thousands

15   of dollars in bribes, was responsible for managing

16   Petroecuador's entire oil trade program.  That official

17   supervised over 100 people and regularly met with Ecuador's

18   vice president.

19             Turning to Pemex, Pemex does many of the same things

20   as Petroecuador but in Mexico.  Like Petroecuador, the

21   evidence will show that Pemex's employees and the employees of

22   its subsidiaries are also government officials.  Pemex is the

23   state-owned oil company of Mexico.  When it wants to buy oil

24   products on the international market, it sometimes uses its

25   wholly owned subsidiary, Pemex Procurement.

1          Pemex Procurement is incorporated in Delaware and

2     has an office in Houston; but, make no mistake, the

3     individuals working for those companies are Mexican government

4     officials as well.  Among other things, you'll learn that

5     everything those officials did, everything, was for and on

6     behalf of Pemex and the Mexican government and that Pemex

7     Procurement is 100 percent owned by its parent company and

8     namesake Pemex.

9          The Mexican officials the defendant bribed helped

10    manage a process through which Pemex awarded public contracts,

11    contracts worth hundreds of millions of dollars.

12         This case is going to focus primarily on two deals,

13    one in Ecuador and one in Mexico, that the defendant won for

14    Vitol through bribes.

15         In the first deal, the defendant's company won the

16    right to buy, market and sell 17.1 million barrels of a

17    product called fuel oil number 6 from Petroecuador over 30

18    months with an initial up-front payment of $300 million.  The

19    fuel oil contract was negotiated by the defendant and Vitol's

20    lawyers who are right here in New York.

21         As you'll hear, in 2016, when Ecuador was awarded

22    the fuel oil contract, private companies like Vitol couldn't

23    just walk in and buy 17 million barrels of oil from the

24    Ecuadorian government, at least not without participating in a

25    public competitive bidding process.  To avoid that process,

1    the defendant had another foreign government, the Government

2    of Oman, a country in the middle east, enter into the deal on

3    Vitol's behalf.  By doing so, one of the Ecuadorian officials

4    who the defendant was bribing, the same official who was in

5    charge of those negotiations, was able to negotiate directly

6    with the defendant rather than have, have to award the

7    contract to the highest bidder.

8              As you'll hear, through a web of middlemen, the

9    defendant paid bribes to Ecuadorian government officials

10   beginning with a so-called success fee, kind of like a signing

11   bonus, of several hundred thousand dollars.

12             Let's turn to Mexico.  Fresh off winning the fuel

13   oil deal in Ecuador, the defendant struck another deal to help

14   his company win business, this time by bribing Mexican

15   government officials.  That's how in 2018 Vitol won several

16   contracts to sell petroleum products to the government of

17   Mexico, including a multiyear deal for over 600 tons of a

18   product called liquid ethane, valued at more than $200

19   million.

20             Even when the defendant's company lost a deal -- the

21   bribes didn't guarantee they'd win every time -- you'll hear

22   that he ended up winning it anyway.  The defendant paid two

23   Mexican government officials hundreds of thousands of dollars

24   each through a maze of intermediaries.

25             As you'll see, even though those officials lived in

1  Houston, the same city as the defendant, he had the bribe

2  money sent to an island in the Caribbean, then to Mexico,

3  where it bounced around through a bunch of different

4  companies, and, finally, into various bank accounts, many in

5  the United States, held in the names of the official's family,

6  friends and associates.  Several other times, the middlemen

7  paid the bribes in cash, right outside the parking lot of

8  Pemex Procurement.

9          So that's a high-level summary of the two corrupt

10 deals in Ecuador and Mexico that the defendant won through

11 bribes.

12         But winning the deal was only part of the

13 defendant's scheme.  The key was finding a way or trying to

14 find a way to pay the bribes without getting caught.

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1    (continuing.)

2          MR. SOLOMON:  As you'll hear, the defendant didn't

3    just drop off bags of cash himself.  He paid the bribes

4    through middlemen spread out across various countries.  That

5    way if something went sideways, it would be hard, although as

6    you'll see not impossible, to trace the money right back to

7    him.

8          Together the defendant and his co-conspirators

9    entered into contracts for services that were never performed.

10   They drafted invoices for work that was never done.  They sent

11   money to offshore companies with no actual business, and they

12   made sure there were layers of separation -- intentional

13   separation between the defendant and the corrupt officials

14   whose pockets he lined.

15         Here is how it worked in three steps:

16         Step 1:  For both Ecuador and Mexico, the defendant

17   and his co-conspirators caused Vitol to send money to a

18   middleman in Curacao, a small island in the Caribbean, for

19   work that he never performed.

20         Step 2:  The defendant's Curacao-based middleman

21   sent the money to another group of middlemen who worked on

22   either the Ecuador side of the scheme or the Mexico side of

23   the scheme.  Those middlemen didn't know each other, but they

24   all knew the defendant.

25         Step 3:  The Ecuador only and the Mexico only

 1    middlemen paid the bribes to the government officials or the

 2    officials' relatives on the defendant's and Vitol's behalf.

 3             The scheme was complex.  The evidence will show that

 4    the defendant and his co-conspirators designed it that way so

 5    that their crimes would never see the light of day or a

 6    courtroom.

 7             Let's talk for a moment about some of the

 8    defendant's co-conspirators and each of those three steps.

 9             First, there was the middlemen in Curacao, who the

10    defendant was connected to by one of his colleagues in Vitol's

11    offices in Switzerland, who had known him for years.

12             As you'll hear, the Curacao-based middlemen

13    communicated with several people in Vitol, but his only role

14    in the Ecuador and Mexico schemes was to receive and move

15    dirty money for the defendant and his company.

16             That's why, when the defendant communicated with

17    him, he often used personal email accounts he created under

18    made up names like Perez Marcos 007 and Sixto Tomas 007, when

19    the defendant gave his middleman the okay, and he told his

20    money -- his middleman how much money to send and where, he

21    did it.  No questions asked.  Again, that was just the first

22    step.

23             The Ecuador bribes, the second step, involved two

24    brothers who operated from Miami and Ecuador who managed

25    various offshore bank accounts in Panama and the Cayman

1    Islands, among other places.

2            Even though the defendant spoke with the brothers

3    all the time, he paid them indirectly through the middleman in

4    Curacao.

5            For the Mexico only bribes, the defendant's second

6    step involved yet another middleman, an associate of the

7    Mexican officials who lived in Houston.  Again, you'll hear

8    that the Mexico only middlemen had no other role in the scheme

9    but to launder money and to add additional layers of

10   separation between the defendant and the officials he was

11   bribing, even though they all lived in Houston, the same city.

12           Like the Ecuadorian brothers, the middlemen on the

13   Mexico side of the scheme got paid through the middleman in

14   Curacao, and they all had one thing in common, the defendant.

15           In the third step, the Ecuador only and Mexico only

16   middlemen dealt directly with the corrupt officials.  It paid

17   the bribes on the defendant's behalf and with Vitol money.

18           As you'll see some of the bribes were paid in

19   overseas bank accounts.  Other times the middlemen just paid

20   for things on behalf of the officials.  As one example, it

21   paid 120,000 Euro invoice for an interior designer working for

22   one of the Ecuadorian officials.

23           So in exchange for helping the defendant and his

24   company win the fuel oil contract, the official got not only

25   money but also new marble floors and four redecorated

1  bathrooms in his home in Portugal.

2         On the Mexico side of the scheme, the defendant's

3  middlemen paid the bribes, many of the bribes into accounts

4  right here in the United States and in cash.  As you'll hear,

5  the middlemen once stuffed some of the cash into medicine

6  boxes.

7         And after that, the Mexican officials began using

8  code words like medicina to refer to the bribes.  They used

9  words like zapatos, shoes; invitaciones, invitations; and

10 gringos in reference to bribes paid in American dollars.

11        For his role in the scheme, the defendant is charged

12 with three crimes.  Judge Vitaliano will instruct you on the

13 law at the end of trial, and you should follow his

14 instructions.

15        A conspiracy is just an agreement between two or

16 more people to do something illegal.  As I mentioned earlier,

17 it is a crime for people who live in the United States or who

18 work for United States companies, like the defendant, to offer

19 or to pay bribes to foreign officials.

20        That law is called the Foreign Corrupt Practices

21 Act, or the FCPA.  In the second count, the defendant is

22 charged with violating the FCPA in connection with the Ecuador

23 bribery scheme.

24        Third, the defendant was charged with conspiracy, or

25 agreement with others, to commit money laundering.  As you'll

1  hear, money laundering is a crime that involves sending money

2  in or out of the United States when the purpose of the

3  transfer is to promote certain other crimes, including foreign

4  bribery.

5          It's also a crime to send money in or out of the

6  United States to try to hide the nature of the sources of

7  money used to pay bribes.  The money laundering scheme relates

8  to both the Ecuador and the Mexico bribery schemes.

9          So those are the charges.

10          Now, how will the government prove its case to you

11 beyond a reasonable doubt?  For starters, you're going to get

12 an inside view of the scheme from multiple witnesses,

13 cooperating witnesses who participated in the scheme right

14 alongside the defendant.

15          You'll hear from several of the bribed paid

16 middlemen, and you'll also hear from several of the foreign

17 government officials who received the bribes.  Together, they

18 will paint a picture of the defendant's crime from nearly

19 every angle.

20          We expect that witness after witness after witness

21 is going to testify about the bribery of money laundering

22 schemes and the defendant's essential role in it.  For

23 example, the defendant personally approved many of the

24 payments, and that he was running the corrupt negotiations

25 with the government officials.  He was bribing them.

1          These are the people who the defendant chose to

2    commit these crimes with.

3          As you'll hear, each of those witnesses will testify

4    pursuant to what's called a cooperation agreement with the

5    government.  That's because they were arrested and because

6    they've accepted responsibility for their crimes.  They've

7    pleaded guilty for their role in the schemes.

8          We expect that those witnesses are going to come

9    right out and say that they're cooperating to have the hope

10   that the judge might give them lighter sentences in their own

11   cases.

12         You will have the opportunity to scrutinize their

13   testimony, and when you do, you'll find that that testimony is

14   corroborated or backed up by the other evidence you'll see and

15   hear in this case.

16         Finally, I'm just going to summarize some of the

17   other categories of evidence you'll see in this trial, and

18   I'll be brief, because as soon as the government's first

19   witness is called, the evidence will speak for itself.

20         In this trial, you're going to see numerous

21   documents and emails such as communications from the 007 email

22   accounts, which he used to tell his Curacao-based middlemen

23   where to send the money, money that ended up in the pockets of

24   foreign government officials.

25         You will see contracts for invoices for work that

1   was never performed, invoices for sophisticated sounding

2   things like swap settlement agreements and brokerage services,

3   which middlemen sent out for payment wherever and whenever the

4   defendant told them to.

5           Again, those invoices were just a vehicle for

6   getting money out of Vitol, to pay the bribes and to hide what

7   the defendant and his co-conspirators were doing.

8           You'll see the defendant's text messages where he

9   discussed the scheme, for example, text messages where he

10  discussed the information needed to prepare those invoices

11  between the Curacao and Ecuador middlemen, and where defendant

12  received confidential information from the same Mexican

13  officials from whom he was bribing.

14          You will see bank records that traced the money all

15  the way from Vitol's bank accounts to bank accounts of Curacao

16  to the other middlemen, and eventually the Ecuadorian and

17  Mexican government officials.

18          And you'll hear the defendant's own voice, multiple

19  recorded conversations with his middlemen, including in a

20  phone call with his co-conspirators while they were right here

21  in Brooklyn.

22          All this evidence, the cooperating witnesses, the

23  007 emails, the text messages, the invoices, the bank records,

24  the recorded conversations and more, will prove beyond a

25  reasonable doubt that the defendant conspired or agreed to pay

 1   nearly a million dollars in bribes to officials in Ecuador and

 2   Mexico.

 3            And in exchange for those bribes, the official

 4   helped the defendant and his company win contracts for oil and

 5   gas of over $500,000,000.

 6            The evidence will also show that the defendant

 7   conspired to promote the scheme and conceal its proceeds by

 8   laundering the bribe money through his international web

 9   middlemen.

10            Finally, the evidence will show the defendant

11   committed these crimes for personal gain, for stature within

12   his company, and for money, and because he thought that the

13   elaborate system he set up would help him keep him from

14   getting caught.  He succeeded in all of those things for many

15   years, until now.

16            Ladies and gentlemen, at the end of this trial,

17   after you've had the opportunity to hear and see all of the

18   evidence, we will have the opportunity to speak to you again.

19   At that time, we will ask you to return the only verdict

20   consistent with all the evidence, guilty on all counts.

21            Thank you.

22            THE COURT:  Thank you, Mr. Solomon.

23            Mr. Price, does the defense wish to make an opening

24   statement at this time?

25            MR. PRICE:  We do, Your Honor.  I was wondering if

58

1   we could have a short bio break.

2           THE COURT:  Okay.  Why don't we make that the

3   midmorning break and make it a little longer.

4           MR. PRICE:  Fantastic.

5           THE COURT:  All right.

6           Ladies and gentlemen, our practice would be to take

7   a midmorning break, usually a little later than this, but

8   we'll combine a couple things at one time, and we'll take a

9   similar break in the afternoon, and we'll break for lunch.

10          During these recesses, you're not to discuss this

11  case amongst yourselves or anyone else you may run into in the

12  hallway in the back.  You are to keep an open mind throughout

13  the case.

14          We will take about a 15-minute break here or so, and

15  we will then bring you back into the courtroom and continue

16  with the opening statement from the defendant.

17          With that, we will take a recess.

18          (Jury not present.)

19          THE COURT:  We'll be back in 15 or so.

20          (Recess taken.)

21          THE COURTROOM DEPUTY:  All rise.

22          (Judge Eric N. Vitaliano enters the courtroom.)

23          THE COURTROOM DEPUTY:  All counsel are present,

24  including the defendant.

25          THE COURT:  Are we ready to proceed?

1           MR. LAX:  Yes, Your Honor.

2           (Jury present.)

3           THE COURT:  Counsel will stipulate that the jury is

4    present and properly seated.

5           MR. LAX:  Yes, Your Honor.

6           MR. KOFFMANN:  Yes, Your Honor.

7           THE COURT:  Thank you, counsel.

8           Ladies and gentlemen, welcome back.  Hope you've had

9    a chance to refresh.  That was our midmorning break, and we

10   are ready to resume.

11          We remain on openings.  I'm going to remind you that

12   what you're hearing or heard from Mr. Solomon and what you're

13   about to hear in the defense opening is not evidence.  This is

14   the introduction to evidence that the parties are providing to

15   us, introduction to evidence and to the case.

16          Now, we will hear an opening for the defense, and

17   for that purpose, I call upon Mr. William Price to make the

18   opening statement.

19          MR. PRICE:  Thank you, Your Honor.

20              OPENING STATEMENT BY MR. PRICE:

21          MR. PRICE:  Ladies and gentlemen, good morning.  My

22   name is Bill Price, and I have the privilege, along with my

23   colleagues you've met yesterday, to represent Mr. Aguilar in

24   this case.

25          This case is about corruption, but it is not about

1    Mr. Aguilar's corruption.  Rather, the evidence will show that

2    Mr. Aguilar, who is a very successful trader in the oil

3    exchange markets, that he engaged in what he believed were

4    legitimate dealings, legitimate business dealings with the

5    governments of Ecuador and Mexico, and that no bribes were

6    being paid.  He didn't know.

7            Let me start with Ecuador.  What the evidence will

8    show is that Mr. Aguilar, on behalf of Vitol, engaged

9    consultants in Ecuador.  And you'll hear that consultants are,

10   in fact, commonplace; in fact, in this case necessary when

11   you're trying to arrange dealings with another government in a

12   foreign land.

13           He engaged with what the government has called a

14   middleman.  They didn't give you names and tell you what these

15   people were.  Well, let me give you some information about

16   that.

17           He hired a company, Oil Intelligence Corporation,

18   which was run by Antonio Pere and his brother, Enrique Pere.

19   This is a company which has helped companies interact,

20   negotiate with the Ecuadorian government for many years, and

21   this is a company that presented itself as legitimate.

22           These were people who were well qualified.  They

23   sent pitch letters to companies saying, we can help you engage

24   with the Ecuadorian government.

25           They did presentations that explained the kinds of

1   things they could do, that they knew who to contact, they knew

2   what kind of contracts they needed, all of that, and that's

3   what Mr. Aguilar saw.

4            What he did not know, and which is undisputed, is

5   that Mr. Pere and his brother had, for years, for decades --

6   not decades, but say years, maybe a decade, had a

7   self-contained criminal enterprise that didn't require the

8   participation of the company who hired them, but they

9   basically bribed government officials to get results.  They

10  could brag about results so that they could get business.

11           And if we can put up slide one.  This is very

12  simplistic.  Basically, a client would hire the Pere brothers'

13  companies, and, you know, what was going on up here was we're

14  a legitimate company.  We have offices in Miami, beautiful

15  offices.  We have expertise.  We can help you.  We get

16  results.

17           What is also going on up here is what Mr. Aguilar

18  saw were the efforts, you know, were the communications, were

19  the drafting of contracts, were the kind of things that you

20  expect consultants to do.

21           What was going on down here is that the Pere

22  brothers had contacts and were bribing foreign officials from

23  their fee.  They're getting a fee, and then they're taking a

24  part of that, and that's the way they're getting results.

25           And this system existed long before Mr. Aguilar ever

1    had anything to do with the contracts at issue in this case.

2             In fact, to give you one example, there is a company

3    called Gunvor.  Gunvor did a number of contracts with the

4    Ecuadorian government, and they used the Pere brothers as

5    consultants.

6             They paid I think it was $97 billion over a series

7    of contracts to the Pere brothers.  The Pere brothers took a

8    portion of that and paid 22 million to various government

9    officials, a huge scheme that Mr. Aguilar did not know about.

10   He did not know about the Pere brothers' secret sauce, and

11   that's what the evidence will show.

12            Now, the evidence will also show that it was not in

13   Antonio or Enrique Pere's interest, and it was not necessary

14   for Mr. Aguilar to know what was going on.  You'll hear

15   evidence, for example, that Mr. Pere did not want people to

16   know about the criminal scheme.  The more people that know

17   about it, the more likely you're going to get caught.  So it's

18   only on a need to know basis.

19            The evidence will also show that the problem in

20   letting the client know is it might affect what you get here,

21   and let me give you an example.

22            Remember I told you about Gunvor?  There is a

23   gentleman called Ray Kohut who is like a trader for Gunvor, an

24   agent, and he hooked up with the Pere brothers.  He had

25   extensive experience in Ecuador, by the way.

1           And after a couple of the oil contracts that the

2    Pere brothers helped Gunvor get, he thought, yeah, I know what

3    you're doing, you're bribing government officials.

4           So he went to the Pere brothers and said, hey, I

5    know what's going on, I want part of your fee.

6           What happened, of course, is the Pere brothers had

7    to give up part of their fee to keep this going, to keep it

8    quiet to Mr. Kohut.  Obviously that is not something they

9    wanted to happen.

10           The evidence is undisputed that in this case

11    Mr. Aguilar did not receive a penny from the amount of money

12    that the Pere brothers received.

13           The evidence will show that Mr. Aguilar did not

14    know, and no one wanted him to know how this success was being

15    done.  It was unnecessary and it would have been hurtful.

16           Now, you heard the government talk about

17    cooperators, and I want to talk to you a little bit about what

18    happened and who those witnesses actually are.

19           The Pere brothers are among them.  What happened is

20    that -- by the way, until the Pere brothers and then others

21    started cooperating with the government, there is not -- no

22    proof, not an email communication, not a private email or

23    whatever, to Mr. Aguilar informing him that we're paying

24    bribes, and that's how this is getting done.

25           Nothing until -- well, until the Pere brothers

1  started cooperating, and then I'll talk to you about what

2  happens then.

3         But the Pere brothers and others, these cooperating

4  witnesses, were caught, talking about the people here, were

5  caught red handed, and they're here to deliver Mr. Aguilar to

6  you and point at him, and they're doing it for their own

7  benefit, to try to minimize, or in hopes of avoiding jail time

8  for them and their family members because they involve like

9  their wives and sons and their families in this, and that's

10  the least dependable evidence you can rely on.

11         Now, in Mexico, it is undisputed that not a single

12  person at PEMEX -- PEMEX is the Mexican government entity that

13  reviews -- and the contract that's at issue here -- it reviews

14  bids, decides who wins.  Not a single person in that entity

15  received any funds whatsoever for Mr. Aguilar.

16         The evidence will show that Mr. Aguilar didn't have

17  contacts.  He did provide payments to two individuals at a

18  company called PPI.  The evidence will show that that is not a

19  government entity.  The employees there do not get government

20  benefits from Mexico.  They don't get Social Security.  They

21  don't get vacation time.

22         In fact, it's a company that is in the

23  United States, in Houston, and organized, incorporated, under

24  the laws of the United States.

25         And these people that the government is going to

1    tell you received payments, they had no influence whatsoever

2    on who the Mexican government gave a bid to.  With respect to

3    the long-term oil contract that's at issue here, in fact, they

4    never even saw the bids.  There's no bribery in Mexico either.

5            As a matter of fact, Vitol didn't even win that big

6    bid.  The bids went in, and the government awarded it to the

7    best bidder.  It wasn't Vitol.

8            What happened is that that bidder, then, had second

9    thoughts and said, you know, we can't really make that price,

10   you know, and the government then turned to Vitol and said,

11   will you step in and do it on these terms, and Vitol said,

12   yes.  So that's what happened in Mexico.

13           So let me, if I can, then, give you a little more

14   detail and identify these cooperating witnesses or what were

15   referred to as middlemen that the government mentioned but did

16   not actually tell you about.

17           You're going to see these people on the stand, these

18   people who have entered into cooperation agreements to avoid

19   repercussions and their responsibility for the undeniable

20   criminal activity that they engaged in.

21           Now, first let me tell you a little bit about

22   Mr. Aguilar.

23           Bring up slide 2.

24           Mr. Aguilar, actually, is a chemist by training, but

25   he became an oil trader, and that helped him a lot

1   because particularly the project he dealt with was liquid

2   petroleum gas, which is very unstable and very difficult to

3   transport around the world.

4           But he became an excellent trader, being able to get

5   gas and sell it to others on behalf of Vitol.  He worked in

6   London for 12 years.  And, by the way, Vitol's headquarters is

7   in Switzerland.  You'll hear that referred to as the cheese

8   place sometimes in some of the evidence you'll get.

9           And so they wanted him to go to Mexico and start

10  running that office.

11          Well, Mr. Aguilar didn't really -- well, at the

12  time, the Mexico office wasn't really up and running, so he

13  moved to Houston instead.  And the idea was he would go to

14  Mexico, but, you know, he developed a life there.  He had two

15  twin girls.  He had a family here in Houston, in the

16  United States.

17          So he decided not to go into the Mexican office.

18  Instead you'll hear about lots of travel to Mexico, and he

19  would also visit Ecuador.

20          Now, Mr. Aguilar is not a top executive at Vitol.

21  He is not a senior executive in Vitol.  In the Mexican office

22  there are like -- he's got two bosses.  And the real bosses,

23  the people who run the company, are in Switzerland.

24          They're the ones who make policy, and by the way, it

25  was a top executive, a managing director, that instructed

1    Mr. Aguilar on how Mr. Aguilar was to pay the consultants he

2    dealt with.

3             You heard the government talk about there was this

4    Curacao middleman.  There was this payment structure and how

5    suspicious it was.

6             Let me tell you what the evidence is about that, and

7    there are two things that you'll learn in this trial.  One,

8    that payment structure was created by a top Vitol executive

9    before Mr. Aguilar had anything to do with these contracts.

10            And second, you'll hear that what happened when the

11   government started its investigation is that this top

12   executive, a man named Marc Ducrest, and the person he brought

13   in, the Curacao middleman you heard about, a gentleman named

14   Lionel Hanst, you will hear that they got together, and they

15   decided that in order to protect Mr. Ducrest, they would point

16   the finger at Mr. Aguilar and say he was the one responsible

17   for this.

18            Let me tell you what the facts will show in this.

19   First of all, Lionel Hanst, who is called a Curacao middleman,

20   that's to make you think of exotic hidden locations and all

21   that stuff.

22            Well, he is based in Curacao.  And by the way, Mr.

23   Ducrest also worked in Curacao at one point.  Let me tell you

24   about the Ducrest/Lionel Hanst relationship, these two

25   gentlemen who actually created this structure.

*Opening - Price*                                                    68

1          By the way, you're not going to hear from Mr.

2    Ducrest.  You're going to hear from Mr. Hanst, we understand.

3    You'll see him on the stand, and most of these facts will come

4    out of his mouth.

5          And what you'll learn is that in the 1990s,

6    Mr. Hanst and Mr. Ducrest and their families developed a very

7    close relationship.  In the late '90s, 2000s, they worked

8    together at a previous employer where they were engaged in the

9    same kind of business as Vitol is, basically trading.

10         And then in December 2013, Mr. Hanst met Mr. Ducrest

11   because Mr. Ducrest had gone on to Vitol.  He was becoming an

12   important person in Vitol, as I said, top, top executive, and

13   Mr. Hanst described this in his own words as the origin of his

14   involvement was Vitol.

15         In October, November 2014, Mr. Hanst interviews Mr.

16   Ducrest in Holland, at almost exactly the same time.  And,

17   folks, just to give perspective here, Mr. Aguilar is not

18   involved in any of this.

19         And the first payments in Ecuador don't come until

20   October -- I'm sorry, January of 2017, first payments to

21   Mexico, not until, I think, October 2017.

22         So this is long before Mr. Aguilar has anything to

23   do with this.  So they have -- Mr. Hanst and Mr. Ducrest have

24   this meeting in October, November, and about the same time,

25   Mr. Hanst creates these two companies.

1          They're called Lion Oil and Zanza Oil, and he

2    creates them to process Vitol payments to people like the

3    consultants, to people like Ducrest.  He creates the structure

4    before he's ever heard of Mr. Aguilar.  This structure is set

5    up before Mr. Aguilar has anything to do with this.

6          And this -- by the way, can we quickly show I think

7    slide 7, that graph.  Okay.

8          So what happens is this Curacao middleman, Mr.

9    Ducrest, the top executive of -- one of the top executives of

10   Vitol, he trades these companies, Lion Oil and Zanza Oil.

11   Those companies are used to pay the fees to the Pere brothers.

12         These are companies that were created before

13   Mr. Aguilar didn't know anything about it.  This was a

14   pre-existing structure that Vitol created.

15         Now, if we can go back to the -- so after this, in

16   November of 2014, after these companies are created to process

17   Vitol payments by a top executive, Mr. Hanst, Mr. Hanst sets

18   up an office in Curacao for the purpose of working for Vitol.

19         By the way, shortly after that, there is a

20   Venezuelan deal signed, oil deal signed.  Mr. Hanst has pled

21   guilty with respect to that deal saying that there were bribes

22   involved in that deal, and Mr. Aguilar had nothing to do with

23   this.  This is a structure that preexisted Mr. Aguilar, the

24   structure itself.

25         Now, what happens?  The government begins

1  investigating, I think bribery in general.  There are various

2  investigations going on, and Mr. Hanst and Mr. Ducrest

3  realize, huh, the government is looking at us, and they might

4  think this does not look quite right.  So what happens?

5          Well, if we can put up the next slide.

6          Oh, I'm sorry.  I missed this.  There is a couple of

7  things you need to know before I talk about this, and that is

8  the structure that was put in place, that Mr. Aguilar was told

9  to use, was approved by Switzerland.  It was approved by Vitol

10 in Switzerland.

11         You heard about big agreements between the Curacao

12 middleman and Vitol.  Those agreements are something called

13 swap agreements and brokerage agreements.  You'll hear some

14 detail about that.  They're agreements between Mr. Hanst's

15 companies and Vitol.  All right.  But you'll see.  You'll see

16 evidence that Switzerland is the one that approved those

17 deals.  You'll see of a piece of paper that's stamped, this is

18 approved.

19         Those contracts with Vitol were approved by the top

20 people in Vitol before Mr. Aguilar has anything to do with

21 this.

22         There were payments then that Lion Oil and Zanza Oil

23 would request from Vitol so it could then send payments to

24 consultants and others.  Okay?

25         Those requests for payments were sent to Switzerland

1    by Mr. Hanst.  They were approved by Switzerland, by Vitol,

2    not by Mr. Aguilar.

3            Finally, Switzerland approved the ultimate payment

4    of fees to these consultants.  So the Pere brothers get their

5    success fees, and they get fees based upon the amount of oil

6    that's sold.  Right?  It's in their contract.

7            And to pay those, Mr. Hanst, whenever he would get a

8    request, he would usually get them from the Pere brothers, he

9    would go to Mr. Ducrest.  In fact, he testified -- well, we

10   think he will testify that Mr. Ducrest approved of every one

11   of those, every one of those payments for what Mr. Aguilar

12   thought were legitimate consulting services.

13           Now, getting now to what happened when Mr. Ducrest

14   and Mr. Hanst started getting a little bit nervous about this.

15   In June of 2020, a bank employee tells Mr. Hanst his accounts

16   are being watched.  Probably shouldn't have told him that, but

17   what will the evidence show?  Mr. Hanst immediately calls Mr.

18   Ducrest, an executive of Vitol.

19           In July of 2020, Mr. Aguilar is arrested by the

20   government.  You'll hear what that is based upon, including

21   the cooperation of the Pere brothers and others.

22           And what does Mr. Hanst do?  He calls Mr. Ducrest.

23   Mr. Ducrest tells him, don't worry, you don't know anything,

24   you're fine.

25           Then in December of 2020, Vitol is fined, pays a

1    fine in connection with some of these contracts.  Mr. Hanst

2    calls Mr. Ducrest.  And then in February of 2021, Mr. Hanst

3    receives what's called a subject letter from US Department of

4    Justice.

5           And what that means is you get a letter saying

6    you're the subject of an investigation, basically which is

7    saying, we think you've engaged in criminal activity.

8           And this is where the evidence will show Mr. Ducrest

9    and Mr. Hanst gets together and says, here's what we're going

10   to do, we're going to point the finger at Mr. Aguilar, who is

11   an employee who we directed to use this payment structure, and

12   we're going to say it was all his idea.

13          So here's what the evidence will show.  The evidence

14   will show that Mr. Hanst hires lawyers.  His lawyers contact

15   the US government.  They agree to something called a proffer.

16          That's where the government sends you a letter and

17   says, basically, you can come to the United States.  We'll

18   talk to you.  Tell us what you know.  We won't arrest you, you

19   know, while you're here.  We won't prosecute you based on what

20   you say, although if you're dishonest with us, we can

21   prosecute you for perjury and for obstruction of justice in

22   connection with other cases, and then we can talk about

23   whether or not we can reach a cooperation agreement, an

24   agreement where you get a deal, so that if you cooperate, you

25   know, you have the expectation that the consequences will not

1    be what you -- what they might otherwise be.  Let's put it

2    that way.

3            And so what happens is Mr. Hanst comes to the

4    United States, and he has a meeting with government officials.

5    There are like five people from the government there.  I think

6    there's three attorneys for Mr. Hanst and Mr. Hanst, and he

7    sits there.

8            The evidence will show he made three absolute

9    misrepresentations, falsehoods, to the government.  He tells

10   them, first, that Mr. Aguilar is the one that was responsible

11   for the structure, and, in fact, the undisputed evidence is

12   before he had anything to do with this.

13           He tells them that Mr. Ducrest never directed Vitol

14   to pay him, to pay Vitol, to pay Zanza Oil and Lion Oil.  The

15   evidence will show that's false.

16           In fact, he tells the government, I'm unsure if Mr.

17   Ducrest is even Javier Aguilar's boss.  I'm unsure of that.

18   Well, at that point in the interview the government plays

19   Mr. Hanst a tape recording that Mr. Hanst had in a

20   conversation with Enrique Pere in which Mr. Hanst tells

21   Enrique Pere, every payment I make, I have to get the approval

22   of Mr. Aguilar's boss.

23           And then once he's presented with that, he tells the

24   government, I'm referring to Mr. Ducrest when I say that.

25           Now, what he did not tell them, as he's sitting

1  there in this room with his three lawyers, what he did not

2  tell them is that those three lawyers were being paid for by

3  Mr. Ducrest, that Mr. Ducrest had given him $350,000, and he

4  can come and ask for more, so that Mr. Hanst can come to the

5  United States and point the finger at Mr. Aguilar.

6          But there are a few things that Mr. Hanst said in

7  that interview which are incredibly important, and which have

8  never been retracted.  He meets with the government.  He gives

9  them this proffer.  They then offer him a cooperation

10  agreement.  We'll get into that during the trial, as to the

11  deal he got so that he would not be responsible for his own

12  conduct.

13          The government had further meetings with him.  They

14  signed a cooperation agreement.  What he told them was he has

15  never retracted.

16          First, he told them, look, this industry, when

17  you're dealing with foreign governments, consultants are

18  common and, in fact, necessary.  Right?

19          The government says, these are middlemen.  There are

20  legitimate consultants out there, and when you're dealing with

21  a foreign government, you deal with people who know about that

22  foreign government.

23          He told them that.  He told them also that Vitol and

24  its agents and these consultants are incredibly secretive.

25  They're guarding their secret sauce.

1            For example, Mr. Hanst, himself, was trying to get

2    business in Ecuador, and he hired a consultant.  He was trying

3    to get business for Vitol.

4            And he didn't want Vitol even to know who that was

5    because in this world where you have traders and a company,

6    they're competing with each other.

7            (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (continuing.)

2           MR. PRICE:  And so you can even keep your sources.

3    In this case, it wasn't the case for Mr. Aguilar, but it's

4    incredibly secretive, in a sense that you just won't be able

5    to know this.  That's the way legitimate business works in

6    this industry.  In fact, Mr. Hanst had one meeting with

7    Enrique Pere, in fact, Mr. Hanst had been visiting this area

8    of the country, and Enrique Pere, one of the Pere brothers,

9    was talking to them about getting paid for, you know, their

10   consulting fees.  And Mr. Hanst told the government, you

11   know, Mr. Pere did not tell me who his sources were and I

12   didn't expect him to because that's his trade secret and

13   that's how you run legitimate business in this industry.

14          So that's going to be the evidence about these

15   companies in Curacao and Vitol and who set that up and

16   Mr. Aguilar was simply said use this, and he did, he did

17   what he was told to do on that.

18          Now, let me talk a little more about -- we are

19   still talking about Ecuador -- about Mr. Aguilar using the

20   government says they're middlemen, but these consultants,

21   Mr. Pere and his brother, Enrique.

22          First, you will hear the evidence that Vitol and

23   Mr. Aguilar would need a consultant in Ecuador in order to

24   get a contract with the government.  There are a few reasons

25   for this.  One, Mr. Aguilar, wasn't experienced in Ecuador,

1  I mean, you don't know who to talk to, you don't know what
2  kind of contracts they want.  You know, you need someone to
3  help you negotiate.  In particular, Vitol was blacklisted in
4  Ecuador, not for any illegal reasons, but Vitol had previous
5  contracts with Ecuadorian government, there had been a
6  contract dispute, you know, money hadn't been paid, this was
7  all above board, and Ecuadorian government said, okay, we
8  are not going to deal with Vitol anymore.

9        And so Mr. Aguilar comes in, and you can't even
10  try to get a contract, because there's this -- this
11  blacklist there.  And he needed someone to help him deal
12  with the government to help him get off that blacklist.  By
13  the way, the Pere brothers did that.  They did that
14  legitimately.

15        Mr. Aguilar certainly believed there was no money
16  paid to the Ecuadorian government except the amount that was
17  owed under that previous contract, right?  I mean, that was
18  resolved.  The Pere brothers knew how to do that.

19        And the third reason is the fuel oil deal in this
20  case was an incredibly complicated deal which the Ecuadorian
21  government had done previously and the Pere brothers had
22  been involved in previously, but Vitol and Mr. Aguilar had
23  not.

24        You hear the government say there was this deal to
25  avoid the bidding process.

1          What the evidence will show is that the country of

2     Ecuador -- the country, not these government officials --

3     the country wanted to sell oil in state-to-state deals.  And

4     the way that would work -- and when I say it's complicated,

5     I'm going to try to make it somewhat understandable -- is

6     that the country of Ecuador would sell to a state the oil,

7     and that state would end up assigning that oil to a private

8     company, in this case, Vitol.

9          That structure had been used previously.  That

10    structure was introduced to Mr. Aguilar by the Ecuadorian

11    government and the Pere brothers.  You know, this is a

12    legitimate structure.  You'll hear Ecuadorian government

13    wanted that structure and one of the reasons why was they

14    were desperately in need of cash.  And under that structure,

15    they get huge amounts of money upfront.

16         So in this case, for example, the foreign entity

17    was Oman, and Oman through Vitol -- Vitol through Oman, then

18    paid the Ecuadorian government $300 million of profit.  You

19    know, this is before the oil starts flowing.  Then once the

20    contract's in place, the oil starts flowing and then the

21    money is continuously paid to Ecuador.  It was about

22    actually $900 million altogether, I think.  So they wanted

23    that sort of cash advance.

24         And, again, you know, it's not illegal to pay a

25    government for its oil, right?  It's illegal to bribe

1  someone.  And this structure did not involve bribes.  It was

2  a legitimate structure.  And Vitol, Mr. Aguilar, did not

3  know how to deal with it, and so they hired the Pere

4  brothers.

5         So as I said, Mr. Aguilar needed a consultant.

6  You are going to see the evidence of the Pere brothers held

7  themselves out as legitimate.  They had these fancy offices

8  in Florida.  You will see Antonio Pere's resumé.  He is

9  American-educated.  He has worked in government and private

10  practice.  He has gotten credible results and he would -- he

11  would -- he would tout this publicly as a reason to hire

12  him.  You will see letters sent to oil executives saying,

13  I'm Antonio Pere, I'm a consultant, I can do all these

14  things for you, I know the right people to contact in the

15  Ecuadorian government, I know how to draft contracts, you

16  know, I know how to look for opportunities.

17         He represented himself as legitimate.

18         And so he was hired.  And what resulted from that

19  is months, months of negotiations between the Ecuadorian

20  government, Oman, and Vitol.  And this is all out there in

21  the public.  There is nothing hidden about these

22  negotiations.  In these negotiations, of course, thousands

23  of pages, the contracts, they are like this big, right?

24  There's also, in these negotiations, Oman and Ecuador had to

25  enter into a coordinated strategic alliance.  The Pere

1  brothers helped draft that alliance.  They helped organize

2  the meetings between Ecuador and Oman to do that.  They

3  drafted letters.  They did what appeared to be the real work

4  of consultants.

5       But as I said, Mr. Aguilar didn't know what was

6  absolutely true, was there was this preexisting criminal

7  enterprise where what the Pere brothers were doing were

8  paying government officials, including Mr. Arias, who -- who

9  I think you will hear from, and others.

10      However, Antonio Pere realized this criminal

11  enterprise was going to be coming to an end, and he realized

12  it in August of 2019.  It was in that month that his offices

13  in Miami were raided.  And he knew there was years and years

14  and years of evidence of his criminal conduct and the

15  criminal conduct of these foreign officials.

16      Vitol was a tiny speck in that, by the way, in

17  those years and years and years.  He knew that his family

18  was implicated in this.  He also knew -- he'll take the

19  stand -- he knew that there was no proof, no e-mails,

20  neither in the private e-mail account or other, that

21  Mr. Aguilar was told and knew that bribes were being used.

22      So what does he do after August 2019?  Well, he

23  talked to his brother, Enrique.  You will see evidence about

24  that relationship, and you will see that the evidence is

25  that Enrique Pere does exactly what his brother Antonio

1    tells him to do.  He's been told by his brother, you do what

2    I say without question.

3           He goes, he gets attorneys.  His attorneys contact

4    the government.  And this same proffer, this same proffer

5    happens that happened with Mr. Hanst.  And it actually

6    happens before Mr. Hanst, but basically:  I'll get together

7    with you, I'll tell you what I know, and I'll get a

8    cooperation agreement for that, the hopes, of course, that

9    there will be no or limited jail time, limited charges, that

10   his family would not be affected.

11          And that's what happened.  He met with them and he

12   agreed to cooperate.  And he knew that one thing that he

13   could say, might make him valuable, is he could say, hey,

14   you know, Vitol was involved in this and Mr. Aguilar,

15   Mr. Aguilar knew.

16          Vitol, by the way, is a big, big catch for the

17   government.  You've never heard of it.  Years ago, I had

18   never heard of it.  It is one of the biggest companies in

19   the world.  Its annual revenue last year was $500 billion.

20   I mean, this is something that's a real prize for a

21   conviction.

22          But in that first -- in that proffer, Mr. Pere

23   says, you know, here's what I know.  What he says is the

24   words he used according to the notes that were taken.  He

25   doesn't say I told Mr. Aguilar there were bribes.  He says

*Opening - Price*                                          82

1    he was aware.

2            And none of the evidence prior to that date shows

3    Mr. Aguilar was aware.

4            What happens then is Mr. Pere and his brother

5    agreed to do recorded conversations with various people who

6    were involved in this, a lot with the government officials,

7    right, who were being paid.  And also some recordings with

8    Mr. Aguilar.  And you will hear those recordings.  And the

9    question is:  Did -- was Mr. Aguilar told that, did he know

10   that bribes were being paid?

11           When you look at -- there were a number of

12   telephone recordings, and when you listen to those

13   carefully, I think you will conclude -- Mr. Pere doesn't

14   come out and say, I told you that they were being paid.  It

15   doesn't happen.

16           What happens is after a bunch of those phone

17   calls, the government directs Mr. Pere to meet with

18   Mr. Aguilar in a restaurant along with Enrique and they

19   record it.  And he's told, you know, I want you to do the

20   best you can, but try to get Mr. Aguilar to admit you told

21   him there were bribes.

22           And he meets with Mr. Aguilar.  And you will see

23   that tape.  And when the time comes for Mr. Pere to get that

24   standing evidence, he says, I think I told you that we paid

25   bribes, I think.  Which admits to the fact that it may

1    never, ever, ever have happened.

2           So you will hear about the circumstances of that

3    meeting and what happened and what was said in that meeting.

4           Based on the evidence for Ecuador is that there

5    were legitimate business practices that were engaged in by

6    Mr. Aguilar.  He used the payment structure that his bosses

7    told him to use and were agreed to without him.  He hired

8    what he thought were legitimate consultants.  And now those

9    people who did engage in criminality are coming here to say,

10   oh, he's involved, too.  And they're doing it so that they

11   receive very little, you know, if any, jail time, so they

12   will be considered cooperators, substantially assisting the

13   government.

14          Now, a little more detail in Mexico.  There was a

15   long-term contract for ethane.  Again, no one in the Mexican

16   government at PEMEX who saw the bids for that, who had any

17   influence on the bids for that, who selected that bid, no

18   one received any payments from Mr. Aguilar.  That is

19   undisputed.

20          He engaged with two people at a company called

21   PPI.  The company located in Houston, incorporated under the

22   state of Delaware, in an office park.  And you go in and you

23   see the American flag in that -- in that building.

24   Mr. Aguilar did not think and the evidence will show that

25   these were not government officials.  It will show that

*Opening - Price*                                    84

1   these individuals that worked at PPI on this long-term

2   contract did not know what other bids were, had no influence

3   at all in who would win a bid for that oil.  And as I said

4   before, Vitol didn't even win the bid initially.  I mean,

5   they were asked by the government to come in and do that

6   contract once the winner said, you know, I kind of made a

7   bad deal, here.

8           So that's more detail about middlemen and

9   cooperators and what the evidence will show.  It's going to

10  be a while before we get a chance to talk to you directly

11  again.

12          And we thank you.  It's unbelievable, the

13  commitment that you guys have made, you know, to listen to

14  this evidence for a period of time.  It's -- as His Honor

15  said -- it's essential to this system working.  In this

16  case, it's essential for Mr. Aguilar's vindication.  And

17  we're really thankful that you folks, you know, have -- are

18  doing this.  I was about to say agreed to do this, but I

19  know that might be overstating it a bit.  But I know that

20  you are going to commit to it and you are going to pay

21  attention and listen to the witnesses and look at the

22  evidence and then give your judgment at the end.

23          And when the evidence is through, we get a chance

24  to come back to talk to you again and we will ask you to do

25  the right thing and that is to elect Mr. Aguilar as not

*Proceedings*                                                    85

1   guilty.

2           Thank you very much.

3           THE COURT:  Thank you, Mr. Price.

4           Now, Mr. Lax, does the government have a witness

5   for us?

6           MR. SOLOMON:  Your Honor, the United States wishes

7   to call Nilsen Arias Sandoval.

8           Mr. Arias, Your Honor, will testify in Spanish, so

9   you may wish to swear in the interpreter.

10          THE COURT:  We will swear in the interpreter.

11          Ladies and gentlemen, moving to that next building

12  block, we have gone from the opening statements now to the

13  production of evidence.  The government goes first.  It's

14  calling its first witness who is in need of interpretive

15  services.

16          We will ask the deputy clerk to swear the

17  interpreter.

18          (Interpreters sworn.)

19          THE INTERPRETER:  I do.

20          THE INTERPRETER:  I do.

21          THE COURTROOM DEPUTY:  I ask you to please state

22  your first and last name for the record.

23          THE INTERPRETER:  Good morning, Your Honor.

24          Mercedes Avalos, AOUSC, federally-certified

25  Spanish interpreter.

*Proceedings*                                          86

1          THE COURT:  Good morning.  And you will be

2    interpreting in Spanish?

3          THE INTERPRETER:  Yes, Your Honor.

4          THE INTERPRETER:  Good morning.

5          Evan Frierson, AOUSC federally-certified Spanish

6    interpreter.

7          THE COURT:  And you will also be interpreting it

8    Spanish?

9          THE INTERPRETER:  Yes, Your Honor.

10          THE COURT:  All right.  And we have the witness?

11          THE COURTROOM DEPUTY:  He's coming up now, Judge.

12          (Witness takes the stand.)

13          THE COURTROOM DEPUTY:  Please raise your right

14    hand.

15          (Witness sworn.)

16          THE WITNESS:  Yes, I swear.

17          THE COURTROOM DEPUTY:  Thank you.

18          Please state your first and last name and spell it

19    for the record.

20          THE WITNESS:  Nilsen Giordano Arias Sandoval.

21    Nilsen, N-I-L-S-E-N, A-R-I-A-S, S-A-N-D-O-V-A-L.

22          THE COURTROOM DEPUTY:  Thank you very much.

23          MR. SOLOMON:  Your Honor, may I inquire?

24          THE COURT:  You may.  And just speak directly into

25    the mic.  You may inquire.

1  NILSEN ARIAS SANDOVAL,

2           called as a witness, having been first duly

3           sworn/affirmed, was examined and testified as

4           follows:

5  DIRECT EXAMINATION BY

6  MR. SOLOMON:

7  Q    Good afternoon, Mr. Arias.

8  A    Good afternoon.

9  Q    I believe I heard as you were being sworn in that you

10 have two last names, sir; is that right?

11 A    Correct.

12 Q    Which of those two last names do you use most commonly,

13 sir?

14 A    The first one, Arias.

15 Q    Okay.  Mr. Arias, where were you born?

16 A    Quito, Ecuador.

17 Q    And did you also grow up in Quito, sir?

18 A    Yes.

19 Q    What is your citizenship?

20 A    Ecuadorian.

21 Q    And your native language?

22 A    Spanish.

23 Q    Are you married, Mr. Arias?

24 A    Yes.

25 Q    And can you tell us what her name is, please?

1   A    Irma Romero Espinoza.

2   Q    Do you speak Spanish at home?

3   A    Yes.

4   Q    How about work?  Do you usually speak Spanish at work?

5   A    Yes.

6   Q    Do you also speak some English?

7   A    Yes.

8   Q    And can you read in English?

9   A    Yes.

10  Q    Mr. Arias, before today, did you and I ever meet to

11  discuss your testimony?

12  A    Yes.

13  Q    Did we sometimes speak in English?

14  A    Yes.

15  Q    Did we usually have an interpreter or a native Spanish

16  speaker there to assist us?

17  A    Yes.

18  Q    Mr. Arias, have you ever testified under oath before?

19  A    No.

20  Q    Are you nervous today?

21  A    Yes.

22  Q    Have you ever talked for more than just a few hours in

23  English?

24           MR. PACKARD:  Objection.  Leading.

25           THE COURT:  Try to avoid that next time.

1    Q    What is the most amount of time you ever talked in

2    English straight, sir?

3    A    No more than two or three hours.

4    Q    Would you be comfortable today testifying in your

5    native language?

6    A    Absolutely.

7    Q    Mr. Arias, are you familiar with the company,

8    Petroecuador?

9    A    Yes.

10   Q    Okay.  Can you please tell the jury what it is?

11   A    Petroecuador is the Ecuadorian state-owned oil company.

12   Q    What do you mean when you say state-owned, sir?

13   A    That it belongs to the state.

14   Q    And that is the government of Ecuador; is that right?

15   A    Yes.

16   Q    Did you ever work for Petroecuador?

17   A    Yes.

18   Q    All right.  Can you tell us the dates, from when to

19   when did you work at Petroecuador?

20   A    Starting in April 2010 through June 2017.

21   Q    And when you left in June 2017, what was your title at

22   Petroecuador?

23   A    International trade manager.

24   Q    For now, sir, just at a very high level, what were your

25   responsibilities as international trade manager?

Arias - Direct - Solomon                              90

1   A    Basically, to set up the purchase and sale of oil

2   and/or its derivatives.

3   Q    What do you mean by derivatives?

4   A    Products that are derived from the refinery of oil,

5   such as gas, diesel.

6   Q    Did Petroecuador have rules against taking money from

7   companies that did business with it?

8   A    Yes.

9   Q    And what's an example of something that wouldn't be

10  allowed under those rules?

11  A    Gifts, trips, percentages from contracts.

12  Q    What do you mean when you say percentages from

13  contracts, sir?

14  A    Contracts are commonly signed by two parties; the

15  selling company and the buying company.

16  Q    Forgive me, I just meant when you said percentage of

17  those contracts, it was prohibited from taking that while

18  you were working for Petroecuador, what do you mean by that?

19  A    Let's call it bribes.

20  Q    Okay.  When you were working for Petroecuador, was it

21  your understanding that it was also --

22           MR. PACKARD:  Objection, leading.

23           THE COURT:  Yes, it's leading.

24  Q    Sir, did you know that it was illegal to take bribes in

25  Ecuador?

*Arias - Direct - Solomon*                              91

1    A    Yes.

2    Q    Did you ever take bribes while you were an official at

3    Petroecuador?

4    A    Yes.

5    Q    Just one time?

6    A    No.  Several times.

7    Q    Mr. Arias, I would like you to look around the room.

8         Do you see anyone in this courtroom who you took

9    bribes from?

10   A    Yes.

11   Q    Who is that?

12   A    Mr. Javier Aguilar.

13   Q    Can you please point to Mr. Aguilar and identify him by

14   an article of clothing?

15        THE COURT:  Are you stipulating to the

16   identification?

17        MR. PACKARD:  We do stipulate.

18        THE INTERPRETER:  May the interpreter render the

19   utterance, Your Honor?

20        THE COURT:  Yes.

21        THE INTERPRETER:  Thank you.

22   A    He is seated in the table in the back.  Starting from

23   the right, he is the third person.  And he is wearing a tie,

24   and I cannot clearly see the color from here, whether it's

25   red or burgundy.

*Arias - Direct - Solomon*                                    92

```
 1   Q    Mr. Arias, approximately how much money did the
 2   defendant pay you in bribes?
 3   A    Around $300,000.
 4   Q    Do you know the exact amount, sir?
 5   A    No.  I am not sure.
 6   Q    What company did the defendant work for?
 7   A    Vitol.
 8   Q    And very briefly, what's Vitol?
 9              MR. PACKARD:  Objection.  Foundation.
10              THE COURT:  Why don't you lay a foundation for us
11   and the jury.
12              MR. SOLOMON:  Happy to do that, Your Honor.
13   Q    Are you company with the company, Vitol, sir?
14   A    Yes.
15   Q    And how are you familiar with that company?
16   A    It is a company that works in trading.  The purchase
17   and sale of oil and its derivatives.
18   Q    And did you work with Vitol in your role in
19   Petroecuador?
20   A    No.
21   Q    You never worked with Vitol while you were at
22   Petroecuador?
23              MR. PACKARD:  Objection.  Asked and answered.
24              THE COURT:  That one I am going to allow.
25   A    Not directly.
```

Arias - Direct - Solomon                    93

1  Q    I see.  All right, we'll return to that in a little

2  bit, sir.

3           Do you know where the defendant worked?

4           THE INTERPRETER:  For the interpreter, where the

5  defendant?

6           MR. SOLOMON:  Worked.

7           THE INTERPRETER:  Worked.

8           MR. SOLOMON:  Forgive me.

9           THE COURT:  Do you have a timeframe?

10          MR. SOLOMON:  I'm sorry?

11          THE COURT:  Timeframe.

12          MR. SOLOMON:  Oh, forgive me.

13 Q    In 2015, do you know where the defendant worked, sir?

14 A    Vitol, in Houston.

15 Q    Do you know what his job was in Vitol?

16 A    He was a trader in charge of LPG gas.

17 Q    A moment ago, you said that you took bribes from the

18 defendant.

19          Can you describe what you did in exchange for

20 those bribes?

21 A    To deliver specific information and to also set up the

22 sale of fuel oil to benefit Vitol.

23 Q    And when you say set up the sale of fuel oil to benefit

24 Vitol, what do you mean by that, sir?  Are you referring to

25 a specific contract?

1           MR. PACKARD:  Objection.  Leading.

2           THE COURT:  I am going to allow the question as

3   stated.

4           You may answer.

5           THE INTERPRETER:  Thank you, Judge.

6   A    Yes, the fuel oil contract.

7   Q    And when was that contract entered into?

8   A    In December 2016.

9   Q    Was one of the parties to that contract Petroecuador?

10  A    The seller.

11  Q    Were you involved in the negotiation of that contract,

12  Mr. Arias?

13  A    Yes.  I was the person in charge.

14  Q    When you say you were in charge of the negotiations,

15  can you explain that a little further, please?

16  A    Yes.  I was the person in charge of leading the seller

17  and buyer in the negotiations of the contract.  For example,

18  the price, the volume, the timeframe.

19  Q    Were there other people at Petroecuador who were also

20  involved in the negotiations?

21  A    Yes.  The team that I supervised.

22  Q    I have a few, for now, just big-picture questions about

23  the contract.

24          How much oil did Petroecuador agree to sell under

25  the fuel oil contract?

*Arias - Direct - Solomon*                              95

1    A    It was fuel oil, and it was 17,100,000 barrels split or

2    divided into 90 cargo.

3    Q    And when you say "cargo," what does that mean?

4    A    Each cargo is of approximately 190,000 barrels, under

5    this contract.

6    Q    Okay.  Over how long of a period did Petroecuador agree

7    to sell those 17.1 million barrels of oil?

8    A    It was three cargos per month, which would total

9    approximately 36 months, if I'm not mistaken.

10   Q    Under the contract was there an amount of money that

11   needed to be paid upfront?

12            MR. PACKARD:  Objection.  Leading.

13            THE COURT:  I am going to allow it.

14   A    Yes.  That was one of the conditions of the contract.

15   Q    How much money, sir?

16   A    Based on the condition of the contract, it was

17   $300 million as an advance -- as a loan.

18   Q    Now, the bribes that you said you received from the

19   defendant, were they tied to that specific contract?

20   A    Yes.

21   Q    Apart from the fuel oil contract, did you try to get

22   any other business for Vitol?

23   A    Yes.

24   Q    Did you expect to receive bribes on those deals, too?

25   A    Yes.

1   Q    Did the defendant pay you the bribes himself?

2   A    No.

3   Q    How did he pay the bribes?

4   A    Through a middleman.

5   Q    Do you know why that was?

6            MR. PACKARD:  Objection.

7            THE COURT:  I'm going to sustain the objection.

8   Q    Mr. Arias, did you also take bribes from other oil

9   trading companies?

10  A    Yes.

11  Q    Did you work with traders at those companies, too?

12  A    Yes.

13  Q    Did anyone at those companies pay you bribes directly?

14  A    No.

15  Q    How did they pay the bribes?

16  A    We would use the same structure through middlemen and

17  through offshore accounts.

18           THE INTERPRETER:  Interpreter correction.

19  A    Through offshore companies.  And it wasn't done

20  directly because it was risky for me.

21           MR. PACKARD:  Objection.  Move to strike.

22           THE COURT:  There's no question.  He answered the

23  question.

24           THE INTERPRETER:  Your Honor, is the interpreter

25  instructed not to render the utterance?

1          THE COURT:  Yes.

2          If Mr. Lax has another question, you may ask.

3    Q    Mr. Arias, have you been charged with a crime in the

4    United States?

5    A    No.

6    Q    You have not been charged with a crime in the United

7    States?

8    A    I apologize, yes.

9    Q    And were those charges in connection with bribes you

10   accepted while working for Petroecuador?

11   A    Yes.

12   Q    What crime were you charged with?

13   A    Money laundering conspiracy.

14         MR. SOLOMON:  I will give you guys a moment to

15   switch.

16   Q    Sir, who did you conspire with?

17   A    With other public employees.

18         THE INTERPRETER:  Interpreter needs clarification.

19   A    And with other traders.

20   Q    Was the defendant one of those traders?

21   A    Yes.

22   Q    Mr. Arias, have you accepted responsibility for your

23   role in that crime?

24   A    Yes.

25   Q    Did you plead guilty?

*Arias - Direct - Solomon*                                        98

1    A    Yes.

2    Q    Why did you plead guilty?

3    A    Because I am responsible for having received

4    commissions, bribes.

5    Q    Mr. Arias, can you describe the geography of Ecuador?

6    A    The geography or where it's located?

7    Q    At a very high level, where is it located, sir, who

8    boarders, those kind of things?

9    A    It's a country located in South America.  It's northern

10   border is shared with Columbia.  It's southern border with

11   Peru.  And to the west, the Pacific Ocean.

12   Q    Do you know what Ecuador's largest export is?

13   A    Yes.  Oil.

14   Q    Do you know what its second largest export is?

15   A    There's competition among them.  Shrimp, bananas, and

16   flowers.

17   Q    Does Ecuador produce its own oil?

18   A    Yes.

19   Q    Who owns the rights to Ecuador's oil?

20   A    The Ecuadorian government.

21   Q    Does Ecuador produce more oil than it uses as a

22   country?

23   A    Yes.

24   Q    What does it do with the rest?

25   A    It exports it.

1    Q    You said a minute ago that Ecuador is bordered on one

2    side by the Pacific Ocean.

3              When Ecuador sells its oil, does it send it out of

4    the country on ships?

5    A    Yes.

6    Q    Is there a part of Ecuador's government that's

7    responsible for selling its oil?

8    A    Yes.

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Arias - direct - Solomon                                    100

1   BY MR. SOLOMON:   (Continuing)

2   Q    And what's that part of the government called?

3   A    The company Petroecuador and the government agency is

4   called the International Trade Management.

5   Q    Does Ecuador also import some oil products?

6   A    Yes.

7   Q    Can you offer some examples of what it might export, sir?

8   A    It exports two types of crude oil.  Oil and fuel oil,

9   basically.

10  Q    And, I'm sorry, I meant to ask you what it imports, an

11  example of that.

12  A    Diesel, gasoline and LPG.

13  Q    That last acronym, LPG, what does that mean?

14  A    Liquid petroleum gas which is the combination of propane

15  and butane.

16  Q    For those of us who aren't in this business, what is LPG

17  used for ordinarily?

18  A    In Ecuador, more than 95 percent of the time is for

19  cooking in homes.

20  Q    Is Petroecuador also responsible for buying oil products

21  on behalf of the country?

22  A    Yes.

23  Q    When you were working for Petroecuador, did you consider

24  yourself a government official?

25  A    Yes.

Arias - direct - Solomon                    101

1   Q    Is that how your family and friends would have described

2   you as well?

3              MR. PACKARD:  Objection.

4              THE COURT:  I'm going to allow it.

5   A    Yes.

6   Q    What's the capital of Ecuador?

7   A    Quito.

8   Q    Does Petroecuador have a headquarters?

9   A    Yes.

10  Q    Where is it located?

11  A    In Quito.

12  Q    Is there an Ecuadorian flag that hangs outside of the

13  building?

14  A    Yes, a flag of the Republic and the company's flag.

15  Q    And on the inside of the offices, are there pictures of

16  the President hanging on the wall?

17             THE COURT:  Meaning the President of Ecuador?

18             MR. SOLOMON:  Yes, Your Honor.  Thank you.

19  A    Yes, there are.

20  Q    When Petroecuador sells oil products, what does it do

21  with the profit?

22  A    They are delivered to the Ministry of Finance.

23  Q    Is the Ministry of Finance also a part of the Ecuadorian

24  government?

25  A    Yes.

Arias - direct - Solomon                      102

1   Q    When Petroecuador buys oil products, where does the money

2   to buy those products come from?

3   A    From the Ministry of Finance.

4   Q    Does Petroecuador have a CEO or someone who holds a

5   similar title?

6   A    Yes, yes, the CEO.

7   Q    Okay.  And for convenience today, can I call him a CEO so

8   I don't ruin that word every time I try to say it?

9   A    Yes.

10  Q    Does the CEO have to report to anyone?

11  A    Yes.

12  Q    Who is that?

13  A    He reports to the board of the company.

14  Q    And who hires the CEO of Petroecuador?

15  A    The board.

16  Q    Does anyone else in the Ecuadorian government have a say

17  in who becomes the CEO of Petroecuador?

18        MR. PACKARD:  Objection.  Foundation.

19        THE COURT:  Are you familiar with how CEOs of the

20  company are chosen?

21        THE WITNESS:  Yes.

22  Q    Okay.  And how is that?

23  A    It is a choice that's made by the board but there is

24  always a representative of the President of the Republic on

25  the board and the President of the Republic has to agree.

Arias - direct - Solomon                          103

1    Q    Can the President of the Republic fire the CEO of

2    Petroecuador?

3    A    Yes.

4    Q    Has that happened before?

5    A    On multiple occasions.

6    Q    Can he fire you?

7    A    He could have.

8    Q    In Petroecuador's organizational chart, how many people

9    were between you and the CEO?

10   A    No one else.

11   Q    How many people reported to you?

12   A    More than a hundred people.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

104

1    MR. LAX:  Your Honor, I see that it's just after

2    1:00, and I understand that your normal practice is to break

3    then and this is a logical place if you wish.

4    THE COURT:  You've met both conditions, Mr. Solomon,

5    so we shall.

6    Ladies and gentlemen, we are -- that's good news.

7    The good news is that we're taking our luncheon break.  The

8    bad news is that nobody's buying you lunch.  I believe a lot

9    of things at times don't go exactly the way we planned, and

10   you found that out already, and one of the things is that the

11   cafeteria seems to be open and shut.

12   William, how are we doing today, is the cafeteria

13   open?

14   THE CLERK:  It is open.

15   THE COURT:  So there's a cafeteria in the building

16   that's available for your use.  There are also restaurants

17   starting around various parts of Brooklyn Heights.  You're

18   welcome to use them as well if you want to brave the chillier

19   weather, but we are taking a break for lunch and whether you

20   decide to eat your lunch here in the cafeteria, bring your

21   lunch the next time or dart out to one of these other places,

22   certain rules do apply.  Some of them you've already heard.

23   It's the same rule as when you go back for the

24   recess break during the session and that is you're not to

25   discuss this case amongst yourselves or with anyone else you

105

1    may run into.  You're to continue to keep an open mind.

2         We are also on what I call radio silence.  I know

3    it's an old expression from the days of radio and it goes back

4    to, I guess, World War II, somewhere along the lines, which

5    means we're not talking to anybody about being here.  We're

6    not communicating about anything that you see or hear or do in

7    the courthouse.  You are not to communicate even the fact that

8    you're coming here.

9         And what do I mean by communicate?  Well, the

10   obvious:  The telephone, a pen, whether it's smoke signals,

11   Instagram, Facebook, all the other million and one social

12   media platforms that I have absolutely no knowledge about

13   other than what my kids tell me.  You're not to -- you're free

14   to use them but you're not free to reference the trial and the

15   personalities, any of the issues, again, the fact that you're

16   coming to Brooklyn and serving on a jury.

17        This is also a homework-free zone.  All of the work

18   that we're going to ask you to do you are going to do right

19   here in the courtroom.  There's no outside research.  There's

20   no independent research.  No extra credit.  In fact, there are

21   penalties if you violate that rule.  So that there is no

22   either electronic methods of Googling and the like or other

23   search engines or the old fashioned ones, actually picking

24   something up with paper and reading through them, they are all

25   off limits to you.

106

1        On the occasion that it is possible that there may
2    be some coverage of the goings on in the courtroom in some
3    form of media, again, the old fashioned kind, radio, TV and
4    newspapers or the electronic kinds that may come your way, you
5    are to totally disregard them whether that happens overnight
6    or during the course of your lunch break.
7        Now, with that, with all those admonitions, you're
8    still supposed to go out and have a good lunch.  We're going
9    to ask you -- I know we've run a little later so we're going
10   to ask you to come back.
11       William, we're still reporting to the Central Jury
12   Room?
13       THE CLERK:  Yes.
14       THE COURT:  In other words, not back here, not on
15   this floor, but report back to the Central Jury Room at around
16   2:15 or so and we'll try to get started between 2:15 and 2:30
17   as close as we can.
18       On behalf of not only me and the court staff, but on
19   behalf of the parties, the lawyers in the case, we all thank
20   you for your patience, for your attention and for your
21   sacrifice.  We all really mean that we appreciate that.  We
22   understand that you're here by sacrifice and we thank you and
23   we congratulate you on your citizenship and on your individual
24   commitments to the rules of law.
25       So with that, you are discharged for lunch and we

1  will see you around 2:15.

2          (Jury exits.)

3          THE COURT:  Okay.  The witness may step down and go

4  to lunch as well and the interpreters too.

5          Now, our normal practice, and I'll listen to

6  counsel, I know we have a much larger contingency and the

7  defense have a printer and the like here, normally, what we do

8  is we say we're going to lock up the courtroom during lunch

9  and if you need something, take it with you and then William

10  will reopen the courtroom.

11          Is that the plan, Mr. Koffmann?  Are you going to be

12  staying here?

13          MR. KOFFMANN:  Your Honor, the court staff was

14  actually kind enough to give us a room just next door.

15          THE COURT:  I wasn't sure we were able to do it.

16          MR. KOFFMANN:  Yes, Your Honor.  Thank you for that

17  and I think that we'll be able to use that room and won't

18  present any challenges.

19          THE COURT:  All right.  So then we'll follow the

20  usual rule which is you're free to leave everything except the

21  things that you need.  William will lock the courtroom and

22  open it when we get close to restart so, therefore, if there's

23  something you think you need, make sure you take it.

24          MR. KOFFMANN:  We will, Your Honor.

25          THE COURT:  Then we'll see you all between as I say

1    2:15 and 2:30.

2              MR. SOLOMON:  One thing, Your Honor, this is

3    Mr. Solomon.  I want to apologize for violating your first

4    rule which was not to introduce myself when I began examining

5    the witness.  So for the record, this is Mr. Solomon.

6              THE COURT:  Mr. Villanueva pulled your fat out of

7    the fire.

8              MR. SOLOMON:  Thank you too, Mr. Villanueva.

9              THE CLERK:  You're welcome.

10             THE COURT:  He'll continue do that.  And I'll

11   continue to try to catch up.

12             All right.  See you at 2:15.

13             (Luncheon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

109

                            AFTERNOON SESSION

1

2              (In open court; outside the presence of the jury.)

3              THE CLERK:  Court is back in session.  Counsel for

4    both sides are present including the defendant.

5              THE COURT:  Are we ready to begin?

6              MR. LAX:  We are, Judge.

7              THE COURT:  Okay.  Bring the jury in.

8              MR. LAX:  Your Honor, Jonathan Lax for the

9    government.  Should we bring in the witness on the stand now?

10             THE COURT:  Yes, start working on that.  We'll try

11   to save as much time as we can.  I'm going to refer all of you

12   at the table as "Mr. Lax."

13             MR. LAX:  My ego is big enough.

14             (The witness, NILSEN ARIAS SANDOVAL, having been

15   previously sworn, resumed the stand.)

16             (Jury enters.)

17             THE COURT:  Be seated, please.

18             Counsel will stipulate that the jury is present and

19   properly seated?

20             MR. LAX:  Yes, Your Honor.

21             MR. KOFFMANN:  We do, Your Honor.

22             THE COURT:  Thank you, Counsel.

23             Ladies and gentlemen of the jury, welcome back.  I

24   hope you had a chance to enjoy a nice lunch.  We are ready to

25   resume.

Arias - direct - Solomon                    110

1        You will remember when we broke, that we were on the

2  government's direct examination by Mr. Solomon.  Mr. Arias is

3  the witness.

4        Mr. Arias, I remind you you remain under oath and

5  Mr. Solomon may continue his examination.

6        MR. SOLOMON:  Thank you, Your Honor.

7  DIRECT EXAMINATION (Continued)

8  BY MR. SOLOMON:

9  Q    Good afternoon, Mr. Arias.

10 A    Good afternoon.

11 Q    When we left off before the break, we were talking about

12 Petroecuador's organizational structure and I'm going to ask

13 you some additional questions about Petroecuador.

14 A    Okay.

15 Q    Earlier, you testified that sometimes Petroecuador is the

16 seller and sometimes it's the buyer.  Is that right?

17 A    Correct.

18 Q    When Petroecuador is the seller, who are its customers?

19 A    Buyers who are previously registered on a list of

20 providers.

21 Q    Okay.  Does Petroecuador sell to private companies?

22 A    Yes.

23 Q    Does it sell to other governments?

24 A    Also.

25 Q    Does Petroecuador sell oil to the United States?

1  A    Yes.

2  Q    Is there a term for government customers of Petroecuador?

3  A    Yes.

4  Q    And what is that?

5  A    Public companies or state-owned entities.

6  Q    Do all Petroecuador's customers have to register?

7  A    All of them.

8  Q    Okay.  Can you, Mr. Arias, please describe at a very high

9  level what the registration process looks like?

10 A    Certain information must be delivered.  Among that

11 information is the makeup of the company but aside from that,

12 also financial information showing the financial capability of

13 the company, proof of having done similar business with other

14 companies in the world, and a statement of not having failed

15 in similar businesses with other companies.

16 Q    Now, for Petroecuador's state-owned customers, are there

17 other requirements of the registration process?

18 A    Aside from those, yes.

19 Q    And what are those, sir?

20 A    A certification from the company from which the --

21       THE INTERPRETER:  Interpreter correction:  "A

22 certification from the country."

23 A    -- from which the company comes certifying that they are

24 from that country.

25 Q    Do you have a role personally in the registration

Arias - direct - Solomon                                    112

1   process?

2   A    Yes.

3   Q    And what's your role?

4   A    After receiving the information, recommend that the

5   company be registered or not.

6   Q    Okay.  And who do you make that recommendation to,

7   Mr. Arias?

8   A    To the CEO.

9   Q    And do you -- did you have the authority to recommend

10  against the registration of a company?

11  A    Yes.

12  Q    Once a company is registered, is it then able to buy

13  products from Petroecuador?

14  A    Yes.

15  Q    Can you describe the process or processes for buying oil

16  from Petroecuador?

17          THE COURT:  I assume you mean for a company properly

18  registered?

19          MR. SOLOMON:  That's correct, Your Honor.  Thank

20  you.

21  A    After the company was registered, we, as a state-owned

22  entity, what we would do would be to hold contests.  These

23  contests are called tenders which could be short term or long

24  term.  And another would be direct negotiation.

25  Q    Okay.

Arias - direct - Solomon                    113

1          THE INTERPRETER:  The interpreter would like to
2    correct in a previous answer the word "contest" to "bidding."
3    Q    Okay.  So let's begin there.
4          You first described, I think you said a tender.  Is
5    that correct, sir?
6    A    Yes.
7    Q    What's a tender?
8    A    The tender is, well, first they're invited and it's the
9    composition, the composition of general terms that must be
10   accepted.
11   Q    And when you say they're invited, who is invited to
12   participate in Petroecuador's tenders?
13   A    Only registered companies, previously registered.
14   Q    And are all the registered companies invited to
15   participate in tenders?
16   A    Yes.
17   Q    How does a tender work generally?
18   A    On the invitation, the invitation includes the type of
19   product and the amount and the companies that are invited
20   simply have to accept the conditions and deliver the best
21   price.
22   Q    Is there --
23          THE INTERPRETER:  Interpreter correction:  "Accept
24   terms and conditions and delivery at the best price."
25   Q    When you say deliver the best price, what do you mean?

Arias - direct - Solomon                    114

1    A    The offers that are made are not public offers.  They're

2    sealed.  And at the time of opening the envelopes, the best

3    price is simply accepted.

4    Q    In a tender, is there any type of negotiation during that

5    process?

6    A    No.

7    Q    And how are the results announced from tenders?

8    A    At that moment, live with the participation of the press

9    even.

10   Q    What was your role as international trade manager in the

11   tender process?

12   A    Organize the whole process from the beginning and to

13   receive the offers along with a team.

14   Q    Did you have any discretion in selecting the winner?

15   A    No.

16   Q    Okay.  You described another process as a direct

17   negotiation.  Did I get that right?

18   A    Correct.

19   Q    Can you explain what you mean by that term?

20   A    It's the negotiation of terms and conditions that can

21   vary with the counterpart.

22   Q    In general, are all registered companies able to

23   participate in direct negotiations?

24   A    Yes and no.

25   Q    Please explain.

Arias - direct - Solomon                    115

1   A    On most occasions -- most of the time, we negotiate with

2   state-owned entities because a certain type of certification

3   was necessary for that.  We did not negotiate with private

4   companies.

5   Q    The certification for negotiations with state-owned

6   entities, what do you call that?

7   A    A strategic alliance.

8   Q    All right.  Can you please explain for the jury what a

9   strategic alliance is?

10  A    It's something that is permitted under Ecuadorian law and

11  it allows two state-owned entities to negotiate directly once

12  the board approves it.

13  Q    And do you know what law that was, sir?

14  A    The law of strategic alliances.

15  Q    Do you know the policy behind that law, sir?

16  A    In general, the idea is that --

17           MR. PACKARD:  Objection.  Foundation.  Objection,

18  foundation.

19           THE COURT:  I'm going to allow it.  He's the manager

20  of the operation.

21  A    In general, the idea is that the best outcome will be

22  negotiated for both countries.

23  Q    And why is that, sir?

24  A    Because of the price and the benefit to the parties.

25  Q    Now, the certification that's required for strategic

1    alliances, who does that certification?

2    A    Petroecuador's legal department with the approval of the

3    board.

4    Q    And do you in your role -- did you in your role as

5    international trade manager have any involvement in that

6    certification process?

7    A    Doing follow up.

8    Q    What do you mean by that?

9    A    Getting in contact with the company that is going to be

10   certified, getting the information from them and following up

11   with the board.

12            THE INTERPRETER:  The interpreter would like to

13   correct:  "And delivering the information to the legal

14   department."

15   Q    Okay.  Earlier when you were describing the tender

16   process, you said that everyone who is registered is invited

17   to participate.  Is that right?

18   A    Yes.

19   Q    When Petroecuador held direct negotiations, were all

20   registered parties invited to participate in those as well?

21            THE COURT:  Mr. Solomon, maybe I'm misunderstanding,

22   but I think you identified two methods of certification.  Are

23   you referencing one certified list as opposed to another?

24            MR. SOLOMON:  Your Honor, I'm not speaking about the

25   certification process, but I'm asking the witness about the

1   two types of participating in buying options with the

2   Ecuadorian government.  So I believe Mr. Arias said there were

3   two ways.  One is in a public tender and the other is through

4   what he called direct negotiations and I'm comparing some of

5   the processes for those, if that makes sense.

6              THE COURT:  I understood the question as asking who

7   can participate in the direct negotiation, is it off of one

8   list as opposed to the other.  That's the thrust of what I

9   thought the question is.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. SOLOMON: (Continuing)

 2             THE COURT:  Is it one list as opposed to the other?

 3    That's what I thought the question was.

 4             MR. SOLOMON:  Let me try and ask a better question,

 5    Your Honor.

 6             THE COURT:  Okay.

 7    BY MR. SOLOMON:

 8    Q    Who was invited to participate in the direct

 9    negotiations?

10    A    Mostly public companies.

11    Q    Is more than one company at a time invited to participate

12    in direct negotiations?

13    A    No.

14    Q    Who at Petroecuador decides who to negotiate with?

15    A    The international trade manager, in this case myself, or

16    the board.

17    Q    Okay.  Who usually selected who to negotiate with, you or

18    the board?

19    A    Me.

20    Q    Who at Petroecuador was responsible for the actual

21    negotiations?

22    A    Me.

23    Q    And at the end of those negotiations, did you have to

24    make a recommendation one way or another?

25    A    Yes, to the CEO.

1    Q    And was the CEO the final decisionmaker on whether to

2    accept a directly negotiated deal?

3    A    No, the board's approval was needed.

4    Q    What was your involvement in seeking the board's

5    approval?

6    A    I would present the negotiation to the board.

7    Q    What do you mean by "present the negotiation"?

8    A    During a board meeting, I would give a debriefing on the

9    characteristics of the negotiation.

10   Q    Okay.  Did you have the authority to recommend against

11   taking -- against approving a deal?

12              THE INTERPRETER:  Can you please repeat the question

13   for the interpreter?

14   BY MR. SOLOMON:

15   Q    Did you have authority to recommend against approving a

16   deal?

17   A    Yes.

18   Q    Earlier, you were talking about the fuel oil contract.

19   Did you recommend that deal to the board, sir?

20   A    Yes.

21   Q    Outside of Petroecuador, was there anyone else in

22   government who was responsible for managing the country's

23   energy sector?

24   A    The Ministry of Hydrocarbons.

25   Q    And what is -- well, first of all, what's a hydrocarbon?

1  A    It is an organic product that is underground such as gas,

2  oil, and carbon.

3  Q    And what is the difference between what the Ministry of

4  Hydrocarbons did and Petroecuador?

5  A    Petroecuador handles the operations, and the Ministry of

6  Hydrocarbons governs the regulations and the law.

7  Q    Was there anyone in government who was responsible for

8  overseeing both of those agencies?

9  A    During that administration, the vice president of the

10 republic was appointed.

11 Q    And when you say "that administration," what time period

12 are you talking about, sir?

13 A    Under the president of Rafael Correa, it was starting in

14 around 2014 until 2017, and it was a vice president who was

15 responsible for this at the time.

16 Q    And what was his or her name, vice president?

17 A    It escapes me.  Well, it was Vice President Jorge Glas.

18 Q    Sorry, I missed that last one.  I got Jorge.  What was

19 the second name?

20        THE INTERPRETER:  May the interpreter please

21 confirm?

22        MR. SOLOMON:  Yes.

23 A    Jorge Glas.

24 Q    Okay.  In your role as international trade manager, did

25 you have to meet with the vice president?

*Arias - Direct - Solomon*                                     121

1   A    Myself and my team, at least once a month.

2            MR. SOLOMON:  Your Honor, may I approach the witness

3   with a few exhibits we're going to work through?

4            THE COURT:  Yes, you may.

5   BY MR. SOLOMON:

6   Q    Okay.  Sir, you have in front of you a binder with a

7   number of folders, and --

8            MR. PACKARD:  I'm sorry.  Your Honor, can we ask the

9   government, whatever exhibit is shown to the witness, to put

10  on the screens?

11           THE COURT:  Whatever the numbers are.

12           MR. PACKARD:  Just to make it available as they go

13  to show on the screens?

14           MR. SOLOMON:  Yeah, I'm happy to, just for the

15  witness for now.

16           So what I was hoping to do, Mr. Packard, was to show

17  him all of these at once, have them admitted, and then do the

18  photos, or we can do it one at a time.

19           MR. PACKARD:  I'd like to see them.

20           MR. SOLOMON:  Okay.

21           MR. PACKARD:  Thank you.

22           MR. SOLOMON:  So, Ms. Jefferson, if you could put up

23  GX 1, please.

24           THE COURT:  Just to the witness and counsel.

25  BY MR. SOLOMON:

*Arias - Direct - Solomon*                          122

1  Q    Mr. Arias, you also have in front of you a paper copy of
2  these, as well.
3          Mr. Arias, can you see the exhibit in front of you?
4  A    Yes.
5  Q    Do you recognize the person in the photo that's been
6  marked for identification as Government Exhibit 1?
7  A    Yes.
8  Q    Who is it?
9  A    Mr. Javier Aguilar.
10         MR. SOLOMON:  Ms. Jefferson, can you please put up
11 Government's Exhibit 2.
12 BY MR. SOLOMON:
13 Q    Mr. Arias, do you recognize the person shown in what's
14 been marked for identification as Government Exhibit 2?
15 A    Yes.
16 Q    Government Exhibit Number 3 for identification, only,
17 please.
18         Mr. Arias, do you recognize the person in Government
19 Exhibit Number 3?
20 A    Yes.  No.  No, excuse me.  No, I don't.
21 Q    Government Exhibit Number 4, please.
22         Do you recognize the person in Government Exhibit
23 Number 4?
24 A    No.
25 Q    Government Exhibit 5, please.

1          Do you recognize the individual in Government

2    Exhibit Number 5?

3    A    Yes.

4    Q    Who is that?

5    A    Enrique Pere.

6    Q    Can we please show Government Exhibit Number 6.

7          Do you recognize the individual in Government

8    Exhibit Number 6?

9    A    No.

10         THE COURTROOM DEPUTY:  Hold on one second.  I'm

11   sorry.

12         MR. SOLOMON:  Yes.

13         (Pause.)

14         THE COURT:  You may proceed.

15   BY MR. SOLOMON:

16   Q    Sir, do you have Government Exhibit Number 6 in front of

17   you?

18   A    Yes.

19   Q    Do you recognize that individual?

20   A    No.

21   Q    Can we pull up Government Exhibit Number 7.

22         Do you recognize that individual?

23   A    No.

24   Q    Government Exhibit Number 8.  Do you recognize that

25   individual?

1   A    Yes.

2   Q    Who is that?

3   A    That's me.

4   Q    Government Exhibit Number 9.  I just have a couple more,

5   sir.

6            Do you recognize that individual?

7   A    No.

8   Q    Government Exhibit Number 10.  Do you recognize that

9   individual?

10  A    Yes.

11  Q    Who is that?

12  A    Nicolas Naranjo.

13  Q    Government Exhibit Number 11.  Do you recognize that

14  person, sir?

15  A    No.

16  Q    Government Exhibit Number 12.  Do you recognize that

17  person?

18  A    Yes.

19  Q    Who is that?

20  A    Xavier Rodriguez.

21  Q    Government Exhibit Number 13.  Do you recognize that

22  person?

23  A    Yes.

24  Q    Who is that?

25  A    Mike Loya.

*Arias - Direct - Solomon*                              125

1    Q    Government Exhibit Number 14.  Do you recognize that

2    person?

3    A    Yes.

4    Q    Who is that?

5    A    Mauricio Samaniego.

6             THE INTERPRETER:  Interpreter correction.

7    A    Samaniego.

8    Q    Government Exhibit Number 15.  Do you recognize that

9    person?

10   A    Yes.

11   Q    Who is that?

12   A    Jose Agusto Briones.

13   Q    And last but not least, Government Exhibit 16.

14            Do you recognize that person?

15   A    No.

16            MR. SOLOMON:  Your Honor, the witness, having

17   identified Government Exhibits 1, 2, 5, 8, 10, 12, 13, 14, and

18   15, we wish to move those exhibits into evidence.

19            THE COURT:  Any objection?

20            MR. PACKARD:  No objection as to any, but for

21   Exhibit 1 under 403, quality of picture.

22            MR. SOLOMON:  Do you wish that I respond, Your

23   Honor?

24            THE COURT:  Yes, sure.

25            MR. SOLOMON:  The witness was able to identify

 1   Government Exhibit 1 as the defendant.

 2            THE COURT:  I don't see a problem.  That objection

 3   is overruled.  The other exhibits are all received in evidence

 4   without objection.

 5            (Government's Exhibits 1, 2, 5, 8, 10, 12, 13, 14,

 6   and 15, were received in evidence.)

 7   BY MR. SOLOMON:

 8   Q    Mr. Arias, we will walk through these in some more

 9   detail, but I would like to publish them one by one, the ones

10   admitted in evidence, and have you identify them one more

11   time.

12            MR. SOLOMON:  Ms. Jefferson, can you please show

13   Government's Exhibit 1.

14   BY MR. SOLOMON:

15   Q    Mr. Arias, when you see that person up on the screen, can

16   you identify who that person is?

17   A    Mr. Javier Aguilar.

18   Q    Government Exhibit 2, who is that?

19   A    Mr. Antonio Pere.

20            MR. SOLOMON:  Government Exhibit 5, Ms. Jefferson.

21   BY MR. SOLOMON:

22   Q    Who is that?

23   A    Mr. Enrique Pere.

24   Q    Government Exhibit 8, who is that?

25   A    Nilsen Arias.

1   Q    That's you, sir?

2   A    Yes.

3   Q    Government Exhibit 10.  Who is that?

4   A    Mr. Nicolas Naranjo.

5   Q    Now, we've not heard anything about Mr. Naranjo.  Who is

6   Mr. Naranjo?

7   A    Mr. Naranjo was somebody that worked as a middleman

8   between Antonio Pere and companies.

9             THE INTERPRETER:  May the interpreter clarify?

10  Interpreter correction.

11  A    The government and companies.

12  Q    And Government Exhibit 12.  Who is that, sir?

13  A    Mr. Xavier Rodriguez.

14  Q    And who is Xavier Rodriguez?

15  A    A public official who worked in the Ministry of

16  Hydrocarbons.

17  Q    And Ministry of Hydrocarbons in Ecuador, sir?

18  A    Yes.

19  Q    All right.  Government Exhibit 13, who is that?

20  A    Mr. Mike Loya.

21  Q    Who is Mike Loya?

22  A    Vitol's CEO.

23  Q    Okay.  Global CEO or a CEO of a particular part of Vitol?

24  A    I met him as a CEO in Houston.

25  Q    Government Exhibit 14, who is that?

1    A    Mr. Mauricio Samaniego.

2    Q    And who is he?

3    A    He was the international trade manager from 2008 until I

4    believe 2022, or 2023.

5    Q    And, finally, Government Exhibit 15.  Who is that?

6    A    Jose Augusto Briones.

7    Q    And who is Mr. Briones?

8    A    He was the advisor to the hydro -- hydrocarbon minister,

9    and he was also the minister of hydrocarbons.  He is now

10   deceased.

11   Q    Okay.  Mr. Arias, all the photos that you looked at that

12   we did not pull up, did you know who any of them were?

13   A    I have no idea.

14   Q    Can we pull up Government Exhibit 1, please?

15        All right.  Mr. Arias, we're going to talk in

16   greater detail about a few of those photos.

17        When did you meet the defendant?

18   A    Approximately in the year 2014, '13 or '14.

19   Q    And where did you meet him?

20   A    At Petroecuador, in my office.

21   Q    Okay.  Which office of Petroecuador was that, sir?

22   A    The Office of the International Trade Manager.

23   Q    Where is that located, sir?

24   A    In Quito, in the main building.

25   Q    In that initial meeting with the defendant, was anyone

1  else there?

2  A    I don't think so.

3  Q    In your role as international trade manager, was it

4  common to meet directly with traders?

5  A    Yes.

6  Q    Do you know how the defendant got that meeting with you,

7  sir?

8  A    It must have been maybe through my --

9           MR. PACKARD:  Objection, speculation.

10          THE COURT:  Sustained.

11  BY MR. SOLOMON:

12  Q    When traders met with you, sir, how did they go about

13  arranging a meeting?

14          MR. PACKARD:  Objection, speculation.

15          THE COURT:  I'm going to allow him, if he knows.

16  How did that come about?

17  A    Normally through my assistant, or otherwise they would

18  ask me directly.

19  Q    And how would they ask you directly?

20  A    An email or phone call.

21  Q    You described Vitol earlier as a trading company; is that

22  right, sir?

23  A    Correct.

24  Q    Do you know what the three biggest trading companies in

25  the world are?

1          THE COURT:  Time period?

2          MR. SOLOMON:  In 2016.

3   A    Yes.

4   Q    What were they, sir?

5   A    Glencore, Vitol, Trafigura.

6   Q    Were Glencore, Vitol, and Trafigura important clients to

7   Petroecuador?

8   A    Yes.

9   Q    And if a trader at one of those companies tried to

10  schedule a meeting with you, was it your normal practice to

11  take such a meeting, sir?

12  A    Yes.

13  Q    Do you remember what you talked about with Mr. Aguilar in

14  that first meeting?

15  A    Yes.

16  Q    What did you talk about?

17  A    He was interested in Vitol participating in the tenders,

18  but they couldn't because they were on a blacklist, so he

19  talked to me about getting them off the blacklist.

20  Q    Okay.  What is a blacklist?

21  A    It's a list on which the companies that have been, you

22  could say, disqualified are put on that list because they have

23  not -- they have breached some of the requirements --

24  Q    Do you know why Vitol --

25  A    -- they have breached all the contracts.

*Arias - Direct - Solomon*                        131

1    Q    Do you know why Vitol was on the blacklist at that time?

2    A    I know that they had breached a contract from before,

3    from the year 2008, approximately.

4    Q    Do you know what Vitol had to do if it wanted off of

5    Petroecuador's blacklist?

6    A    Yes.  It was simple, to pay a fine.

7    Q    Anything other than that?

8    A    No.

9    Q    Did you tell the defendant that?

10   A    Yes.

11   Q    Did you discuss anything else with the defendant at that

12   time, sir?

13   A    No.

14   Q    So I believe you said this is around 2014; is that right,

15   sir?

16   A    Yes.

17   Q    Earlier we talked about a product called liquefied

18   petroleum gas, or LPG.

19         At that time did Petroecuador have a supplier of

20   LPG?

21   A    Yes.

22   Q    Who was that?

23   A    Petredec.

24   Q    Tell us about Petredec for LPG at that time, sir.

25   A    It's a contract that Petredec had won through a bidding

1    process.

2    Q    What was the term of that contract?

3    A    Well, it's by volume, so approximately two-and-a-half

4    years.

5    Q    Earlier you described Mr. Aguilar as a trader, sir; is

6    that right?

7    A    Correct.

8    Q    Do you know whether he specialized in any particular

9    kinds of products?

10   A    Yes.

11   Q    What products?

12   A    LPG.

13   Q    Did you ever discuss potential LPG business with the

14   defendant?

15   A    Yes.

16   Q    Okay.  Tell us about those discussions.

17   A    At that time he was interested in the company

18   participating in LPG in the year 2014, but they couldn't.

19   Q    And why couldn't they?

20   A    Because they were on the blacklist.

21        MR. SOLOMON:  Before I move on, I'd like to take a

22   printout of Government Exhibit 1, and for the Court, I have

23   here a board which I'm going to affix Government Exhibit 1 to

24   as a demonstrative for the jury.

25        THE COURT:  You may.

1      MR. SOLOMON:  Ms. Jefferson, can you please pull up

2  Government Exhibit 12, please.

3  BY MR. SOLOMON:

4  Q    A moment ago you identified the person in Government

5  Exhibit 12 as Xavier Rodriguez; is that right, sir?

6  A    Yes, sir.

7  Q    By the way, how is his first name spelled?

8  A    Xavier with an X, X-A-V-E-I-R -- I-E-R.

9  Q    And how do you know Mr. Rodriguez?

10  A    He was the undersecretary of hydrocarbons.

11  Q    And did you work with him in that role, sir?

12  A    You can say, yes.

13  Q    Why the qualification?

14  A    Because actually the ministry was not a part of

15  Petroecuador, but as a regulatory body, we had some dealings.

16  Q    Earlier you said that you pled guilty to a money

17  laundering conspiracy.

18      Was Mr. Rodriguez one of the people that you

19  conspired with?

20  A    Yes.

21  Q    What was Mr. Rodriguez's role in the conspiracy?

22      MR. PACKARD:  Objection.  Foundation.

23      THE COURT:  I'll allow it.

24  A    Mr. Rodriguez was interested later on in helping Vitol

25  get off the blacklist.  And later on he was the person who

1  helped with the negotiations by presenting the companies,

2  along with Vitol -- I'd like to correct.  The people.

3  Q    What do you mean, sir, when you're correcting to the

4  people?

5  A    He was the person who introduced me to it, even though I

6  already knew him as a representative, but the person who

7  introduced me to Mr. Aguilar from Vitol to do what he called

8  business.

9  Q    I see.  Do you --

10       THE INTERPRETER:  Interpreter correction.

11  A    To do what he called deals.

12  Q    Do you know how Mr. Rodriguez knows the defendant?

13       MR. PACKARD:  Objection.  Speculation.

14       THE COURT:  Overruled.

15  A    Yes.

16  Q    How is that?

17  A    According to what Mr. Rodriguez told me --

18       MR. PACKARD:  Objection.  Hearsay.

19       THE COURT:  Sustained.

20  BY MR. SOLOMON:

21  Q    Did you and Mr. Rodriguez ever discuss bribes, sir?

22  A    Yes.

23  Q    Was that in connection with the conspiracy that you pled

24  guilty to, sir?

25  A    Yes.

1    Q    Did Mr. Rodriguez ever tell you that he received bribes

2    while he was in the Ecuadorian government?

3              MR. PACKARD:  Objection.  Hearsay.

4              THE COURT:  This is being offered for the truth,

5    Mr. Solomon?

6              MR. SOLOMON:  It is.  May we approach?

7              THE COURT:  Yes.

8              (Sidebar.)

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                        136

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          MR. SOLOMON:  It is being offered for the truth.

5     It's a statement of a co-conspirator, Mr. Rodriguez --

6          THE COURT:  There is so many conspiracies here, I

7     want to make sure we're in the right conspiracy.

8          MR. SOLOMON:  Okay.  I can lay the foundation for

9     that of what he -- what the witness will say is that Mr.

10    Rodriguez also took bribes from the defendant in connection

11    with the fuel oil transaction and other transactions related

12    to Vitol, and that's what he pled to.

13         MR. PACKARD:  So, I'm unclear if he's going to say

14    that -- if this guy is about to testify that Mr. Rodriguez

15    took bribes, that's all hearsay.  So I don't see how they're

16    going to use hearsay to get over my hearsay objection about

17    what he would say.

18         MR. SOLOMON:  It is hearsay, but it is accepted for

19    the hearsay rule as a statement by a co-conspirator.

20         MR. PACKARD:  If that's been established, Your

21    Honor, but we don't think we're even at that, you know, that

22    presumption that could apply.

23         THE COURT:  Well, the issue is what's the proffer

24    for that conspiracy?  Is it the one that Mr. Aguilar is

25    charged in?

1          MR. SOLOMON:  Yes, Your Honor, it is.  He has just

2   said that one of the crimes he pled guilty to was conspiracy.

3   The people he conspired with, he's named so far, are

4   Mr. Aguilar and Mr. Rodriguez.

5          And one of those various conspiracies is the Vitol

6   conspiracy.  What we suspect he's going to say is that not

7   only did Mr. Rodriguez tell him that he also received bribes

8   from the defendant, but he told him in such a way as to say,

9   you should also accept bribes from the defendant as part of

10   the foundations of the corrupt deal.

11          THE COURT:  This creates the creation of trust among

12   co-conspirators.

13          MR. SOLOMON:  Absolutely.

14          THE COURT:  I will allow it.

15          MR. SOLOMON:  Thank you, Your Honor.

16          (End of bench conference.)

17

18

19

20

21

22

23

24

25

1          MR. SOLOMON:  If we could have the last question

2     read back, please.

3          (Record read.)

4          THE WITNESS:  Yes.

5     BY MR. SOLOMON:

6     Q    Did he tell you who he received bribes from?

7     A    No.

8          MR. PACKARD:  Objection, Your Honor, as to time.  It

9     bears on the subject we just discussed at sidebar.

10         MR. SOLOMON:  I'm happy to inquire as to the time,

11    Your Honor.

12         THE COURT:  Yes.

13    BY MR. SOLOMON:

14    Q    When is the first time that you had a conversation with

15    Mr. Rodriguez about bribes?

16    A    Approximately the year 2014, '15.

17    Q    Tell us about that conversation, sir.

18    A    He was asking to -- when he was asking us to help Vitol,

19    he said that Vitol was interested in us helping them, and he

20    referred to them as the friends or our friends when talking

21    about the people from Vitol.

22    Q    Mr. Arias, is Vitol a company?

23    A    Yes.

24    Q    In those conversations, did Mr. Rodriguez tell you any

25    particular person at Vitol with whom he discussed bribes?

1          MR. PACKARD:  Objection.  Hearsay.  May we approach?

2          THE COURT:  I'll let you approach.

3          (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                 140

1    (continuing.)

2          (Sidebar conference held on the record out of the

3    hearing of the jury.)

4          MR. PACKARD:  Your Honor, it's Michael Packard for

5    Mr. Aguilar.

6          The issue here is one of timing.  This gentleman,

7    I believe, is attesting to an initial first conversation

8    ever with Xavier Rodriguez, where he is reporting to say

9    that Mr. Rodriguez was already going to talk about bribe

10   payments he has received from Vitol.

11         The issue here is Mr. Aguilar is not charged with

12   participating in any scheme that started before that time.

13   It's outside the scope of charge of conspiracy.  It is not a

14   statement in furtherance of this charge of conspiracy,

15   period, full stop.

16         MR. SOLOMON:  You asked that we establish the

17   timing.  And what the timing is going to show is that he

18   began receiving bribes in 2014, and continued to receive

19   bribes throughout the charged scheme for many years

20   thereafter.

21         What Mr. Rodriguez's role is he was one of the

22   introducing people between Mr. Aguilar and Mr. Arias and he

23   also is one of the people who held one of the first meetings

24   with the Peres.  So this is the foundation of the scheme,

25   Your Honor.

*Sidebar*                                                        141

1          THE COURT:  This is the foundation of the scheme

2     leading into the creation of the role that Mr. Aguilar

3     allegedly played?

4          MR. PACKARD:  So here is the issue, Your Honor.

5     There is only the bribery payment that the Government has

6     identified to us, the bribe payment made to Xavier Rodriguez

7     occurred after this alleged conversation he is talking about

8     right now, every single one, we wrote the letter.

9          MR. SOLOMON:  We do intend to offer specific

10     evidence only of payments during the charged conspiracy.

11     Beginning in 2015, we will establish one payment, then one

12     in 2016, and a series of payments in 2017 and 2018.

13          MR. PACKARD:  The testimony from somebody is also

14     evidence.  They are barred from introducing this because

15     they did not identify it on the schedule identified by the

16     Court, period.  This is absolute sandbagging, Your Honor.

17     It ought not be allowed.

18          MR. SOLOMON:  Forgive me, but as Your Honor knows,

19     your ruling was to identify the specific transactions of the

20     nature alleged in the superseding indictment on which the

21     government intended to rely on at trial.  Not only did we

22     satisfy those obligations through a letter identifying

23     dozens of such transactions, we also --

24          THE COURT:  The question is are you relying now on

25     a transaction -- very simple, are you now relying on a

1   transaction --

2          MR. SOLOMON:  We are not.

3          THE COURT:  -- that you didn't identify?

4          MR. SOLOMON:  We are not, Your Honor.  We are

5   relying only on --

6          THE COURT:  Well, relying.

7          Are you going to use, during the course of this

8   trial, a transaction that you did not identify?

9          MR. SOLOMON:  We are not, Your Honor.

10          THE COURT:  He said no.

11          MR. PACKARD:  He is about to identify here, he is

12   about to get testimony from this witness, that Xavier

13   Rodriguez will say I've got bribes that weren't identified

14   to us.  It could be outside the scope of the letter, but --

15          MR. SOLOMON:  We are not going to ask, Your Honor,

16   about any transactions.  Only the conversations which are

17   the foundation of the scheme, which were, did Mr. Rodriguez

18   ever tell you about bribes, yes.

19          THE COURT:  Didn't you just ask if he ever took a

20   bribe?

21          MR. SOLOMON:  I asked him if Mr. Rodriguez ever

22   told him that he took bribes from the defendant.  Period.

23   Hard stop.

24          We are not going to adduce evidence before the

25   jury of a transaction in 2014 or before the charged

1  conspiracy.  Only the existence of, look, there were bribes

2  paid, that is the establishment of the trust relationship,

3  he paid me and therefore he can be trusted to pay you, and

4  that's how the scheme began.

5          MR. PACKARD:  So the issue, Your Honor, is a

6  payment is a transaction.  You can call it whatever you

7  want, semantics, this is something that has never been told

8  to us.

9          THE COURT:  There were other conversations that

10  come later between these same people?

11          MR. SOLOMON:  Yes.  There are many.

12          THE COURT:  Many.  Including during the charged

13  conspiracy?

14          MR. SOLOMON:  Yes, absolutely.

15          THE COURT:  Okay.  Sustained.

16          MR. PACKARD:  Thank you, Your Honor.

17          (Sidebar conference ends.)

18          (Continued on following page.)

19

20

21

22

23

24

25

1          (In open court.)

2    BY MR. SOLOMON:

3    Q    Mr. Arias, I believe you said a moment ago that

4    Mr. Rodriguez approached you with the idea of doing business

5    with Vitol; is that correct?

6    A    Correct.

7    Q    And what was the kind of business that was being

8    proposed?

9              MR. PACKARD:  Objection.  Vague.

10             THE COURT:  I'm going to allow it.  He can answer.

11   I will allow him to answer.

12   A    Bribes.

13   Q    Forgive me, was there a particular product that you

14   discussed with Mr. Rodriguez?

15   A    Yes.

16   Q    And what product was that?

17   A    GLP.

18   Q    Did you also discuss Vitol's being on the blacklist

19   with Rodriguez?

20             THE INTERPRETER:  May the interpreter please

21   clarify the interpretation of the question?

22             The product was LPG.

23             MR. SOLOMON:  Thank you.

24   A    Yes.  He insisted on our helping getting them off the

25   list.

1  Q    So we have been talking about the time period 2014,

2  2015, thereabouts; is that right, sir?

3  A    Correct.

4  Q    Did those conversations with Mr. Rodriguez continue?

5  A    Yes.

6  Q    And did there come a time when you discussed a specific

7  LPG transaction with Mr. Rodriguez?

8  A    Correct.

9  Q    Tell us about that proposal.

10          MR. PACKARD:  Objection.  Vague as to time.

11          THE COURT:  Can you set a more specific time,

12  Mr. Solomon?

13          MR. SOLOMON:  I would be happy to.

14  Q    Can you place us in time, Mr. Arias?  What time were

15  these discussions about a specific LPG contract?

16  A    Starting in the middle of 2015.

17  Q    Okay.  And tell us about that proposal, sir.

18  A    Vitol wanted to continue to participate in the -- to

19  continue to offer, but they were not able to do so because

20  they were blacklisted.  And the only way in which they could

21  do so was to introduce a state-owned entity as fronting.

22  Q    When you use the word "fronting," sir, what do you

23  mean?

24  A    A company that would act on their behalf to obtain the

25  product and to engage in the negotiations.

1    Q    And was that company a state-owned company, sir?

2    A    It had to be in order to engage in a direct

3    negotiation.

4    Q    What state-owned company were you discussing at that

5    time, in 2015, sir?

6    A    PEMEX, Mexico.

7    Q    And what is PEMEX?

8    A    It is the Mexican state-owned company.  It is a Mexican

9    state-owned oil company.

10   Q    And in connection with those conversations with

11   Mr. Rodriguez, and I think you said this is mid-2015, did

12   you discuss bribes?

13            MR. PACKARD:  Objection.  Hearsay.

14            THE COURT:  This is what we discussed at sidebar,

15   Mr. Solomon?

16            MR. SOLOMON:  It is, Your Honor.

17            THE COURT:  Overruled.

18   A    Yes.

19   Q    Tell us about that discussion.

20            MR. PACKARD:  Objection, Your Honor.

21            THE COURT:  May we approach?

22            (Sidebar.)

23            (Continued on the following page.)

24

25

*Sidebar*                                                                147

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. PACKARD:  So Your Honor, my Spanish is very

4     limited; however, I heard the word "valores," which means, I

5     believe, payments.

6          And so I want to make sure that he's not about to

7     testify that Xavier Rodriguez said he got payments in the

8     past from Vitol, because that's exactly what you said he

9     can't testify to.  If he is about to testify that he's

10    making some future proposal for this conspiracy --

11         MR. SOLOMON:  Just to clarify -- sorry to

12    interrupt.  Go ahead, Mr. Packard.

13         MR. PACKARD:  If he is going to testify about

14    future payments, we object to that under hearsay.

15         MR. SOLOMON:  Just to be clear, that was not my

16    understanding of Your Honor's ruling.

17         THE COURT:  No.  I don't want any testimony

18    about -- that involves payments prior -- that were not

19    identified --

20         MR. SOLOMON:  Prior to the charged conspiracy.

21         THE COURT:  Yes.

22         MR. SOLOMON:  And within the charged conspiracy --

23         THE COURT:  Which that would -- and as far as

24    identification, yes, and either way, the point was that

25    there were going to be specific transactions about which

*Sidebar*                                                          148

1  there would be testimony that they would be turned over and

2  discovered.

3           MR. SOLOMON:  Correct.

4           THE COURT:  So I don't know.  The concern is that

5  this is going to be testimony about a transaction that was

6  not turned over and, presumably, because of the timing, you

7  suspect it was not turned over.

8           MR. PACKARD:  I don't know why it wasn't, Your

9  Honor.

10           What I will say is not only was it not identified

11  in any specific list of transactions, it's not in any 3500

12  material that there's a conversation about past payment.

13  This is brand spanking new, right here, right now, as an

14  Officer of the Court.

15           MR. SOLOMON:  That's not correct.  This is covered

16  in Mr. Arias's 302.

17           But beyond that, I will help you with the Spanish.

18  What he was testifying to --

19           THE COURT:  I feel so left out.

20           MR. SOLOMON:  There were payments and he used the

21  word "sobornos," which means bribes.  He didn't identify a

22  transaction.  Then I asked him whether he talked about

23  bribes in that conversation and he said yes, we talked about

24  commissions and by commissions, I meant bribes.

25           And so for there, we're leaving it at that and I

1  am going to ask him what he understood for that to mean,

2  what kind of terms he used and this sort of thing, but I am

3  not going to ask the witness, well, did he tell you on

4  April 15, 2013 that he got a payment into his Bank of

5  America account.

6           I mean, we are going to get there later, but those

7  were identified to you, but in this instance, he is saying

8  only that --

9           THE COURT:  Okay, so why don't you put in as

10  saying from blank and beyond, did this happen.

11          MR. SOLOMON:  He said mid-2015.  And I did put

12  that buffer in the question, so I think we are there.  And I

13  am happy to be more specific.

14          THE COURT:  But make sure when he answers, when he

15  elaborates on his answer, you are going to go back and say

16  okay, he said that, what about -- you have got to go down

17  your list, whatever your list is.

18          MR. SOLOMON:  And I am.

19          THE COURT:  You as well.

20          MR. PACKARD:  I want no testimony about alleged

21  payments that Xavier Rodriguez said he received before this

22  charged conspiracy.

23          If he is talking about stuff from the front end,

24  our objection is hearsay, but we get your ruling there.

25          THE COURT:  Right.

*Sidebar*                                                              150

1          MR. KOFFMANN:  Your Honor, this is Mr. Koffmann.

2          Can I make a suggestion?  The witness has given an

3     answer that is in Spanish.  The interpreter can tell us at

4     sidebar what the answer is, just to make sure that there is

5     no issue and it won't violate Your Honor's ruling.

6          MR. SOLOMON:  Yes.  I don't want to be the

7     translator.

8          THE COURT:  I lost track which interpreter we are

9     on.

10         MR. SOLOMON:  I will go grab her.

11         We are going to take a break after this, anyway.

12    We are up to our midafternoon break.

13         THE INTERPRETER:  The answer to the question by

14    the witness was:  Mr. Rodriguez was acting on behalf of

15    Mr. Aguilar Vitol and in order to move forward with the

16    contract, it was necessary that the amount of the

17    commissions, bribes, be defined.

18         THE COURT:  And this is for the transaction after

19    April.

20         MR. PACKARD:  Our objection, of course, is

21    hearsay, but --

22         THE COURT:  Right, I know.  Then you got my

23    ruling.

24         MR. PACKARD:  Yes, sir.  No additional objections.

25         THE COURT:  Okay.

1          MR. PACKARD:  Thank you, Your Honor.

2          THE COURT:  We are going to get that answer and

3    then we will take a break, okay.

4          MR. SOLOMON:  Thank you, Your Honor.

5          MR. PACKARD:  Thank you, Your Honor.  Perfect.

6          (Sidebar conference ends.)

7          (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           MR. SOLOMON:  Your Honor, may the interpreter

3    provide the answer given by the witness?

4           THE COURT:  Yes.

5    A    Mr. Rodriguez was acting on behalf of Mr. Aguilar,

6    Vitol, and in order to move forward with contract, it was

7    necessary that the amounts of the commissions, bribes, be

8    defined.

9           THE COURT:  Okay.  I think before you pursue that

10   line, Mr. Solomon, I think we will take a midafternoon

11   break, give everybody a chance to go back, relax for a few

12   minutes, and use any of the other rooms back there that you

13   may need to use.  We will take about a 15-minute break or

14   so, for our midafternoon break.

15          The midafternoon and the midmorning break rules

16   continue to apply.  Do not discuss the case amongst

17   yourselves or with anyone else you may run into in the hall

18   and continue to keep an open mind.  And we will be back in

19   about 15 minutes or so.

20          (Witness leaves the stand; jury exits.)

21          THE COURT:  Okay, we will take our break.

22          I don't know -- Mr. Solomon, I don't know how far

23   you have to go, but we can stretch to 5:30 or so, if need

24   be, but --

25          MR. SOLOMON:  Your Honor, we will take all of the

*Proceedings*                                                      153

1    time you have available today.

2              THE COURT:  With this witness?

3              MR. SOLOMON:  Yes.  We expect this witness to

4    continue.

5              THE COURT:  You do not anticipate finishing direct

6    in any event?

7              MR. SOLOMON:  No, Your Honor.

8              THE COURT:  That's fine.  At least we know where

9    we are headed.

10             MR. SOLOMON:  Thank you.

11             THE COURT:  Everyone else can stretch.  We will

12   see you in about 15.

13             MR. PACKARD:  Thank you, Your Honor.

14             (Recess taken.)

15             THE COURTROOM DEPUTY:  All rise.  Court is now in

16   session.  Counsel for both sides are present including the

17   defendant.

18             THE COURT:  Be seated, please.

19             MR. LAX:  Your Honor, it's Jonathan Lax.

20             We are going to bring the witness back in, if

21   that's okay?

22             THE COURT:  Yes, you may.

23             (Witness takes the stand.)

24             THE COURT:  William is getting the jury and

25   Mr. Lax is getting the witness.

1           (Jury enters.)

2           THE COURT:  Be seated, please.

3           Counsel will stipulate that the jury is present

4   and properly seated.

5           MR. SOLOMON:  So stipulated.

6           May I inquire, Your Honor?

7           MR. PACKARD:  Stipulated for the defense, Your

8   Honor.

9           THE COURT:  Ladies and gentlemen, we are in the

10  homestretch now for the day.  We are on direct examination.

11          Mr. Solomon will continue.

12          MR. SOLOMON:  Thank you, Your Honor.

13          And I am going to begin by attaching Government

14  Exhibit 12 to the display board and this is Xavier Rodriguez

15  next.

16  BY MR. SOLOMON:

17  Q   Mr. Arias, I want to begin with a few language-related

18  questions.

19          And the first is the easiest.  I have a note from

20  my colleague.  Earlier, you used the word "gerente general."

21          What does that mean, sir?

22  A   You could say that here, it's a CEO.

23  Q   And I have been using the term CEO, but I just want to

24  make sure that we are in accordance with some of the

25  documents.

1           Does it also mean general manager, sir?

2    A    Yes, it's the same thing.

3    Q    Okay.

4           When you spoke with Mr. Rodriguez, what language

5    did you speak in?

6    A    Spanish.

7    Q    When you spoke with the defendant, what language did

8    you speak in?

9    A    Spanish.

10   Q    Did you speak with Antonio Pere?

11   A    Yes.

12   Q    What language?

13   A    Spanish.

14   Q    Did you speak with Enrique Pere?

15   A    Yes.

16   Q    What language?

17   A    Spanish.

18   Q    What is the literal word in Spanish for bribes?

19   A    Sobornos or coimas.

20   Q    Did you ever use words like "sobornos" or "coimas" in

21   your discussions with Mr. Rodriguez?

22   A    Never.

23   Q    Did you ever use those words with any of your

24   co-conspirators?

25   A    Never.

*Arias - Direct - Solomon*                        156

1    Q    Were there other words in Spanish or expressions that

2    you used to talk about bribes?

3    A    Yes.  Commissions, deals, commission.

4         THE INTERPRETER:  Comisiones, negocios, by the

5    witness.

6    Q    Anything else?

7    A    Business.

8    Q    Just before the break I asked you whether, in -- pause

9    that.

10        I want to put up some boundaries for our

11   discussion, Mr. Arias.

12        When I am asking you about bribes, okay, and

13   discussions that you had with Mr. Rodriguez, I would like --

14   I think you placed that last conversation in mid-2015, okay?

15   So I would like that conversation to stick from that time

16   period forward.  Okay, sir?

17   A    Okay.

18        THE COURT:  And to be clear, forward means closer

19   in time to today.

20        THE WITNESS:  Okay.

21   Q    Just before the break, sir, you said that you had a

22   conversation with Mr. Rodriguez about a potential LPG deal

23   with the defendant and Vitol in which you discussed bribes;

24   is that correct, sir?

25   A    Correct.

1   Q    And how did you respond to that discussion, sir?

2            MR. PACKARD:  Objection, vague.

3            THE COURT:  No, I think he can answer it.  I will

4   allow it.  Overruled.

5   A    What I said to Xavier Rodriguez was that he should

6   first meet with Antonio Pere to discuss the details of the

7   deal.

8   Q    And I think you said in Spanish, sir, negocios; is that

9   correct?

10  A    Correct.

11  Q    And what did you mean when you said negocios?

12  A    To make it more clear, it was referring to the

13  commissions of -- or the bribes that we would be requesting

14  for this.

15           MR. SOLOMON:  Can we please pull up what's been

16  introduced into evidence as Government Exhibit 2?

17           (Exhibit published.)

18  Q    Is this Mr. Antonio Pere?

19  A    Yes.

20  Q    Tell us how you met Mr. Pere.

21  A    I met him way before, in the year 2006, 2007.  He was

22  introduced to me by another friend, Francisco Acosta, who

23  had also been the minister of energy.

24  Q    And at that time, sir, did you have an understanding of

25  what Mr. Antonio Pere did for a living?

1    A    Yes.

2    Q    And what was that?

3    A    He would act as an agent or consultant for certain

4    companies and almost always paying bribes to public

5    officials.

6           MR. PACKARD:  Objection.  Move to strike.

7    Foundation.

8           THE COURT:  I'm going to allow it.

9    Q    Has Mr. Antonio Pere ever paid you a bribe?

10   A    Yes.

11   Q    Were those bribes part of the scheme that you pled

12   guilty to, sir?

13   A    Yes.

14   Q    Who did Mr. Pere pay you bribes on behalf of?

15   A    Certain companies.

16   Q    All right.  Please name them.

17   A    Trafigura, Petredec, Sergeant Marine, Gunvor -- I'm

18   actually removing Petredec from the list.  Vitol.  And I'm

19   trying to make sure I'm not forgetting any.  And Vitol, yes.

20   Q    Did he pay you bribes on behalf of the defendant?

21   A    Yes.

22   Q    A moment ago you said that you told Xavier Rodriguez to

23   set a meeting with Antonio Pere to discuss the commissions;

24   is that correct, sir?

25           MR. PACKARD:  Objection.  Misstates testimony.

1         THE COURT:  He's trying to fix a point to go to a

2    question.  I'm going to allow it for that purpose.

3         THE INTERPRETER:  The answer was correct.

4    Q    Do you know whether that meeting actually occurred?

5    A    Yes.

6    Q    Okay.  What was Antonio Pere's role in the scheme

7    involving the defendant?

8    A    He was the one receiving the payment from Javier

9    Aguilar.  And Antonio Pere would subsequently distribute the

10   funds.

11        MR. SOLOMON:  For the record, I am going to affix

12   Government Exhibit 2 to the display board.

13   Q    Do you know how Antonio Pere makes money?

14   A    Yes.  Through the system that I have already described,

15   acting in the middle of companies and public officials.

16   Q    Okay, but how does he actually make money himself?

17        MR. PACKARD:  Objection.  Speculation.

18        THE COURT:  Why don't you lay the foundation.

19        MR. SOLOMON:  I can put:  Do you know.

20        THE COURT:  Do you know.

21   Q    Do you know how he personally made money in that role, sir?

22   A    Yes.

23   Q    How is that?

24        MR. PACKARD:  Objection.  Foundation.

25        THE COURT:  The question is:  How do you know?

1    A    Because he described it to me on several occasions.

2              MR. PACKARD:  Objection.

3              Oh, sorry.

4              THE COURT:  I am going to allow it.

5              MR. PACKARD:  The answer is fine.

6              The question I thought was coming I'm

7    pre-objecting to, Your Honor.

8              MR. SOLOMON:  Let's see how we go.

9    Q    The question is:  What did he tell you?

10             MR. PACKARD:  Objection.  Hearsay.

11             THE COURT:  I'm going to sustain the objection and

12   suggest you move on, Mr. Solomon.

13             MR. SOLOMON:  Okay.  I think this is an issue that

14   is probably going to recur.

15             And if I may, can we come to sidebar, sir?

16             THE COURT:  Sure.

17             (Sidebar.)

18             (Continued on the following page.)

19

20

21

22

23

24

25

1           (Sidebar conference held on the record out of the

2     hearing of the jury.)

3           MR. SOLOMON:  Your Honor, I am happy to focus on

4     how he made commissions specifically on this transaction,

5     but it is going to be a statement in furtherance of the

6     scheme because it describes how Mr. Pere received a cut, a

7     per-barrel commission.  Part of that money was then paid

8     forward to the defendant.  So basically they took the

9     submissions, they divided them up.  Some of them were

10    bribes, he kept some of them.

11          Sorry?

12          MR. LAX:  Some were paid forward --

13          MR. SOLOMON:  Some were paid forward to the

14    witness, excuse me.

15          That was made in furtherance of the conspiracy,

16    obviously, to explain this is how the operation works.

17          THE COURT:  I got a little bit lost because we are

18    talking about 2008, so I don't know where we were here.

19          MR. SOLOMON:  Fair enough.  And that is on me and

20    I am happy to place us back in time, but that's where I am

21    going with this, Your Honor.

22          THE COURT:  Yes.

23          MR. SOLOMON:  In the discussions, I will place

24    them in connection with this scheme.

25          THE COURT:  A little earlier in the day, to the

*Sidebar*                                                               162

1  extent that there are conversations in the nature of

2  building trust among the co-conspirators, they are

3  admissible to establish on the record how the conspiracy

4  develops, why these people are trusting each other.  And I

5  think it's admissible on that basis.

6        MR. PACKARD:  Your Honor, the only thing I

7  noticed --

8        THE COURT:  In the appropriate -- assuming that

9  things were turned over properly and it's in the right

10  timeframe.

11        MR. SOLOMON:  What I will do is I will focus it in

12  connection with this scheme in particular, and I hope that

13  that satisfies Your Honor's ruling.

14        MR. PACKARD:  I think, Your Honor, my concern was

15  it a was a general question, how does he make money?

16  There's lots of ways people make money.  This scheme, if he

17  is not talking about things in this scheme, it's one

18  thing --

19        THE COURT:  Here's the problem, you are going to

20  object every time he asks a leading question.

21        MR. PACKARD:  Not every time.

22        THE COURT:  Most of the time.

23        And then when he doesn't ask leading questions,

24  you will say where is the foundation.  We will be here we

25  will be here till Tisha B'Av.

*Sidebar*                                                        163

1              MR. PACKARD:  I am a stickler, Your Honor, I'm

2    sorry.

3              THE COURT:  I am going to get my stick.

4              MR. PACKARD:  Certainly, Your Honor.

5              THE COURT:  I was always told when I was young

6    like you, it doesn't go on the record, it's your word

7    against the judge's.

8              MR. PACKARD:  That's right.  I like your odds,

9    Your Honor.

10             (Sidebar conference ends.)

11             (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court.)

2        THE COURT:  Mr. Solomon.

3    BY MR. SOLOMON:

4    Q    I am going to be a little more specific with you,

5    Mr. Arias.

6        I believe you said earlier that Antonio Pere is

7    one of the people you conspired with to pay bribes; is that

8    correct, sir?

9    A    Correct.

10   Q    And was one of the companies that he paid you bribes on

11   behalf of Vitol?

12   A    Yes.

13   Q    And did he pay you bribes on behalf of the defendant?

14   A    Yes.

15   Q    Okay.  In connection with that particular scheme, sir,

16   do you know how Antonio Pere received money?

17   A    Yes.

18   Q    And how do you know that?

19   A    Because he confirmed with me the scheme.

20   Q    Okay.  And what did he tell you, sir?

21   A    That he organized the payments through an offshore

22   intermediary company that Javier Aguilar -- that had been

23   mentioned by Javier Aguilar.  And he said that it was a

24   company that Vitol had already used previously in a scheme

25   with Brazil.

1  Q    Okay.  Do you know what that company was, sir?

2  A    No.

3  Q    Do you know who owned that company?

4  A    No.

5  Q    Okay.  So just to confirm, I believe you said Antonio

6  Pere paid you bribes on behalf of the defendant, correct?

7  A    Correct.

8           (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SOLOMON:   (Continuing)

2    Q    And the money that Mr. Pere received, he received from an

3    offshore company that the defendant worked with, is that

4    correct?

5            MR. PACKARD:  Objection.  Asked and answered.

6            THE COURT:  Yes, sustained.  Let's move on.

7            MR. SOLOMON:  Okay.  Your Honor, I'm going to place

8    one additional item on the board here, and that is a face that

9    has not been identified and does not have a name, and I'm

10   going to place it between Mr. Aguilar and Mr. Antonio Pere.

11   Q    Mr. Arias, based on that conversation, does this display

12   accurately represent how you understood the payment flows

13   would occur?

14   A    Yes.

15   Q    Did Antonio Pere work alone?

16   A    No.

17   Q    Who else did he work with?

18   A    His brother, Enrique Pere.

19           MR. SOLOMON:  Okay.  Can you please, Ms. Jefferson,

20   put up Government Exhibit 5, which has been admitted into

21   evidence, and I'm going to place Government Exhibit 5 on the

22   board.

23   Q    Was Mr. Pere, was Mr. Enrique Pere one of the individuals

24   you conspired with to receive bribes on behalf of Vitol?

25   A    Yes.

1   Q    And what was Enrique Pere's role in the scheme?

2   A    He managed the banks and the payments from those banks.

3   Q    How was that different than what Antonio Pere did?  Can

4   you explain to us the different roles of the brothers?

5   A    Yes.  Antonio was the boss, so to speak.  He was the one

6   who established the negotiations and the amounts, and Enrique

7   was the operational side.

8   Q    Okay.  Did you ever meet with Enrique Pere in person?

9   A    Yes.

10  Q    Where did you meet?

11  A    We would meet in Quito or Miami.

12  Q    Did the Pere brothers have an office?

13  A    Yes.

14  Q    And where was that office located?

15  A    In Miami around --

16       THE INTERPRETER:  The interpreter needs repetition.

17  A    Coral Gables.

18  Q    When you met with the Peres, did you meet in that office?

19  A    Yes.

20  Q    Did you meet them anywhere else in Miami?

21  A    Yes, at Antonio's house.

22  Q    Earlier, you said you took bribes from several other

23  companies in addition to Vitol, is that correct?

24  A    Yes.

25  Q    Did Enrique Pere handle those bribes as well, sir?

Arias - direct - Solomon                          168

1    A    Yes.

2    Q    In your conversations with Xavier Rodriguez, mid-2015 and

3    beyond, about bribes, did he tell you who paid him the bribes?

4    A    In the agreement, the person who was going to pay him was

5    Enrique Pere.

6    Q    And were those bribes on behalf of anyone else, sir?

7    A    No.

8    Q    Talking about Xavier Rodriguez, he received payments from

9    Enrique Pere you said, correct, sir?

10   A    Yes.

11   Q    Was Enrique making those payments on his own behalf or on

12   behalf of someone else?

13            MR. PACKARD:  Objection.  Asked and answered.

14            THE COURT:  I'll allow it.

15   A    Oh, no, on behalf of someone else.

16   Q    Who?

17   A    In this case, Mr. Xavier Rodriguez.

18            MR. SOLOMON:  I'm going to put on the display board

19   what's been identified as Government Exhibit No. 8, which is a

20   photo of Nilsen Arias.

21   Q    Sir, did the Peres use nicknames to describe the people

22   involved in the scheme?

23   A    Yes, always.

24   Q    Do you know why they did that?

25            MR. PACKARD:  Objection.  Speculation.

Arias - direct - Solomon                    169

1        THE COURT:  We're going to find out.  Overruled.

2        Do you know why?

3   A    Yes.  It was a custom that they had their whole lives.

4   Q    Okay.  Did they have one for you, sir?

5   A    Yes.

6   Q    What was that?

7   A    Two.  With some people, Mr. Juice, and with others,

8   El Gordo.

9   Q    I'm going to ask you about the first one, sir.

10       Why did they call you Mr. Juice?

11  A    It's a long story, but at a meeting, I didn't drink

12  alcohol and so I asked for a juice, and I ended up with that

13  nickname.

14  Q    Do you know if they had a nickname for Mr. Rodriguez?

15  A    Yes, they had a nickname.

16  Q    And what was that?

17  A    Del Hierro.

18  Q    And for the record, how is that spelled?

19  A    Del, D-E-L, Hierro, H-I-E-R-R-O.

20  Q    Do you know what that means, sir?

21  A    Yes.  There was a little bit of confusion about it for me

22  because it was the name of a singer or a Colombian soccer

23  player.  And they said that he looked like that person, but I

24  don't know which of the two.

25       MR. SOLOMON:  Okay.  I'm going to attach his

1    nickname to the display board.

2    Q    We're going to change directions some, Mr. Arias.

3         Earlier you stated that Antonio Pere paid you bribes

4    on behalf of the defendant, is that correct?

5    A    Correct.

6    Q    Do you know how the defendant met Mr. Pere?

7    A    Yes, because I organized that meeting.

8    Q    Tell us about that, sir.

9    A    When Xavier Rodriguez and I were organizing the payment

10   of the commissions, I told him that the first thing that he

11   had to do was to meet with Antonio Pere, and that was what

12   they did under my instructions.

13   Q    Why did you tell him that?

14   A    Because I was not going to discuss those conditions with

15   them.

16   Q    Why not?

17   A    Because it was risky.  We were talking about commissions,

18   bribes.

19   Q    Do you know who attended that meeting, sir?

20        MR. PACKARD:  Objection, speculation, not relevant.

21        THE COURT:  I'll allow it.

22   A    Yes.

23   Q    How do you know that, sir?

24   A    Because three people who were at the meeting confirmed it

25   to me.

1    Q    Who were those three people?

2    A    Antonio Pere, Enrique Pere, and Javier Aguilar.

3    Q    Do you know whether Mr. Rodriguez was at that meeting,

4    sir?

5    A    I don't remember.

6    Q    All right.  I want to walk through in order, sir.

7              What did Antonio Pere tell you occurred at that

8    meeting?

9              MR. PACKARD:  Objection.  Hearsay.

10             THE COURT:  Mr. Solomon, we're in the bounds of my

11   rule.

12             MR. SOLOMON:  We are, sir.

13             THE COURT:  I'll allow it.

14             MR. SOLOMON:  Let me ask one foundational question

15   to help, Your Honor.

16             THE COURT:  Yes.

17   Q    What time period are we talking about, sir?

18   A    Right now, we're talking about the first meeting in the

19   year 2015.

20   Q    Okay.  And was this after your conversation with Javier

21   Rodriguez, which, I think, you testified earlier was mid-2015?

22   A    Yes.

23   Q    Okay.  Returning to my question, what did Antonio Pere

24   tell you occurred at that meeting?

25   A    At that first meeting, they had agreed on amounts, based

1  on negotiations, that would be paid if the LPG deal went

2  through, the amount of commissions that would be paid.

3          THE INTERPRETER:  Interpreter correction.

4  Q    And, sir, when you say "commissions" right now, what are

5  you referring to?

6  A    Bribes.

7  Q    And when you say "the LPG deal," is this the LPG deal

8  with PEMEX that you were referencing earlier, sir?

9  A    Yes, sir.

10  Q    And I believe you said you had a conversation with the

11  defendant about that meeting too.

12          Is that correct?

13  A    Yes.

14  Q    What did he tell you?

15  A    That he had left that meeting happy and that the, our

16  friends were good people, good guys.

17          THE INTERPRETER:  Interpreter correction:  "The

18  friends were good guys."

19          MR. SOLOMON:  I'm sorry.  Interpreter, "the

20  friends"?

21          THE INTERPRETER:  "The friends."

22  Q    Who do you mean when you say "the friends"?

23  A    He referred to the Pere brothers that way.

24  Q    Okay.  What was your understanding based on that

25  conversation, sir?

1      MR. PACKARD:  Objection.  Speculation or vague.
2  Understanding of what?
3      THE COURT:  Why don't you be more specific in the
4  question, and it will satisfy the objection.
5  Q    Based on what the defendant told you, what was your
6  understanding of what occurred, of what occurred at the
7  meeting between Antonio Pere and the defendant?
8  A    That everything had been arranged and we could continue
9  with the official negotiation.
10 Q    All right.  Sir, I'm going to need you to be more
11 specific.
12     When you say "everything had been arranged," what do
13 you mean?
14 A    When I said everything, there are two parts.  The first
15 part is the negotiations themselves, which is what I was
16 interested in, and the other part is the payment of the
17 bribes.
18 Q    After that conversation with the defendant, did you start
19 working on an LPG deal with Vitol?
20 A    With Vitol and PEMEX, yes.
21 Q    Was there a particular person at Vitol who was in charge
22 of those negotiations?
23 A    Mr. Javier Aguilar.
24 Q    All right.  Sir, at a very high level, can you please
25 describe the proposed LPG transaction that you worked on.

Arias - direct - Solomon                    174

1   A    Yes.  We had, we were offering them the right to sell us
2   LPG for a loan of $500 million.
3   Q    So I just want to walk through this slowly, sir.
4        Petroecuador, was it going to be the buyer in this
5   transaction?
6   A    Yes.
7   Q    Who was going to be the seller?
8   A    PEMEX.
9   Q    What's PEMEX?
10  A    The Mexican oil company, the Mexican state-owned oil
11  company.
12  Q    Does Mexico produce LPG, sir?
13       MR. PACKARD:  Objection.  Foundation.
14       THE COURT:  Subject to connection.  Overruled.
15  A    It does produce it but for its own use.
16  Q    Okay.  So the LPG at that was going to be sold from PEMEX
17  to Ecuador, where was PEMEX going to get that LPG?
18  A    Vitol would supply it to PEMEX, and PEMEX would then sell
19  to Petroecuador.
20  Q    Why not just buy the LPG right from Vitol?
21  A    It would have had to be done through a tender, and we
22  couldn't, we could not engage in a direct negotiation with
23  Vitol.
24  Q    Is a tender a competitive process?
25  A    Yes.

Arias - direct - Solomon                       175

1   Q    Do you have any influence over the winner of a tender?

2            MR. PACKARD:  Objection.  Asked and answered.

3            THE COURT:  I'm going to allow it, just for

4   continuity purposes.

5   A    No.

6   Q    Do you have influence over the winner of direct

7   negotiations?

8   A    Yes.

9   Q    At some point in time, sir, did you start dealing

10  directly with PEMEX regarding this proposed transaction?

11  A    Yes.

12  Q    And did you ever meet with PEMEX officials in person,

13  sir?

14  A    Yes, on two occasions.

15  Q    Okay.  Where were those meetings held?

16  A    The first one was during a visit by PEMEX to Ecuador in

17  our offices, and the second one was held in PEMEX's main

18  offices in Mexico City.

19  Q    Do you know the exact dates of those meetings, sir?

20  A    Not the exact dates but they were around October of 2015.

21  Q    Mr. Arias, did you keep a journal of the meetings you

22  held?

23  A    Yes.

24  Q    What did you write in those journals?

25  A    First, the date of the meeting, and also the relevant

1    topics of the meeting.

2    Q    Did you write down every meeting in those journals, sir?

3    A    Almost all official meetings, yes.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. SOLOMON: (Continuing) .

2  Q    What do you mean when you say "official meetings"?

3  A    The ones of the type that I had been discussing here,

4  direct negotiations, but not my private meetings.

5  Q    Did you provide a copy of those journals to the

6  government, sir?

7  A    The originals.

8         MR. SOLOMON:  Your Honor, may I approach the witness

9  with Government Exhibit 511 for identification only?

10         THE COURT:  Yes.

11  Q    Sir, do you recognize what's been marked for

12  identification as Government Exhibit 511?

13  A    Yes.  It's one of my journals.

14  Q    And everything in these journals you wrote, sir?

15  A    Yes.

16         MR. SOLOMON:  Your Honor, may I approach with some

17  specific pages that we've identified as sub exhibits?

18         THE COURT:  Yes.  Are they going to be separately

19  numbered?

20         MR. SOLOMON:  They are.  And they're numbered, for

21  the record, GX 511, A1 through A9.

22         THE COURT:  And the defense has received copies of

23  those?

24         MR. SOLOMON:  They have, Your Honor.

25         Just for the witness, please, Ms. Jefferson, can you

1   please pull up Government Exhibit 511-A1.

2   Q    Sir, is that a page from the journal in front of you?

3   A    Yes.

4            MR. SOLOMON:  Ms. Jefferson, can you pull up A2.

5   Q    And we'll do the same question, Mr. Arias.  Do you

6   recognize that page, sir?

7   A    Yes.

8   Q    Is that a part of the journal which I've handed to you a

9   moment ago?

10  A    Yes.

11           MR. SOLOMON:  Ms. Jefferson, can you pull up A3.

12  Q    When it's before you, sir, please let me know if you

13  recognize it.

14  A    Yes.

15           MR. SOLOMON:  Ms. Jefferson, A4.

16  Q    When that's up, sir, please let us know if you recognize

17  it.

18  A    Yes.

19           MR. SOLOMON:  A5, please.

20  Q    Same question, sir.

21  A    Yes, I do recognize it.

22  Q    A6.  Do you recognize this document, sir?

23  A    Yes.

24  Q    Is it a page of the journal in front of you?

25  A    Yes.

1  Q    A7, please.  Do you recognize A7, sir?

2  A    Yes.

3  Q    Is it part of the journal in front of you, which has been

4  identified as GX 511?

5  A    Yes.

6  Q    A8.  Do you recognize that, sir?

7  A    Yes.

8  Q    Finally, A9.  Do you recognize that, sir?

9  A    Yes.

10        MR. SOLOMON:  The government moves to admit

11  Government Exhibits A1 through A9 into evidence.

12        MR. PACKARD:  No objection.

13        THE COURT:  Received without objection.

14        (Government's Exhibits A1 through A9 were received

15  in evidence.)

16  Q    Thank you, Mr. Arias.  If you could keep those close to

17  you, we'll be referring to them for sometime.

18        MR. SOLOMON:  Your Honor, to give you a sense, it's

19  5:10.  I have one series of questions that will take us up to

20  5:30, if that works for Your Honor.

21        THE COURT:  That will work.  It may be an obvious

22  question but in what language is this journal?

23        MR. SOLOMON:  This journal is in Spanish, sir.

24        THE COURT:  Is there going to be a proposed

25  translation provided, as well?

1            MR. SOLOMON:  There is not a translation of this

2    journal, Your Honor.  However, we're going to ask very general

3    questions about it, for example, the first one we'll look at

4    is just a diagram.

5            THE COURT:  Okay.  I'm waiting with bated breath.

6            MR. SOLOMON:  Ms. Jefferson, can you pull up

7    Exhibit 511-A1 and show this to the jury.

8            THE COURT:  So the record is clear, these are all

9    received in evidence without objection.

10           MR. SOLOMON:  Yes, Your Honor.

11           Ms. Jefferson, can you please zoom in on the diagram

12   on the top right, including the date.

13   BY MR. SOLOMON:

14   Q    Sir, what is the date of this entry in your journal?

15   A    October 7th.

16   Q    What year was that?

17   A    2015.

18   Q    Can you explain the diagram in the top right corner, sir?

19   A    Yes.  It is the explanation that we received when PEMEX

20   visited Quito regarding the new structure of the trading area.

21   Q    Does this relate to one of the -- does this relate to the

22   LPG transaction we've been discussing, sir?

23   A    Yes.

24           MR. SOLOMON:  Your Honor, may I approach?

25           THE COURT:  You may.

1  Q    Mr. Arias, I'm going to ask that you keep those pages of

2  the journal handy.  In the folder I've just given you, I have

3  a number of exhibits.  The first four of those are GX 1033, an

4  attachment to that, which is GX 1033-A, and Spanish language

5  translations of both of those documents, which is 1033-T and

6  1033-AT.

7           MR. SOLOMON:  Ms. Jefferson, can you show for the

8  witness, GX 1033.

9  A    Okay.

10 Q    Sir, do you recognize GX 1033?

11 A    Yes.

12 Q    What is this?

13 A    It's an email sent by me to the Petroleos Mexicanos team,

14 PEMEX, with two attachments.

15 Q    And the date, sir?

16 A    December 2, 2015.

17          MR. SOLOMON:  Ms. Jefferson, can you pull up just

18 for the witness, GX 1033-A.

19 Q    Sir, do you recognize this document?

20 A    Yes.

21 Q    Is this one of the attachments to the email we've just

22 been looking at?

23 A    Yes.

24          MR. SOLOMON:  At this time the government would like

25 to move into evidence Government Exhibits 1033 and 1033-A.

1          THE COURT:  Any objection?

2          MR. PACKARD:  Objection.  We need to see the

3   translation to understand exactly what we're about to agree or

4   not agree comes in.

5          MR. SOLOMON:  Sure thing.  The translations, Mr.

6   Packard, we've stipulated to but I'll pull those up on the

7   screen now, which is 1033-T.

8          MR. PACKARD:  No objection.

9          THE COURT:  It satisfies your concern?

10          MR. PACKARD:  Yes, sir.  Thank you.

11          THE COURT:  It's received in evidence without

12   objection.

13          (Government's Exhibits 1033 and 1033-A were received

14   in evidence.)

15          MR. SOLOMON:  The government would like to move into

16   evidence the English translations of those documents, which

17   have been stipulated to by the parties, which are 1033-T and

18   1033-AT.

19          THE COURT:  Have you entered into a formal written

20   stipulation or we're taking it on the record that's

21   stipulated?

22          MR. SOLOMON:  We have written into a formal

23   stipulation, sir, and that will be Government Exhibit 8009,

24   which we will move in evidence a little later when more of the

25   documents have been presented.

1          MR. PACKARD:  We have stipulated on this, Your

2     Honor.  I can represent that.

3          THE COURT:  Okay.

4          MR. PACKARD:  Thank you.

5          THE COURT:  At some point it comes in.  Ladies and

6     gentlemen, we referenced in the opening instructions to you

7     that stipulations are where the lawyers agree on certain facts

8     or set of facts, and they come in without objection and

9     they're to be treated as established.

10          In this case, we're talking about an English

11     translation to the other documents that we now know are in

12     Spanish.

13          MR. SOLOMON:  Your Honor, I'll take that as a cue

14     and move into evidence 8009, which is the stipulation as to

15     the translation of certain documents as exchanged by the

16     parties.

17          THE COURT:  That's the way we do it in Brooklyn.

18     Welcome to Brooklyn.  Received without objection, I assume.

19          MR. PACKARD:  Without objection.

20          THE COURT:  Thank you.  It's received in evidence.

21          (Government's Exhibit 8009 was received in

22     evidence.)

23          MR. SOLOMON:  Ms. Jefferson, can we pull up 1033-T.

24     Display that for the jury, please, Mr. Villanueva.

25          Can we zoom in, first, on the to and from date?

1  BY MR. SOLOMON:

2  Q    Sir, can you tell us who this communication is between?

3  And if you could, describe some of the folks by category.

4  That will move things along.

5  A    It's an email sent by me to the PEMEX team.  And we have

6  copied our private lawyers and my trading team in which two

7  proposals are contained, a financial proposal and the trading

8  proposal.

9          MR. SOLOMON:  Ms. Jefferson, can you please pull up

10  the body of this email.

11  Q    Stepping back, sir, can you tell us what this email is

12  about?

13  A    After the meetings that we had in Ecuador, as well as

14  Mexico, we received documentation from PEMEX that was being

15  transferred to all of the teams to be discussed.

16          MR. SOLOMON:  Ms. Jefferson, can you please pull up

17  GX 1033-AT, which has been admitted in evidence.  And, Mr.

18  Villanueva, if we could show that to the jury, please.

19          Why don't we just start with the logo and the first

20  paragraph at the top.

21  Q    Mr. Arias, can you tell us what this attachment is,

22  generally?

23  A    It's the document that I was speaking about that has two

24  parts.  It's the details of the trading agreement, not just

25  for the LPG deal, but for an additional deal, as well.

1    Q    Is that the Petroecuador logo at the top, sir?

2    A    Yes.

3    Q    Did Petroecuador prepare this document?

4    A    No.  That was a surprise because the document has some

5    inconsistencies.

6         MR. SOLOMON:  Ms. Jefferson, can you zoom in on the

7    number at the bottom?  Very small.

8    Q    Sir, do you know what this number represents?

9         MR. PACKARD:  Objection.  Speculation.

10        THE COURT:  Overruled.  We'll find out, if he knows.

11   A    Yes.

12   Q    What is this code?

13        MR. PACKARD:  Objection.  Foundation.

14   Q    What is this number?

15        MR. PACKARD:  Objection.  Foundation.

16        THE COURT:  It's in evidence.

17   BY MR. SOLOMON:

18   A    It's a tracking code of a document.

19   Q    And do you know where this document was drafted, sir?

20   A    According to this code, in New York.

21        MR. PACKARD:  Objection.  Foundation.

22        THE COURT:  Is it a document?  I understand this to

23   be a document from the company of which he is next to the

24   president in charge.

25        MR. PACKARD:  I believe he testified it was not from

1   his company, Your Honor.

2          MR. SOLOMON:  That's correct, Your Honor, but he

3   testified he understood what the code means, and so we've

4   asked him.

5          MR. PACKARD:  That was the foundation objection

6   lodged, Your Honor.

7          THE COURT:  He says he understands.  We'll find out

8   what the basis of his understanding is of the code.

9          THE INTERPRETER:  May the interpreter finish giving

10  the answer?

11         MR. SOLOMON:  Yes.  My apologies.

12  BY MR. SOLOMON:

13  A    According to the code, it was drafted in New York and

14  it's the first version.

15         THE COURT:  Now ask it anyway.

16  Q    How do you know what this code means, sir?

17  A    Many companies, we would use codes but this was not a

18  Petroecuador's tracking code.

19         THE COURT:  Are you familiar with the code here?

20         THE WITNESS:  With this specific one, no.  It did

21  not pertain or belong to Petroecuador.

22         THE COURT:  So the question was, then, how do you

23  know from looking at the code that it came from a New York

24  office if you don't have familiarity with the code?

25         THE WITNESS:  At the beginning of the code it says

1   NY, which means New York, and at the end of the code you can

2   see V1, which means version one.

3           MR. PACKARD:  Move to strike.  NY can mean lots of

4   things.

5           THE COURT:  Stricken.  Stricken means the jury

6   disregards it.

7           MR. SOLOMON:  Please pull up paragraph B,

8   Ms. Jefferson.

9   Q    Sir, what has been displayed is in English.  I understand

10  you can read in English, but just as a reminder you have

11  before you both the English and Spanish versions.  So you can

12  turn to whichever you prefer.

13  A    Okay.

14  Q    Paragraph B begins by saying Vitol loan to PEC.

15          Can you explain what this paragraph is about, sir?

16  A    As I had said before, a condition of the transaction was

17  a loan of $500 million, which gave them the right to sell us

18  LPG.

19  Q    To be clear, the document I think says $500.

20          Does that mean $500, sir?

21  A    No.  It was $500 million, and that's part of the

22  inconsistencies that I had mentioned.

23  Q    Was the defendant involved in this negotiation?

24  A    Yes.

25  Q    Did you discuss the amount of the loan with the

1  defendant?

2  A    Yes.

3  Q    Was the amount of the loan that Petroecuador was looking

4  for $500 million?

5  A    Yes, for LPG.

6  Q    Were you looking for an additional loan for anything else

7  in connection with this transaction, sir?

8  A    Yes.

9  Q    Please explain.

10 A    It was also the right for PEMEX to sell us diesel

11 gasoline for a loan of one billion.

12 Q    A billion dollars?

13 A    Yes.

14 Q    So twice the amount that is reflected in this document?

15        MR. PACKARD:  Objection.

16        THE COURT:  Sustained.

17 Q    Did you discuss the request for a billion dollar loan

18 with the defendant, sir?

19 A    I did.

20 Q    Was it a problem that this document said 500 million when

21 Petroecuador was looking for a billion?

22 A    Yes.  Not just that, there are other things, too.

23 Q    Did you discuss that problem and the other things with

24 the defendant?

25 A    Yes, immediately.

1    Q    What did he tell you in response?

2    A    Not to worry, that he had arranged everything, and that

3    was PEMEX's fault.

4    Q    Did he tell you what he meant by arranged everything?

5    A    Yes.  When I expressed my grievances to him for these

6    problem and inconsistencies, I was very upset and bothered

7    because of the time wasted.  And he told me not to worry.  He

8    said I am supervised two of the people mentioned on this

9    document.

10            THE INTERPRETER:  Interpreter correction.

11   A    I controlled two of the people in this document.

12            (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (continuing.)

2   Q    What did you understand the defendant to mean when he

3   said he controlled two of the people in this document?

4              MR. PACKARD:  Objection.  Speculation.  Relevance.

5              THE COURT:  He's asking what he understood he was

6   told.  Overruled.

7   A    That he had power over Margarita and Blanca Estela

8   Coeto.  Those are the names he mentioned.

9   Q    Now, sir, when you say power over, what do you mean?

10  A    I understood what he said, which is you have no idea.

11  We have them under our control.  We've paid them several

12  times.

13             MR. SOLOMON:  Ms. Jefferson, can you please pull

14  up GX 1033 T, which has been admitted in evidence, and

15  display that for the jury.  And pull up just the names up

16  top.

17             (Exhibit published.)

18  Q    Sir, did he tell you the people he controlled at PEMEX?

19  A    Yes.

20  Q    Are these people on this e-mail, sir?

21  A    Yes.

22  Q    Who are they?

23  A    Margarita Perez and Blanca Estela Coeto.

24  Q    And can you read the e-mail handle for Margarita Perez

25  and Blanca Estela?

1  A    Yes.  For Margarita Perez, it's

2  Margarita.Perez@PMICIM.com.

3  Q    What is PMICIM?

4  A    It's the company Petroleos Mexicanos, PEMEX.

5  Q    And Ms. Coeto, where does she work?

6  A    Also at PEMEX.

7  Q    Are those what you described earlier as companias

8  estatales?

9  A    Yes.

10 Q    And those relationship government companies, sir; is

11 that right?

12 A    Yes.  Of Mexico.

13           MR. SOLOMON:  Your Honor, I have borrowed three

14 extra minutes of your time.  I think I will retire here for

15 the day, for the weekend.  Thank you.

16           THE COURT:  Thank you very much, Mr. Solomon.

17           Ladies and gentlemen of the jury, that does bring

18 us to the end of the session today.  Again, we all

19 appreciate your patience and your attentive opinions and

20 your sacrifice.  So we do break for the day and for the

21 weekend and we will resume on Monday.

22           I will, again, repeat, as I indicated earlier, by

23 the time this trial is over, you can tell me, because I am

24 going to keep repeating them and reminding you that I keep

25 repeating them because it's so critically important.  And

1    that is during this recess weekend, you are not to discuss

2    the case amongst yourselves or with anyone else.  You are to

3    continue to keep an open mind.

4            We remain on radio silence.  No mention of the

5    fact that you are a juror or coming to the courthouse or

6    anything else that we do here during the course of this

7    trial, the fact that you are even coming to Brooklyn.  No

8    communications about anything that even remotely touches

9    upon this trial.

10           It also remains -- and, again, by any means of

11   communication, from the old fashioned pen to the most modern

12   form of, what is it called, now, X, formally known as

13   Twitter and all those things?  No communications in any way

14   regarding the case.

15           It's a homework-free zone.  There is no research

16   permitted, either electronic search engines or otherwise.

17   You are to totally relax and not perform any work at home

18   relating to this case.  All the work that you will be asked

19   to do and all the work that you are permitted to do that

20   relates to this case happens within the four walls of this

21   courtroom until the day when the deliberations begin and you

22   move into the deliberation room for your deliberations.

23           To the extent that this case is covered in some

24   form of media, and, again, we had that broad definition of

25   media, from newspapers to Instagram and other social

*Proceedings*                                                          193

1   platforms, media platforms, you are to totally tune it out,

2   mind, eyes and ears, and, again, I encourage you to tune out

3   the media reports of any court proceeding anywhere for fear

4   that you may hear something in the course of those media

5   accounts that will ultimately confuse you about what your

6   responsibilities are here.

7           Now, I have to check with William on this, but to

8   make sure, where are they to report on Monday?

9           THE COURTROOM DEPUTY:  Still the Central Jury

10  room.  There is a separate room for them.

11          THE COURT:  So they are going to Central Jury.

12          THE COURTROOM DEPUTY:  I gave them directions

13  already.  I will repeat it to them.

14          THE COURT:  William will remind you -- Monday is a

15  very large jury call.  So we want to make sure that you all

16  stay separate from the huge panel that will be coming in for

17  consideration for jury selection that day, but it will be,

18  the initial report will be to the Central Jury room in the

19  specific room that William will tell you about.

20          Try to get to the Central Jury room no later than

21  9:45.  We'll try to start as close as 10:00 as we can.  And

22  we will try to keep you posted as much as we can about

23  scheduling.

24          What we know for the upcoming week, for sure, is

25  that we have a hard stop at 1 o'clock on Wednesday, so the

*Proceedings*                                                        194

1   jury will not be working in this case on Wednesday

2   afternoon.

3          And William, what is our status on Friday?

4          THE COURTROOM DEPUTY:  We have other matters.

5          THE COURT:  So ordinarily, and, again, as you all

6   found out already, we try to give you as much notice as we

7   can about the schedule.  The unfortunate thing about that is

8   that sometimes the schedule changes, and circumstances that

9   we cannot control.

10          However, if the schedule holds, and we'll try to

11   give you updates as the week goes on, we will not be sitting

12   on this case on Friday.  So that right now, the schedule for

13   next week looks like full days on Monday, Tuesday and

14   Thursday, and a half day on Wednesday.  That's what the

15   current schedule looks like.

16          If the weather people get totally bamboozled by

17   what's going on out there and it turns out that three inches

18   of snow turns into 30 inches of snow because something moved

19   by two-and-a-half miles somewhere, we will keep you posted,

20   if we have to face that circumstance, either Monday or later

21   on during the course of this trial.  Keeping in mind that in

22   the good old days, February was the snowiest month of the

23   year in New York, so not that we've seen snow, but it's

24   possible that snow may return.

25          At any rate, again, we appreciate your sacrifice,

1    we appreciate your patience, bid you a wonderful weekend,

2    look forward to seeing you on Monday morning.

3                (Jury exits.)

4                THE COURT:  Okay.  Mr. Arias, you are free to step

5    down.

6                (Witness left the stand.)

7                THE COURT:  We want to thank our interpreters for

8    their very able service, both on this side of the courtroom

9    and that side of the courtroom.

10                And also for our Court reporters, as always, who

11    always go the extra mile with or without this case.

12                Anything else we need to attend to before we go?

13                MR. LAX:  Not on behalf of the government, Your

14    Honor.

15                MR. PACKARD:  Nor on behalf of the defense, Your

16    Honor.

17                THE COURT:  Bid you a good weekend and see you

18    Monday.

19                MR. LAX:  Thank you, Your Honor.

20                THE COURT:  You are welcome.

21                (Matter adjourned to January 8, 2024 at 10:00 a.m.)

22

23

24

25

196

1                          I N D E X

2

3    WITNESSES:

4

5      NILSEN ARIAS SANDOVAL

6           DIRECT EXAMINATION BY MR. SOLOMON          87

7

8

9                          EXHIBITS:

10

11        Government's Exhibits 1, 2, 5, 8, 10,    126

12        12, 13, 14, and 15

13        Government's Exhibits A1 through A9       179

14        Government's Exhibits 1033 and 1033-A     182

15        Government's Exhibit 8009                 183

16

17

18

19

20                    *      *      *      *

21

22

23

24

25