UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
— — — — — — — — — — — — — — — — — — — — — — — X

UNITED STATES OF AMERICA

    - against -

JAVIER AGUILAR

                Defendant.

— — — — — — — — — — — — — — — — — — — — — — — X

No. 20 Cr. 390 (ENV)

**Served Via ECF On July 11, 2024**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT JAVIER AGUILAR'S POST-TRIAL MOTIONS FOR
JUDGMENTS OF ACQUITTAL OR A NEW TRIAL**

---

**CLARK SMITH VILLAZOR LLP**

Rodney C. Villazor
Michelle E. Lee
666 Third Avenue, 21st Floor
New York, NY 10017
(212) 377-0850
rodney.villazor@csvllp.com
michelle.lee@csvllp.com

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
danielkoffmann@quinnemanuel.com

Michael T. Packard
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 212-7100
michaelpackard@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

# TABLE OF CONTENTS

**Page**

I.    The Court Should Order a New Trial to Remedy the Improper Introduction of the Highly Prejudicial "Diversion Scheme." .......................................................................... 1

II.    A New Trial Is Warranted Because Mr. Aguilar Was Entitled to Jury Instructions on the FCPA's Affirmative Defense. ................................................................................ 11

III.    The Government Constructively Amended and Prejudicially Varied from the Grand Jury's Indictment. ...................................................................................... 16

IV.    The Evidence Supporting the Mexico-Related Specified Unlawful Activity in Count Three Is Insufficient. ........................................................................................ 18

    A.    The Evidence Was Insufficient to Find that PPI Was an Instrumentality of the Mexican Government. ................................................................................ 19

    B.    The Evidence Was Insufficient to Find that PPI Employees Worked on Behalf of an Instrumentality of the Mexican Government in an Official Capacity. ................. 21

V.    Prejudicial Spillover from the Mexico-Related Errors Taints All Counts. ..................... 24

VI.    The Court Should Have Required Juror Unanimity on the Specified Unlawful Activities Underlying Count Three.............................................................................. 25

VII.    The Court Should Order a New Trial Because It Improperly Admitted Agent Wood's Testimony About an Unconstitutional Interrogation.............................. 28

VIII.    The Ecuador-Related Evidence Is Insufficient to Sustain the Convictions..................... 30

CONCLUSION ............................................................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### Cases

*Arizona v. Fulminante*,
499 U.S. 279 (1991)..................................................................................................... 30

*Benderson Dev. Co. v. U.S. Postal Serv.*,
998 F.2d 959 (Fed. Cir. 1993) ..................................................................................... 15

*Del Castillo v. PMI Hldgs. N. Am. Inc.*,
No. 14 Cv. 3435 (KPE), 2016 WL 3745953 (S.D. Tex. July 13, 2016)............................ 19

*Diaz v. United States*,
144 S. Ct. 1727 (2024)................................................................................................... 10

*Guam v. Materne*,
72 F.3d 103 (9th Cir. 1995) .......................................................................................... 15

*Hedgpeth v. Pulido*,
555 U.S. 57 (2008) (per curiam)..................................................................... 23, 24, 25

*Kowalchuck v. Metro. Transp. Auth.*,
94 F.4th 210 (2d Cir. 2024)........................................................................................ 6, 7

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .......................................................................................................... 15

*Ling Nan Zheng v. Liberty Apparel Co. Inc.*,
389 F. App'x 63 (2d Cir. 2010) .................................................................................... 21

*Liparota v. United States*,
471 U.S. 419 (1985)....................................................................................................... 15

*McDonnell v. United States*,
579 U.S. 550 (2016)....................................................................................................... 23

*McKoy v. North Carolina*,
494 U.S. 433 (1990)....................................................................................................... 27

*Miranda v. Arizona*,
384 U.S. 436 (1966)....................................................................................................... 28

*New Hampshire v. Maine*,
532 U.S. 742 (2001)....................................................................................................... 15

*Prisco v. A&D Darting Corp.*,
 168 F.3d 593 (2d Cir. 1999) .................................................................................. 6

*Russell v. United States*,
 369 U.S. 749 (1962) ............................................................................................ 18

*Snyder v. United States*,
 No. 23-108, 603 U.S. ___, 2024 WL 3165518 (U.S. June 26, 2024) .................... 33

*Stansbury v. California*,
 511 U.S. 318 (1994) (per curiam) ....................................................................... 28

*United States v. Beros*,
 833 F.2d 455 (3d Cir. 1987) ................................................................................ 27

*United States v. Biaggi*,
 909 F.2d 662 (2d Cir. 1990) ................................................................................ 32

*United States v. Birney*,
 686 F.2d 102 (2d Cir. 1982) .................................................................................. 6

*United States v. Botti*,
 711 F.3d 299 (2d Cir. 2013) .................................................................................. 1

*United States v. Causey*,
 834 F.2d 1179 (5th Cir. 1987) ............................................................................. 28

*United States v. Coleman*,
 No. 2:18 Cr. 101 (JED), 2023 WL 3815150 (N.D. Ind. June 5, 2023) ................. 29

*United States v. Connolly*,
 No. 16 Cr. 370 (CM), 2018 WL 2411760 (S.D.N.Y. May 15, 2018) .................... 15

*United States v. Cruz*,
 581 F.2d 535 (5th Cir. 1978) (en banc) .............................................................. 28

*United States v. Esquenazi*,
 752 F.3d 912 (11th Cir. 2014) ............................................................................. 19

*United States v. Finazzo*,
 No. 10 Cr. 457 (RRM), 2014 WL 184134 (E.D.N.Y. Jan. 14, 2014) ..................... 1

*United States v. FNU LNU*,
 653 F.3d 144 (2d Cir. 2011) ................................................................................ 28

*United States v. Frazier*,
 No. 15 Cr. 153 (VSB), 2019 WL 761912 (S.D.N.Y. Feb. 21, 2019) ...................... 1

*United States v. Full Play Grp., S.A.*,
No. 15 Cr. 252 (PKC), 2023 WL 5672268 (E.D.N.Y. Sept. 1, 2023).................................. 32

*United States v. Gonzalez*,
686 F.3d 122 (2d Cir. 2012) ................................................................................... 18

*United States v. Jimenez Recio*,
537 U.S. 270 (2003) ....................................................................................... 14, 15

*United States v. Johnson*,
968 F.2d 208 (2d Cir. 1992) ............................................................................ 13, 14

*United States v. Lesane*,
No. 22 Cr. 10 (LJL), 2023 WL 3560549 (S.D.N.Y. May 19, 2023) .................................. 29

*United States v. Leslie*,
103 F.3d 1093 (2d Cir. 1997) ................................................................................... 1

*United States v. Lorenzo*,
534 F.3d 153 (2d Cir. 2008) .............................................................................*passim*

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009) .................................................................................. 25

*United States v. Navarro*,
145 F.3d 580 (3d Cir. 1998) .................................................................................. 27

*United States v. Pacheco*,
434 F.3d 106 (1st Cir. 2006) ................................................................................... 7

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) .................................................................................... 18

*United States v. Powell*,
469 U.S. 57 (1984) ............................................................................................. 26

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007) .................................................................................. 15

*United States v. Rivera*,
546 F.3d 245 (2d Cir. 2008) .................................................................................. 21

*United States v. Rooney*,
37 F.3d 847 (2d Cir. 1994) ............................................................................... 24, 25

*United States v. Silverman*,
430 F.2d 106 (2d Cir. 1970), *modified on other grounds*, 439 F.2d 1198 (2d Cir. 1970) ....... 17

*United States v. Sturman*,
   49 F.3d 1275 (7th Cir. 1995) ................................................................ 27

*United States v. Vega Molina*,
   407 F.3d 511 (1st Cir. 2005) ................................................................ 5

*United States v. Wade*,
   512 F. App'x 11 (2d Cir. 2013) ........................................................... 6

*United States v. Woods*,
   169 F.3d 1077 (7th Cir. 1999) ............................................................ 30

*United States v. Zane*,
   495 F.2d 683 (2d Cir. 1974) ............................................................... 26

*United States v. Zayac*,
   765 F.3d 112 (2d Cir. 2014) ............................................................... 16

*United States v. Zvi*,
   168 F.3d 49 (2d Cir. 1999) ................................................................. 26

*Warner Bros. Inc. v. Am. Broad. Cos.*,
   720 F.2d 231 (2d Cir. 1983) ............................................................ 6, 7

## Constitutional Provisions, Statutes, and Rules

U.S. Const., amend. V ..................................................................... 9, 18

15 U.S.C. § 78dd-2 ............................................................................. *passim*

15 U.S.C. § 78dd-3 ............................................................................. *passim*

18 U.S.C. § 201 ................................................................................... 33

18 U.S.C. § 666 ................................................................................... 33

Fed. R. Civ. P. 44.1 ............................................................................ 12

Fed. R. Crim. P. 26.1 ..................................................................... 11, 12

Fed. R. Crim. P. 29 ............................................................................ *passim*

Fed. R. Crim. P. 33 ............................................................................ *passim*

Fed. R. Evid. 403 ........................................................................ 8, 9, 30

Fed. R. Evid. 404 ............................................................................... 25

**Foreign Legal Authorities**

Mexican Const., art. 14................................................................................................ 14

Mexican Federal Penal Code, art. 212 ................................................... 11, 13, 14, 16

Mexican Federal Penal Code, art. 222 ................................................... 11, 13, 14, 16

**Other Authorities**

3d Cir. Model Crim. Jury Instrs. § 6.18.1956-6 (2023), https://bit.ly/3zwyrsF ......................... 27

3 Wayne R. LaFave et al., *Criminal Procedure* § 10.6(c) (4th ed., Dec. 2023 update) .............. 29

DOJ & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* (2d ed. 2020)......... 33

Defendant Javier Aguilar respectfully submits this reply memorandum of law in further support of his motions for judgments of acquittal or a new trial on all Counts under Rules 29 and 33 of the Federal Rules of Criminal Procedure, ECF No. 354 ("Mot"),[1] and in response to the government's opposition thereto, ECF No. 357 ("Opp.").[2]

## I.   THE COURT SHOULD ORDER A NEW TRIAL TO REMEDY THE IMPROPER INTRODUCTION OF THE HIGHLY PREJUDICIAL "DIVERSION SCHEME."

The opposition does not (and cannot) undermine Mr. Aguilar's showing that the Court erred by admitting evidence of the alleged "diversion scheme." *See* Opp. 17–27. Mr. Aguilar preserved this argument before and throughout trial. *See, e.g.*, ECF Nos. 269 & 277; Trial Tr. 2356:2–23, 3087:20–3088:4.

A new trial is warranted on this ground for at least four reasons: (1) the Court's pretrial and midtrial rulings led Mr. Aguilar reasonably to believe that he could pursue a long-previewed

---

[1]   Unless otherwise indicated, this reply omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations. All abbreviations, defined terms, and citations styles have the same meaning as those used in the opening brief.

[2]   The government is wrong to argue, in a footnote, that Mr. Aguilar's Rule 33 motions are untimely because they were not raised at the close of trial. *See* Opp. 15 n.6. The Second Circuit and courts within it routinely hold that parties waive arguments that they raise only in footnotes. *See, e.g.*, *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013); *United States v. Frazier*, No. 15 Cr. 153 (VSB), 2019 WL 761912, at *13 (S.D.N.Y. Feb. 21, 2019). Were the Court to consider this argument, it should reject it. The government cites no decision in support for good reason: this argument is legally and factually baseless. Because a grant of a new trial under Rule 33 is an alternative to a judgment of acquittal under Rule 29, *see* Fed. R. Crim. P. 29(d), a motion for the latter preserves the former, *see United States v. Finazzo*, No. 10 Cr. 457 (RRM), 2014 WL 184134, at *1 (E.D.N.Y. Jan. 14, 2014) (considering all the defendant's post-trial motions when he moved at trial under Rule 29 and renewed those motions post-trial while "also mov[ing] . . . under Rule 33" for the first time); *cf. United States v. Leslie*, 103 F.3d 1093, 1100–01 (2d Cir. 1997) (rejecting argument that defendant waived ground for post-trial relief by moving under one rule but not the other). Mr. Aguilar fully preserved each ground for post-trial relief before or at trial, as Mr. Aguilar showed in his opening brief and reiterates throughout this reply. And the government's hyper-technical revisionism overlooks the Court's and the parties' clear and sensibly efficient desire to permit additional post-trial motions beyond those made and reiterated on the record at the close of a two-month trial. *See, e.g.*, Trial Tr. 3917:14–3918:5.

defense without opening the door to previously excluded diversion evidence, and the government's inconsistent objections confirm the reasonableness of his understanding; (2) the Court never provided Mr. Aguilar the warning that courts routinely give about what will or will not open doors to damaging evidence, and courts routinely grant relief where (as here) a court reverses course on an interlocutory order on which a party reasonably relied to its later detriment; (3) the government never satisfied the offer of proof that the Court demanded to admit diversion evidence; and (4) the government used this improperly admitted evidence to inflict incurable unfair prejudice on Mr. Aguilar at the very close of trial. *See* Mot. 12–34. None of the government's arguments to the contrary withstands the close scrutiny that Rule 33 demands.

  ***First***, the government distorts the record to try to obscure how the Court's pretrial and midtrial rulings, and the parties' conduct at trial, led Mr. Aguilar reasonably to believe that he could contrast Gunvor trader Ray Kohut's solicitation and receipt of kickbacks from the Pere brothers from the absence of similar conduct on Mr. Aguilar's part *without* opening the door to unrelated evidence of Mr. Aguilar's alleged diversion of Vitol money from Mr. Hanst.

  As the opening brief painstakingly details, Mr. Aguilar repeatedly informed the Court and the government before trial that he intended to contrast his conduct with Mr. Kohut's to show his lack of knowledge that the Pere brothers were paying bribes. *See* Mot. 12–20 (citing ECF No. 214 at 2–3 & n.3 (citing the criminal complaint against Mr. Kohut), and ECF No. 219 at 7–8). It was no secret that Mr. Aguilar intended to raise that defense at trial when the Court twice rejected the government's argument that such a defense would open the diversion door. *See* Mot. 14–16 (citing ECF No. 226 at 3–4, and ECF No. 230 at 1). In holding that two *other* defenses could open the door, while adding that it could not "presently conceive of" any other door-opening defenses, ECF No. 226 at 3–4, *after* Mr. Aguilar repeatedly had informed the Court about this intended

defense, the Court led Mr. Aguilar reasonably to believe that he had the green light to raise this defense without opening that door.  *See* Mot. 14–16.

It may well be that the Court did not fully appreciate the implications of this defense when it held, repeatedly, that this defense would not open the door to the diversion scheme.  But there can be no denying that Mr. Aguilar squarely presented what this defense would be. The government thus engages in revisionist history when it claims that Mr. Aguilar had "not suggested" that he might invoke this defense "at the time the Court made its in limine rulings." Opp. 19; *see* Opp. 22.  To the contrary, Mr. Aguilar explicitly previewed this defense, the government expressly acknowledged it, and the Court plainly did *not* count it among the potential defenses that might open the door.  *See* Mot. 12–16.

The government further misstates the record when it ignores its failure to object to Mr. Aguilar's invocation of this defense in his opening statement.  *See* Mot. 20–21.  That failure to object both triggered a waiver and proved that the government, like Mr. Aguilar, reasonably understood the Court's pretrial orders to permit Mr. Aguilar to assert that he lacked knowledge of the Pere brothers' alleged bribes because, unlike Mr. Kohut, he never asked them for any kickbacks.  The Court's post-trial opinion brushes aside the government's failure to object to Mr. Aguilar's opening statement by calling those several paragraphs of express assertions "a bit of a warble."  ECF No. 324 at 2 n.1.  But the government's opposition confirms that it was *well aware* that Mr. Aguilar was asserting this long-previewed defense when it failed to object. As the government notes, Mr. Aguilar's opening statement explained that Mr. Kohut "became aware that the Peres were paying bribes and demanded a kickback," and then "*went further still*" by stating that Mr. Aguilar received no such kickbacks from the Pere brothers.  Opp. 18–19

(emphasis added).  The government's opposition thus not only ignores its failure to object, but affirmatively undermines the Court's written rationale for opening the diversion door.

The government's revisionism continues when it tries to excuse its failure to object by suggesting that the first time Mr. Aguilar compared his conduct to Mr. Kohut's was during his cross-examination of the government's first witness, Nilsen Arias.  *See* Opp. 19.  That, of course, ignores Mr. Aguilar's many pretrial submissions and opening statement that expressly previewed this defense.  *See* Mot. 13–16 (collecting sources).  And as the government concedes, the Court overruled the government's first—*and only*—kickback objection, and its assertion that those questions somehow opened the door to diversion evidence, when the Court instead held that such questions were proper to show "the state of mind of *these individuals*"—plural.  Opp. 19 (emphasis added).  The opposition thus confirms what Mr. Aguilar reasonably understood during trial:  that the Court's sidebar ruling during Mr. Arias's cross-examination allowed Mr. Aguilar to elicit testimony from more than one witness to show his lack of knowledge of bribes through his non-solicitation of kickbacks without opening the diversion door.

The government's silence during Mr. Aguilar's cross-examination of the next witness, Antonio Pere, reaffirms that both sides understood that Mr. Aguilar could compare his conduct with Mr. Kohut's with regard to kickbacks from the Pere brothers without opening the door.  *See* Mot. 24–26.  As the opposition notes, Mr. Aguilar "returned to the same line of questioning regarding Kohut and kickbacks" when cross-examining Antonio Pere.  Opp. 19.  But the opposition tellingly overlooks that—once more—the government *failed to object* to those questions.  *See* Opp. 19–20.  In doing so, the opposition again undercuts the Court's written rationales for thrusting that door open.  It is incredible to suggest that the Court's sidebar ruling during Mr. Arias's cross-examination raised an obvious "red flag" about kickbacks that

Mr. Aguilar knew not to cross, *see* ECF No. 324 at 3–4—because if it did, the government surely would have objected when Mr. Aguilar crossed that supposedly clear line with the very next witness. Faulting Mr. Aguilar for not "seeking clarification" of the Court's prior sidebar ruling, Opp. 19 (citing ECF No. 324 at 3), ignores that the Court had just permitted Mr. Aguilar to develop that exact defense. It was the government's burden to seek clarification, given that it neither objected to those questions nor otherwise asserted its supposed secret understanding of the Court's order *overruling* its first (and only) kickback objection at any point until the Court issued its sua sponte order days later in the face of the government's repeated waivers.

The Court's rulings before and during trial therefore led Mr. Aguilar reasonably to believe that he could ask about kickbacks from the Pere brothers without opening the door to diversion evidence. Mr. Aguilar's *and* the government's conduct during trial confirm that Mr. Aguilar's understanding was reasonable. And even if it were not, the government's repeated failures to object during trial waived any such objection or sua sponte relief from the Court. *See, e.g.*, *United States v. Vega Molina*, 407 F.3d 511, 524 (1st Cir. 2005) (courts should not "do the government's homework" to cure waiver). A new trial thus is warranted.

**Second**, the government is wrong to assert that the Court could open the door to previously excluded and highly prejudicial diversion evidence without giving Mr. Aguilar any warning that his long-previewed defense might open that door, and while conversely stating (or at least logically implying) that he could assert that defense while keeping that door shut. *See* Opp. 22–24. Mr. Aguilar's opening brief cited a robust body of precedent from this Court, district courts in this Circuit, the Second Circuit, and its Sister Circuits holding that defendants opened the door to otherwise forbidden evidence only after they disregarded a clear warning that certain defenses might do so. *See* Mot. 17–20 (collecting cases). Those decisions demonstrate what should be

uncontroversial: it is awfully unfair to admit highly prejudicial evidence that a court previously excluded without first warning the party that continuing to pursue a particular defense would open that door—and a party whose liberty is at stake may reasonably rely on the lack of any such warning as an indication that he is not about to open the door.

The government is just as wrong to assert that Mr. Aguilar's detrimental reliance on the Court's pretrial and midtrial rulings warrants no relief. *See* Opp. 23–24. The government does not dispute that the Second Circuit and its Sister Circuits have held that district courts abuse their discretion to reconsider interlocutory orders when litigants reasonably rely on those orders to their detriment. *See* Mot. 17–18 (collecting cases). The government recognizes, as it must, that the Second Circuit has held that district courts abuse their discretion to reverse course where (as here) a litigant "act[s] to their detriment in reliance on the initial ruling." *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 246 (2d Cir. 1983) (cited Opp. 23, Mot. 17). And as the Second Circuit noted in a decision that the government and the Court's post-trial ruling both cited, district courts may not reverse course on a prior ruling where (as here) "prejudice accrues to the party that had previously thought it had secured a favorable ruling." *United States v. Wade*, 512 F. App'x 11, 14 n.1 (2d Cir. 2013) (cited Opp. 21 and ECF No. 324 at 1–2). *Wade*, in turn, cited two other Second Circuit decisions holding the same. *See id.* (citing *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982), and *Prisco v. A&D Darting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999)).

The government resists this rule by claiming that it must be toothless since it found no "in-circuit case that granted any kind of relief" when a court reversed a prior ruling and pulled the rug on a litigant's case. Even if that were true in principle—and it isn't, as the out-of-circuit cases Mr. Aguilar cited prove—it is wrong in fact. Earlier this year, the Second Circuit vacated and remanded when a district court suddenly and sua sponte reconsidered and granted a motion that it

previously had denied without first warning the parties and allowing them to be heard, thereby "procedurally prejudic[ing]" the plaintiff. *Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 215–16 (2d Cir. 2024) (citing *Warner Bros.*, 720 F.3d at 245–46). This case is much worse because Mr. Aguilar's reasonable, but ultimately detrimental, reliance on the Court's pretrial and midtrial evidentiary rulings (and the government's inconsistent objections) inflicted actual prejudice to his liberty in a criminal case. Thus, relief is even more warranted here.

The government also fails to distinguish *United States v. Pacheco*, where the First Circuit vacated and remanded a conviction after the district court abruptly changed course and "pulled the rug out from under the defense" at trial. 434 F.3d 106, 115–17 (1st Cir. 2006). The government responds that the district court's shift in *Pacheco* prejudiced the defendant because it occurred at the charge conference, while the shift here occurred midtrial. *See* Opp. 23–24. But that distinction makes no difference. In both cases, the district court's trial-stage pivot backtracked on pretrial rulings on which the defendants reasonably relied when preparing for and at trial, and thereby prejudiced the defendants at trial. And the Court's midtrial pivot here inflicted "significant" jury prejudice that the Court's pretrial ruling recognized *could not* be cured at trial, even with mitigating instructions, no matter what Mr. Aguilar did. ECF No. 155 at 5–8.

At any rate, the government misses the point by focusing on the purported lack of decisions "*requiring* that such a warning be given" before opening the door, Opp. 22 (original emphasis). That ignores the reality that Mr. Aguilar faced in the lead-up to and during trial. Mr. Aguilar's expressly previewed lack-of-knowledge defense on kickbacks was highly case-specific. As the Court repeatedly held pretrial, *see* ECF No. 226 at 3–4, ECF No. 230, it was not the sort of defense that obviously would risk opening the door to any otherwise inadmissible evidence, much less the particular diversion evidence at issue. The lack of a clear warning in this case, combined with the

nature of the evidence, the government's repeated waivers, and the Court's pretrial and midtrial rulings that reasonably *allowed* Mr. Aguilar to assert this defense without opening the diversion door, all underscore why the Court's sudden decision to reverse course midtrial irreparably and unfairly prejudiced Mr. Aguilar.

The government also is wrong to claim that no court has ever granted a new trial under Rule 33 because of a Rule 403 error. *See* Opp. 22. Mr. Aguilar's opening brief cited *several* decisions from the Second Circuit reversing and remanding for a new trial where (as here) district courts violated Rule 403 and improperly admitted propensity evidence. *See* Mot. 33–34 (collecting cases). Although district courts may be understandably reluctant to acknowledge their own evidentiary errors and award post-trial relief, the Court of Appeals has no trouble doing so, even under an abuse-of-discretion standard.

The Court's sua sponte decision opening the door to diversion evidence, made with no clear warning to Mr. Aguilar that his long-previewed defense might open that door, in defiance of the government's repeated waivers, and in the face of so many decisions giving defendants such warnings and so many decisions ordering relief when courts suddenly and without warning undo orders on which litigants have detrimentally relied, therefore warrants a new trial.

***Third***, the government cannot dodge its failure to satisfy the second part of the "offer of proof" that the Court required to open the diversion door. *See* Opp. 24–26. As Mr. Aguilar explained, the government failed to prove that he had *not* diverted Vitol money from Mr. Hanst at any time *before* he retained the Pere brothers in January 2017. *See* Mot. 27–30. Even as it acknowledged that it was required to do so, ECF No. 274 at 3, the government did not even try to meet its burden. The government cannot salvage its failure to do so simply by reiterating the Court's (erroneous) midtrial ruling to the contrary. *Contra* Opp. 24. The Court can, and should,

revisit that ruling post-trial with the benefit of time and a fuller record. Nor can the opposition do so by self-servingly claiming, without evidence, that the start of some alleged diversion payments in February 2017 somehow proves there were no other such payments before then. *Contra* Opp. 25. Particularly given that (1) Mr. Aguilar identified specific earlier payment streams from Mr. Hanst that the government could have investigated, but did not investigate, for alleged diversion payments in 2015 and 2016, *see* ECF No. 277 at 2; and (2) Mr. Aguilar showed that the government failed to obtain critical financial records needed to try to meet its burden, *see id.* at 3. The government complains it can be hard to prove a negative, *see* Opp. 25—but that is precisely what the Court required the government to show to admit this evidence. And the opposition certainly cannot flip the government's burden to Mr. Aguilar to admit his involvement in alleged embezzlement just to avoid the admission of improper propensity evidence. *Contra* Opp. 25 (suggesting that Mr. Aguilar had to "represent that there were in fact other earlier payments" and "point to evidence of such payments"). The Court imposed this offer of proof on the government and the government alone. ECF No. 324 at 5; Trial Tr. 1663:2–1664:6. Mr. Aguilar bore no burden of proof to keep the door shut—having already shut it by defeating the government's original motion in limine, ECF No. 155—or to rebut the government's showing when it fell short of what the Court demanded. And for good reason, as doing so would implicate significant Fifth Amendment concerns, *see* Mot. 29–30; ECF No. 277 at 4, which the Court's prior rulings have yet to address, *see* Trial Tr. 2207:10–22, ECF No. 324 at 5.

**Fourth**, the opposition overlooks the many ways in which the government exploited evidence of the alleged diversion scheme at the very close of trial to inflict—in violation of Rule 403 and the precedent discussed above—precisely the incurable prejudice that the Court's pretrial order predicted. *See* Mot. 30–34 (citing ECF No. 155); *contra* Opp. 26–27. The caginess

of the government's opposition proves as much.  In one breath, government says it "did not introduce any testimony on how Aguilar used the funds he diverted."  Opp. 26.  But in another, it concedes it told the jury in its rebuttal summation, and showed them through an exhibit slide deck, that Mr. Aguilar "appeared to have spent some of the Diversion Scheme money at an art gallery."  Opp. 27.  As the Court accurately predicted before trial, "the potential for prejudice from evidence of the Diversion Scheme is significant" *especially because* it "is more inflammatory" than the charged crimes, given that it allegedly involves the use of "pilfered money [to buy] luxury goods" like art.  ECF No. 155 at 5–6.  The opposition also ignores that the government's main diversion witness, Michael Petron, was the last substantive witness to testify at trial.  Mr. Petron, a purported summary witness, rattled off his many credentials moments after he was sworn, Trial Tr. 3128:7–3129:15, improperly adding the imprimatur of his expertise to this highly prejudicial evidence, *see, e.g.*, *Diaz v. United States*, 144 S. Ct. 1727, 1744 (2024) (Gorsuch, J., dissenting) ("where, as here, the professed expert carries with him the imprimatur of the government," he "may induce the jury to trust [his] judgment rather than its own view of the evidence").  And in its rebuttal summation, the government urged jurors to convict Mr. Aguilar not because he paid bribes, but because "Javier Aguilar was *stealing* from Vitol."  Trial Tr. 3774:22–3775:7 (emphasis added).  That statement—which the opposition tellingly ignores—urged the jury to convict on uncharged conduct and invited precisely the improper propensity inference that the Court's pretrial ruling and established precedent are meant to prevent.  So too did the government's *many* other references to the alleged diversion scheme in its summations, *see* Mot. 32–33 (collecting citations), which refute the government's claim that it "hardly referenced the Diversion Scheme at all," Opp. 26.  These were among the very last things the jury heard from the parties before they began their deliberations.  It strains credulity to think that they had no effect on jurors' deliberations.

10

\*      \*      \*

The Court's sua sponte decision to reverse its pretrial and midtrial rulings that Mr. Aguilar's long-previewed defense would not open the diversion door was improper; it ignored the standard of proof that the Court imposed; and it inflicted incurable unfair prejudice. Nothing in the opposition proves otherwise. To be sure, the Court was entitled to change its mind after deciding the motions in limine and hearing the evidence come in at trial. What it was not entitled to do, however, was to pull the rug out from under Mr. Aguilar midtrial with no warning. A new trial therefore is warranted to cure the manifest injustice that would result from allowing a jury verdict tainted by the improper introduction of powerful and irreparably prejudicial propensity evidence.

## II.   A NEW TRIAL IS WARRANTED BECAUSE MR. AGUILAR WAS ENTITLED TO JURY INSTRUCTIONS ON THE FCPA'S AFFIRMATIVE DEFENSE.

The government also fails to rebut Mr. Aguilar's argument that the jury should have received an instruction on the FCPA's foreign law affirmative defense, 15 U.S.C. §§ 78dd-2(c)(1), 78dd-3(c)(1), or to show that the Court's failure to charge that affirmative defense does not warrant a new trial under Rule 33. *See* Mot. 34–41; *contra* Opp. 28–33.

Once again, the government's waiver argument misstates the record: Mr. Aguilar unambiguously requested this instruction at an appropriate time. *Contra* Opp. 28–30. The foundational basis for this affirmative defense here was the Court's February 16, 2024 ruling that Articles 212 and 222 of the Mexican Federal Penal Code did not criminalize payments to employees of PPI. *See* ECF No. 316 & App'x (requesting instruction on the FCPA's affirmative defense in light of the Court's ruling lodged at ECF No. 313). Mr. Aguilar requested a charge on that affirmative defense just three days later, *see id.*, and reiterated that request before and at the charge conference, ECF No. 317, App'x at 11; Trial Tr. 3326:9–10, 3327:6–3328:1. That provided "reasonable written notice" under Rule 26.1. The government correctly cites the

11

advisory committee note to Civil Rule 44.1 (Criminal Rule 26.1's counterpart), Opp. 28, which reaffirms the reasonableness of Mr. Aguilar's notice here. Those notes explain that neither rule "attempt[s] to set any definite limit on the party's time for giving notice of an issue of foreign law." Fed. R. Civ. P. 44.1, advisory committee's note to 1966 enactment. What matters is "the reason proffered by the party for his failure to give earlier notice." *Id.* In some cases, "the pertinence of foreign law may remain doubtful until the case is further developed." *Id.* Accordingly, the notes make clear that in cases like this one, "the issue [of foreign law] may not become apparent until the trial and notice then may still be reasonable." *Id.* That was precisely what happened here.

The government protests that the timing of Mr. Aguilar's request "severely prejudiced the government" because it supposedly "was too late for the government to fully research and respond to Aguilar's assertions" about Mexican law. Opp. 30. Not so. By that point, the government had a Mexican-law expert on retainer for *months*, if not *years*. *See* ECF No. 207 at 1 (noting government disclosed its Mexican-law expert to Mr. Aguilar on May 11, 2023; ECF No. 207-2 (expert disclosure dated May 5, 2023); *see also* ECF No. 120 ¶¶ 56(a)–(b) (superseding indictment dated Dec. 2, 2022, relied on Mexican antibribery law). Both sides had briefed issues of Mexican antibribery law for *weeks*. *See, e.g.*, ECF Nos. 270, 271, 282, 283, 290; *see also* Trial Tr. 3338:2–4 ("We've been briefing these issues for months, certainly weeks at this point, so there is no notice issue to the Government here."). And the government did, in fact, respond to Mr. Aguilar's request for an instruction on this affirmative defense with a letter of its own citing other Mexican laws it asserted might negate that affirmative defense, *see* ECF No. 318 at 2–3—all of which are *civil* provisions the government rehashes in its opposition, *see* Opp. 32. The government's inability to cite an *active* and *on point* provision of Mexican criminal law that might reach Mr. Aguilar's

alleged payments to PPI employees thus resulted not from Mr. Aguilar running out the clock (which he didn't do), but the failure of a half-dozen prosecutors and an expert to identify any such provision over the course of months, if not longer. *See, e.g.*, Trial Tr. 3337:4–25 (government cited a "*repealed*" provision of "the PEMEX law" to try to argue that the payments at issue were criminal under Mexican law (emphasis added)). At any rate, the government would have plenty of time between now and a new trial to develop whatever legal or factual arguments it thinks might defeat this affirmative defense before a properly instructed jury.

The government's response on the merits fares no better. Mr. Aguilar does not rely on the "absence of written laws prohibiting the payments," Opp. 32—rather, he relies on the textual scope of Articles 212 and 222, Mexico's criminal bribery laws, *see* ECF No. 316. This Court and Mexican courts, including the Mexican Supreme Court, all have held that those written statutes do not criminalize payments to employees of entities like PPI. *See, e.g.*, ECF Nos. 282 at 4–5, 282-2, 312, 312-2, 312-4, 313. Under Second Circuit precedent, that is controlling and requires an instruction on this affirmative defense here. *United States v. Johnson*, 968 F.2d 208, 212 (2d Cir. 1992). As Mr. Aguilar has explained, Mot. 37–38, ECF No. 316 at 3, under *Johnson*, when an affirmative defense turns on whether the defendant's conduct was "lawful" under some other body of law, the defendant need not "prove that his conduct violated *none* of the panoply of . . . laws that might apply to his situation"—instead, given "the burdensome nature of proving such a negative," "the government [must] come forward and articulate which . . . statutes [the defendant's] conduct arguably violated." 968 F.2d at 212 (original emphasis). The only Mexican criminal laws that "the government has identified as applying to [Mr. Aguilar's] conduct" are Articles 212 and 222 of the Mexican Federal Penal Code. *See, e.g.*, ECF No. 271; ECF No. 207-2

at 4–6.  Mr. Aguilar proved (ECF Nos. 270, 282, 290), and the Court then held (ECF No. 313),

that neither statute prohibits paying money to employees of private entities like PPI.

Yet even though *Johnson* relieved Mr. Aguilar of the obligation to do so, he was still able to

prove the negative.  As Mr. Aguilar explained repeatedly during trial,  *see, e.g.*, ECF No. 270-1

at 7–8; ECF No. 270-4 at 2; ECF No. 282 at 3, Mexico's written right of *taxatividad*, codified in

Article 14 of the Mexican constitution, reaffirms that everything in Mexico that is not specifically

prohibited by an "exactly applicable" *criminal law* is considered lawful.  ECF No. 270-22

("In criminal proceedings, it is prohibited to impose, by simple analogy, and even by majority of

reason, any penalty that is not decreed by a law that is exactly applicable to the crime in question.");

*see* Trial Tr. 3332:3–21 (explaining that under the principle of *taxatividad*, "conduct that's not

prescribed is permitted").  The Court's ruling on Articles 212 and 222, combined with the

government's concession that those were the only criminal laws that could apply to payments to PPI

officials, established that Mr. Aguilar's payments to Mr. Espinosa and Mr. Guzman were "lawful

under the written laws and regulations" of Mexico.  15 U.S.C. §§ 78dd-2(c)(1), 78dd-3(c)(1).

The government's only response is to assert that the FCPA's affirmative defense does not

apply here because Mexican *civil* statutes might reach Mr. Aguilar's conduct even though it now

concedes that Mexican *criminal* law does not.  *See* Opp. 33.  But even crediting the opposition's

wrongheaded arguments, that would imply—at most—that the term "lawful" in the phrase "lawful

under the written laws of the foreign . . . country," 15 U.S.C. §§ 78dd-2(c)(1), 78dd-3(c)(1), is

*ambiguous* as to whether it encompasses more than a foreign country's criminal laws.  *Compare*

ECF No. 316, *and* Mot. 38–40, *with* Opp. 33 (citing dueling sources of plain meaning).

For example:  A criminal conspiracy is "an agreement to commit an unlawful act," meaning one

contrary to a criminal statute; an agreement to violate a civil statute is not a criminal conspiracy.

*United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003).  By contrast, civil wrongs are "not unlawful," they merely "beget[ ] a remedy in law or in equity."  *Benderson Dev. Co. v. U.S. Postal Serv.*, 998 F.2d 959, 962 (Fed. Cir. 1993).  Because the government cannot show that Mr. Aguilar's interpretation is *unreasonable*, the rule of lenity required the Court to apply Mr. Aguilar's narrower reading, under which it could consider only Mexico's written criminal laws.  *See, e.g.*, *Liparota v. United States*, 471 U.S. 419, 427 (1985) (noting "longstanding recognition of the principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); *Guam v. Materne*, 72 F.3d 103, 106 (9th Cir. 1995) (O'Scannlain, J.) ("Only where the defendant's interpretation is unreasonable does the rule of lenity not apply."); *see also Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004) (rule of lenity applies to statutes, like the FCPA, that have both civil and criminal applications).

Nor is the government's farfetched judicial estoppel argument persuasive.  *Contra* Opp. 30–31.  At the outset, the government fails to mention that "[t]here is no consensus among courts as to whether judicial estoppel even applies in the context of criminal prosecutions." *United States v. Connolly*, No. 16 Cr. 370 (CM),  2018 WL 2411760, at *6 (S.D.N.Y. May 15, 2018); *see also United States v. Quinones*, 511 F.3d 289, 321 n.22 (2d Cir. 2007) (declining to decide whether judicial estoppel applies in criminal cases and noting it remains an open question).  Even if that doctrine were available, it would not apply here—indeed, the government does not even cite the elements of the doctrine in its opposition.  In civil cases, judicial estoppel applies when (1) "a party's later position [is] clearly inconsistent with its earlier position," (2) "the party has succeeded in persuading a court to accept that party's earlier position," and (3) "the party . . . would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).  The government points to Mr. Aguilar's

undeveloped and source-less aside in his Mexican-law surreply that "PPI employees are subject to the same criminal, civil, and employment sanctions that apply to all private-company employees who steal from or defraud their employers by engaging in bribery, embezzlement, or other forms of corrupt conduct." ECF No. 290 at 4. But the observation that PPI employees are not free to embezzle or receive gratuities is consistent with Mr. Aguilar's argument, which the Court credited, that Mexican criminal law does not penalize someone who *pays* a gratuity or even a "bribe" to a PPI official. Nor did Mr. Aguilar "succeed[ ] in persuading [the C]ourt to accept" that PPI employees are above the law, because the Court's Mexican-law ruling touched *only* on Articles 212 and 222 and never interpreted other laws that might impose penalties on PPI employees rather than people who make payments to those employees. *See* ECF No. 313. And Mr. Aguilar certainly would receive no *unfair* advantage by allowing the jury to consider an affirmative defense that Congress and the President deliberately included in the FCPA's antibribery provisions.

In sum, Mr. Aguilar easily met the Second Circuit's minimal threshold to obtain a jury instruction on this affirmative defense by showing that it "has a foundation in the evidence." *E.g.*, *United States v. Zayac*, 765 F.3d 112, 120 (2d Cir. 2014). The Court's failure to charge the jury with such an instruction thus was error, and nothing in the opposition shows otherwise. The Court should grant Mr. Aguilar a new trial under Rule 33 so a new jury can weigh his guilt or innocence with a proper understanding of what the FCPA does and does not make criminal.

## III. THE GOVERNMENT CONSTRUCTIVELY AMENDED AND PREJUDICIALLY VARIED FROM THE GRAND JURY'S INDICTMENT.

The government makes several arguments to try to gloss over its constructive amendment of, and prejudicial variance from, the grand jury's Indictment. *See* Opp. 34–37. None has merit.

Citing a few stray references to PEMEX in the Indictment's introductory paragraphs, the government mistakenly claims that the grand jury charged two theories of FCPA criminality: (1) that PPI is an instrumentality of Mexico—the only theory the government seriously pursued at trial—and (2) that Mr. Guzman and Mr. Espinosa acted on behalf of a second instrumentality, PEMEX. *Id.* at 35 (citing ECF No. 244 ¶¶ 8–10). But the Indictment's description of the charged Mexico bribery scheme focuses almost exclusively on PPI—just as the government did at trial. For example, the Indictment makes clear that Mr. Guzman and Mr. Espinosa were both "procurement manager[s] at PPI"; Mr. Aguilar bribed them to "assist Vitol in winning business from PPI, including a contract to supply ethane to PPI"; and, as a result, "PPI awarded the Ethane Supply Contract to Vitol." ECF No. 244 ¶¶ 38–39. The only reasonable reading of the Indictment thus is that Mr. Guzman and Mr. Espinosa qualified as "foreign officials" under the FCPA not because of anything to do with PEMEX, but because of their roles at and conduct on behalf of PPI, an alleged FCPA instrumentality. Because nothing about the charged scheme involves PEMEX, Mr. Aguilar could not have been (and was not) on notice that the government would suddenly pivot to a new theory midtrial. That pivot violated "[t]he policy underlying the requirement of specificity in the indictment": "to prevent the usurpation of power by the court and prosecutor in allowing a defendant to be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *United States v. Silverman*, 430 F.2d 106, 110 (2d Cir. 1970), *modified on other grounds*, 439 F.2d 1198 (2d Cir. 1970).

Nor, as the government incorrectly claims, did Mr. Aguilar endorse the government's ever-changing theories of FCPA liability in his proposed jury instructions. *Contra* Opp. 36–37. That Mr. Aguilar's instructions tracked the FCPA's statutory language—defining "foreign official" to include "employee[s]" of an instrumentality as well as those "acting in an official

capacity for or on behalf of " an instrumentality—was hardly an admission that PEMEX was the instrumentality at issue in the Indictment. *See* 15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A). Mr. Aguilar accordingly did not "invite" the government's constructive amendment and prejudicial variance, Opp. 37, simply by accepting a charge that quoted the statute itself.

The government's final retort that the FCPA's two bases for instrumentality liability are both "valid legal theories," Opp. 37, simply is irrelevant. What matters under the Fifth Amendment is whether both theories were fairly presented to the grand jury, contained in the four corners of grand jury's Indictment, and properly noticed to Mr. Aguilar. *See, e.g.*, *Russell v. United States*, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure."); *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012) ("Under the Fifth Amendment, a defendant has a substantial right to be tried only on charges presented in an indictment returned by a grand jury."). Here, they were not. And despite the government's belated attempt to backfill the grand jury's charges, "the indictment must be considered as it was actually drawn, not as it might have been drawn." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). The Indictment is clear that PPI—and only PPI—is the alleged FCPA instrumentality at the heart of the grand jury's charges.

Because the government's last-minute pivot violated Mr. Aguilar's Fifth Amendment rights, the Court should vacate his conviction on Count Three and order a new trial under Rule 33.

## IV. THE EVIDENCE SUPPORTING THE MEXICO-RELATED SPECIFIED UNLAWFUL ACTIVITY IN COUNT THREE IS INSUFFICIENT.

For PPI employees Mr. Espinosa and Mr. Guzman to be "public officials" under the FCPA, they must have acted in an "*official* capacity" either "*for* or *on behalf of* " a foreign government or

its instrumentality.   15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A) (emphases added).   But the evidence adduced at trial was insufficient for a jury to find beyond a reasonable doubt that PPI was an instrumentality under the *Esquenazi* test or that Mr. Espinosa and Mr. Guzman worked on behalf of an instrumentality of a foreign government with regards to the ethane supply contract. The opposition does not show otherwise.   Mr. Aguilar preserved this ground for relief at trial. *See* Trial Tr. 3283:15–3290:4.

### A.      The Evidence Was Insufficient to Find that PPI Was an Instrumentality of the Mexican Government.

The opposition fails to show that the *Esquenazi* factors determining whether an entity qualifies as an "instrumentality" of a foreign government under the FCPA support the conviction on Count Three.   *See United States v. Esquenazi*, 752 F.3d 912, 925–27 (11th Cir. 2014). The government's attempts to recast those factors all fail.   And together, those factors show that reasonable doubt existed as to PPI's putative status as an FCPA instrumentality— and, at minimum, as to Mr. Aguilar's subjective knowledge of PPI's purported instrumentality status.   *See, e.g.*, ECF No. 235 (explaining why the FCPA requires proof of the defendant's knowledge of an alleged bribe recipient's status as a "foreign official" under the statute).

*First*, the government admits that Mexican law categorizes PPI as a type of "commercial entity" instead of a "state productive company," Opp. 10, yet omits that PPI employees are *not* public servants under Mexican law, *see* Trial Tr. 3875:11–13 (instructing that "[e]mployees of affiliate companies are not 'public servants' under Mexico's Penal Code").   *Second*, the Court already has rejected the government's argument that PPI should be considered an instrumentality because it is owned by an instrumentality (PEMEX).   *See* ECF No. 313 at 5–6 (citing *Del Castillo v. PMI Hldgs. N. Am. Inc.*, No. 14 Cv. 3435 (KPE), 2016 WL 3745953, at *7, *10 (S.D. Tex. July 13, 2016)).   *Third*, the government admits PEMEX, *not* the Mexican

government—made employment decisions at PPI, Opp. 10, and fails to mention that the Mexican Secretary of Energy could designate only one member of the board of directors of PEMEX's affiliated companies, like PPI, *see* Trial Tr. 3875:5–7. *Fourth*, the government admits that PPI's funding comes not directly from the Mexican government but from PEMEX, Opp. 12, and overlooks that Mexico does not subsidize PPI, *see* Trial Tr. 3102:1–4 (Guzman cross). *Fifth*, the government's assertion that PPI had an "effective" monopoly over international procurement for PEMEX, Opp. 11, defies the Court's explicit instruction to the jury that the opposite was true, Trial Tr. 3875:14–15. *Finally*, nothing in PPI's articles of incorporation required it to work exclusively for PEMEX. *See* Trial Tr. 2848:7–17 (Espinosa cross). These points reveal that there is not even "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," which itself is not enough to support a conviction. *United States v. Lorenzo*, 534 F.3d 153, 159–62 (2d Cir. 2008).

The government's last two points—that PPI published its public tenders on government websites and PPI changed its name to associate it with PEMEX, *see* Opp. 12—correspond to no factors set out in *Esquenazi* or any other FCPA case. Rather, the remaining *Esquenazi* factor— whether the government generally considers the entity to be performing a governmental function, 752 F.3d at 926–27—weighs decisively in Mr. Aguilar's favor because the fact that PPI employees are not public servants under Mexican law indicates that the government does not consider PPI to be performing a governmental function. Mot. 55. And as for how long these *Esquenazi* indicia have existed, PPI's name change also favors Mr. Aguilar because it occurred at most five years before the ethane supply contract at issue. Trial Tr. 2668:25–2669:16 (name changed to "PPI" around 2013 or 2014). Before then, PPI was known as "Integrated Trade Systems, Inc.," which reveals no affiliation at all with PEMEX or the Mexican government. *Id.*; ECF Nos. 127–5 & 127-6.

The non-FCPA decisions the government cites for the proposition that it need satisfy only half or "several" factors in a multifactor test, *see* Opp. 10 (citing *United States v. Rivera*, 546 F.3d 245, 250 (2d Cir. 2008), and *Ling Nan Zheng v. Liberty Apparel Co. Inc.*, 389 F. App'x 63, 65 (2d Cir. 2010)), provide no guidance here because they are civil cases that have nothing to do with Rule 29 of the Federal Rules of Criminal Procedure and do not turn on a reasonable-doubt standard.  In any case, as explained above, *none* of the *Esquenazi* factors supports a finding that PPI is an instrumentality.  Because no factor supports an instrumentality finding here under *Esquenazi*—let alone Mr. Aguilar's knowledge of PPI's asserted instrumentality status— no reasonable jury could find Mr. Aguilar guilty beyond a reasonable doubt of the Mexico-related conduct in Count Three under the theory that PPI is an instrumentality of Mexico.

The Court thus should enter a judgment of acquittal on Count Three under Rule 29. *Lorenzo*, 534 F.3d at 159–62 (reversing conviction and instructing court to acquit despite "ample evidence" of conspiracy because "specious inferences are not indulged").

**B.**      **The Evidence Was Insufficient to Find that PPI Employees Worked on Behalf of an Instrumentality of the Mexican Government in an Official Capacity.**

Nor was there sufficient evidence for a jury to find that PPI employees worked on behalf of an instrumentality of the Mexican government.  Although PEMEX is an instrumentality, the evidence at trial showed that PPI employees worked on behalf of PEMEX *Etileno*—a distinct entity—with respect to the ethane supply contract at issue, and nothing in the record suggests that PEMEX Etileno is an instrumentality of the Mexican government.  Mot. 57–59.  The evidence also shows that PPI worked for PEMEX Etileno in a *commercial* capacity—not an "official one," as the FCPA requires.  *Id.*  Thus, there was insufficient evidence to support a jury finding that Mr. Espinosa or Mr. Guzman worked on behalf of an instrumentality of a foreign government in an official capacity.  All of the government's responses miss the mark.

21

*First*, the government argues that there is enough evidence that Mr. Espinosa and Mr. Guzman worked on behalf of PEMEX in an official capacity because there supposedly is evidence that they worked on behalf of both PEMEX and PEMEX Etileno. Opp. 8. But the ethane supply contract that the government quotes says that PPI was acting "as the sales agent on behalf and account of PEMEX *ETILENO*"—not PEMEX, Opp. 7 (quoting GX 5161; GX 5161-T at 8 (emphasis added)). The government also asserts that "PEMEX itself [ ] ordered PPI to procure the ethane." Opp. 7–8. But the letter they cite describes PEMEX Etileno as the "Requesting Unit"— not PEMEX. GX 5321-T. This evidence corroborates Mr. Espinosa's testimony that PEMEX Etileno—not PEMEX—was the end user on the ethane supply contract. Trial Tr. 2746:12–14, 2759:12–16 (Espinosa direct). The government also cites snippets of testimony when Mr. Espinosa and Mr. Guzman generally claim that they worked for PEMEX (when they in fact worked for PPI). Opp. 6–7. But once more, the government cannot identify any evidence showing that these two PPI employees worked on behalf of PEMEX with respect to the *specific* ethane contract at issue, much less that they did so in an "official capacity."

*Second*, the government claims that PEMEX and PEMEX Etileno were "functionally the same entity," Opp. 8—a claim that defies common sense, flouts the doctrine of corporate separateness, and is based on no evidence whatsoever. To the contrary, Mr. Espinosa himself testified that PEMEX Etileno and PEMEX are "different companies" under the "PEMEX umbrella." Trial Tr. 2824:4–7, 2824:16–19 (Espinosa cross). No reasonable jury could find that PEMEX and PEMEX Etileno were one in the same.

*Third*, the government claims that there is no distinction between acting in an "official capacity" (as the FCPA requires) and a "commercial capacity," and that Mr. Aguilar did not ask the Court to instruct the jury on that distinction. Opp. 9 n.3. Both claims are wrong. The FCPA

uses the phrase "official capacity," and phrases like "lawful duty of such official," along with phrases like "to assist such domestic concern in obtaining or retaining business." 15 U.S.C. § 78dd-2(a), (h)(2)(A). That confirms the plain distinction between something *official* (*i.e.*, governmental) and something *commercial*. *See McDonnell v. United States*, 579 U.S. 550, 574 (2016) (holding that an "official act" "must involve a formal exercise of governmental power"). Because PPI employees are not public officials under Mexican law, *see* ECF No. 313, they cannot—and, at any rate, did not here—act in any "official capacity." Moreover, the Court *did* instruct the jury that a foreign official must act in their "official capacity," Trial Tr. 3850:6, and that employees of affiliate companies are not "public servants" under Mexican law, Trial Tr. 3875:11–13. Faced with these instructions and the PEMEX letters that call PPI a "Commercial Proxy," Trial Tr. 2760:5–11 (Espinosa direct); GX 5321-T at 1; GX 5322-T at 1, no reasonable jury could have concluded that these private commercial agents had acted in an "official capacity."

*Finally*, the government's opposition cites no evidence that PEMEX Etileno is an instrumentality of the Mexican government. Opp. 6–12. That is because no such evidence exists in the record. *See, e.g.*, Mot. 50, 53, 58.

Even after drawing reasonable inferences in the government's favor, the evidence shows— *at most*—roughly equal support for the government's position and Mr. Aguilar's. As a result, "a reasonable jury must necessarily entertain a reasonable doubt," and Mr. Aguilar thus is entitled to a judgment of acquittal. *Lorenzo*, 534 F.3d at 159–62. That is true regardless of the jury's verdict on the Ecuador-related specified unlawful activities charged in Count Three. The Court's failure to require and provide a special verdict form for Count Three, *see infra* § VI, means that the Court cannot determine what specified unlawful activities undergirded the jury's verdict—and certainly cannot know whether the presence of the improperly charged Mexico-related conduct

23

swayed the jury's deliberations on Count Three.  *See, e.g.*, *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.").

## V.    PREJUDICIAL SPILLOVER FROM THE MEXICO-RELATED ERRORS TAINTS ALL COUNTS.

Prejudice from the Mexico-related charges spilled over onto the Ecuador side of the case, hamstringing Mr. Aguilar's defense from the start.  Mr. Aguilar preserved this ground for Rule 33 relief because (among other things) he had argued, when moving to sever and transfer the Mexico-related Counts, that trying the Mexico- and Ecuador-related Counts together would (and later did) lead to "prejudicial spillover."  ECF No. 127-1 at 26.  Mr. Aguilar specifically requested that the money-laundering charges on Mexico be "splice[d]" for that very reason.  *Id.* at 9 n.4; *see also, e.g.*, ECF No. 147-1 at 20 (arguing improperly venued Mexico-related charges would infect any conviction with the risk of prejudicial spillover).

Prejudice spills over into other counts when "[1] evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and [2] this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts."  *United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) (emphasis omitted).  For the reasons explained in Section IV, the Mexico charges never should have been tried in the first place.  The government does not contest that it used the Mexico-related charges to bolster the weak Ecuador-related charges, Opp. 37–38, by (among other things) asking the jury to ponder how "unreasonable . . . it seems" to have "two schemes going at the same time and the coincidence that in one you're totally unaware that these guys are getting bribes paid to them, and the other, you're paying them yourself but they just happen not to be government officials," Trial Tr. 3751:20–25.  Thus, it is undisputed that the Mexico charges were

presented in a way that allowed the jury to use this evidence improperly to convict Mr. Aguilar on the Ecuador-related counts.  That more than satisfies *Rooney*'s second prong.  37 F.3d at 856.

Mr. Aguilar also satisfies the *Rooney*'s first prong.  *See id.*  The government's lone counter is a reference to the Court's pretrial ruling that evidence of the alleged Mexico bribery scheme likely would have been admissible under Rule 404(b) to prove the Ecuador-related charges. Opp. 38.  But that pretrial statement did not decide the issue; it simply found that Mr. Aguilar had not established substantial prejudice justifying severance.  ECF No. 140 at 7–13.  The Court never had an opportunity to decide the admissibility of evidence of the Mexico Bribery Scheme under Rule 404(b), and the government never moved in limine to raise that issue before or during trial. Had the government been forced to argue for the admissibility of the uncharged Mexico scheme under Rule 404(b), the Court may have excluded it as unduly prejudicial with the benefit of added context at trial.  *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (error to admit uncharged conduct "as propensity evidence in sheep's clothing . . . with insufficient regard for the unfair prejudice that surely would result").  This uncertainty compounds the risk of prejudicial spillover that Mr. Aguilar demonstrated in his motion.  A new trial thus is warranted.

## VI.   THE COURT SHOULD HAVE REQUIRED JUROR UNANIMITY ON THE SPECIFIED UNLAWFUL ACTIVITIES UNDERLYING COUNT THREE.

The failure to require unanimity as to the specified unlawful activities underlying the promotion object of Count Three was error and was not, as the government contends, harmless just because the jury separately convicted Mr. Aguilar on the concealment object.  *Contra* Opp. 40–44.  Rather, the failure to instruct the jury that it needed to agree unanimously on the particular specified unlawful activity or activities at issue tainted the money-laundering conspiracy count on both objects.  *See Hedgpeth*, 555 U.S. at 58.  There was no meaningful distinction between the government's trial evidence of promotion and concealment.  Had the Court properly

instructed jurors that they all needed to agree on the specified unlawful activity with respect to the gateway object of promotion—whether a violation of the FCPA or foreign antibribery law—that instruction may well have influenced their deliberations on what Mr. Aguilar allegedly conspired to conceal and why. It therefore is "impossible to tell which ground the jury selected" in voting to convict on both objects or why they did so. *United States v. Zvi*, 168 F.3d 49, 55 (2d Cir. 1999).

That the jury returned a guilty verdict on the FCPA counts does not render the charging error on the money laundering count—a different charge with different elements—harmless either. *Contra* Opp. 41. "Each count in an indictment is regarded as if it was a separate indictment," and a conviction on one does not mandate a conviction on another. *United States v. Powell*, 469 U.S. 57, 62 (1984); *see United States v. Zane*, 495 F.2d 683, 689–90 (2d Cir. 1974) ("[a] jury's determination on one count in an indictment has no estoppel effect on its determination on other counts at the same trial"); *see also* Trial Tr. 3885:19–25 (charging jury that "[w]ith respect to each count" it needed "to resolve individually the issue of whether the Government has established beyond a reasonable doubt the essential elements of the offense"). The jury's findings on other counts thus cannot cure the defective instruction with respect to the money laundering count, and the government's two cases do not establish otherwise. *Contra* Opp. 41. In *Zvi*, the defendant was convicted "of timely money laundering counts as well as for filing false tax returns, both of which were objects charged in the conspiracy." 168 F.3d at 55. But this jury's verdict on the FCPA charges does not inform whether they voted to convict on the money laundering count based on a violation of the FCPA or, potentially, Ecuadorian law. *United States v. Malpeso* is even less apt, as it involved a jury instruction on the use of a firearm in connection with a gun charge. 115 F.3d 155, 165–66 (2d Cir. 1997).

Although the government spends pages trying to explain why juror unanimity is not required on specified unlawful activities, it nowhere addresses the many authorities Mr. Aguilar cited to the contrary. *See* Mot. 63–65. That includes *United States v. Ng Lap Seng*, an in-Circuit FCPA case that required a unanimous verdict on the specified unlawful activities at issue, and *United States v. Liersch*, on which this Court twice relied in committing to give Mr. Aguilar clear instructions and a special verdict form requiring unanimity on the specified unlawful activities underlying Count Three. *See* Mot. 64–65 (collecting citations).

Nor does the government address the principle that juror unanimity "require[s] unanimous agreement as to the nature of the defendant's violation, *not simply the fact that a violation has occurred*." *McKoy v. North Carolina*, 494 U.S. 433, 450 n.5 (1990) (Blackmun, J., concurring) (emphasis added). "[T]he Courts of Appeals are in general agreement" on this principle. *Id.* The government does not distinguish these on-point decisions because it cannot. Rather than tread the same wrongheaded path as another court in this district, *see* Trial Tr. 3412:13–24, this Court should have heeded its prior orders and the precedent Mr. Aguilar cited, which confirms that jurors must agree unanimously on the specified unlawful activities underlying a doubly derivative money-laundering conspiracy count like this one. *See* Mot. 64–65 (citing *United States v. Sturman*, 49 F.3d 1275, 1282 (7th Cir. 1995), and *United States v. Beros*, 833 F.2d 455, 461–62 (3d Cir. 1987)). As the Third Circuit's pattern money-laundering instructions make clear, jurors "must agree . . . as to which purpose or purposes [the defendant] intended to serve by engaging in the transaction[s]," and must do so "unanimously"—jurors "need not unanimously agree on each purpose, but, in order to convict, must unanimously agree upon at least one such purpose." 3d Cir. Model Crim. Jury Instrs. § 6.18.1956-6, at 22–23 (2023) (citing *United States v. Navarro*, 145 F.3d 580 (3d Cir. 1998)), https://bit.ly/3zwyrsF.

27

Because the Court failed to charge the jury on the need for unanimity as to each specified unlawful activity, the Court should grant Mr. Aguilar a new trial on Count Three.

## VII. THE COURT SHOULD ORDER A NEW TRIAL BECAUSE IT IMPROPERLY ADMITTED AGENT WOOD'S TESTIMONY ABOUT AN UNCONSTITUTIONAL INTERROGATION.

The government is incorrect to claim that Agent Wood's improperly admitted testimony about Mr. Aguilar's alleged interrogation statements warrants no post-trial relief under Rule 33 just because the Court denied Mr. Aguilar's pretrial motion to suppress. *See* Opp. 44–45. Mr. Aguilar preserved this ground for post-trial relief through that pretrial motion and did not waive it by undermining Agent Wood's testimony at trial. *See, e.g.*, *United States v. Cruz*, 581 F.2d 535, 542 (5th Cir. 1978) (en banc) (pretrial motion to suppress preserves ground for post-trial relief, even when defendant does not object at trial and "d[oes] his best to turn that evidence to his favor"), *overruled in part on unrelated grounds by United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987).

As the opening brief explains, additional evidence and context adduced *at trial*—long after the pretrial suppression hearing and order—shows why the government has not met its "heavy" burden under *Miranda v. Arizona*, 384 U.S. 436, 475 (1966), and thus why the jury should never have heard Agent Wood's testimony about Mr. Aguilar's alleged statements during the airport interrogation. *See* Mot. 66–76. In particular, Agent Wood's trial testimony underscored that (1) he interrogated Mr. Aguilar in a border-crossing setting the Second Circuit has held is one where "compulsory questioning . . . inheres" because travelers have "nowhere else to go," *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011); (2) he did so for 90 minutes using aggressive tactics that conveyed "by word [and] deed" that Agent Wood and his FBI counterpart Agent Zukas believed Mr. Aguilar was guilty of crimes, *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam); and (3) he testified about Mr. Aguilar's alleged statements based not on

28

any recording that his agency's policies urged him to obtain, or on any contemporaneous notes, but solely on his fading (and failing) memory of an interrogation conducted three-and-a-half years before his testimony, *see* Mot. 72–73.  In addition, Agent Wood's testimony did nothing to resolve the fundamental flaw in the Court's pretrial order:  its improper reliance on statements from two customs officers that Mr. Aguilar had purportedly completed the immigration process before Agent Zukas first approached him for questioning about alleged foreign bribery.  *See* Mot. 69–70 (explaining why that reliance was improper under established precedent).

Because Mr. Aguilar's post-trial motion focuses on additional evidence developed at trial, it does not merely seek "to relitigate issues decided at the suppression hearing," Opp. 44.  Rather, it asserts new and further-developed arguments that arose at trial, which Rule 33 empowers the Court to resolve post-trial.  *See, e.g.*, *United States v. Lesane*, No. 22 Cr. 10 (LJL), 2023 WL 3560549, at *2 (S.D.N.Y. May 19, 2023) ("The Court is permitted, but not required, to entertain a post-trial motion to reopen a suppression hearing based on evidence adduced at trial."); 3 Wayne R. LaFave et al., *Criminal Procedure* § 10.6(c) (4th ed., Dec. 2023 update) (defendants may "obtain reconsideration" of pretrial suppression order when "at trial new or additional evidence is produced bearing on the issue or substantially affecting the credibility of the evidence adduced at the pretrial hearing").  Because Mr. Aguilar's "argument for a new trial is grounded on discovery of new evidence as opposed to his desire to merely revisit the Court's order on his motion to suppress, it is an appropriate argument within the context of Rule 33." *United States v. Coleman*, No. 2:18 Cr. 101 (JED), 2023 WL 3815150, at *6 n.5 (N.D. Ind. June 5, 2023).  A contrary rule would defy the government's assertion elsewhere in its opposition that "pretrial evidentiary ruling[s]" may "be revisited in appropriate instances" as "the case unfolds."  Opp. 21.

The government also is mistaken to claim that the improper admission of Agent Wood's testimony falls short of the standard for relief under Rule 33 because it does not show Mr. Aguilar's actual innocence. *See* Opp. 45. As the Seventh Circuit has held, Rule 33 relief is appropriate when "newly discovered facts [ ] would lead to the suppression of critical evidence, and thus to [an] acquittal"—even when the defendant may have "actually committed the crime." *United States v. Woods*, 169 F.3d 1077, 1078 (7th Cir. 1999) (Easterbrook, J.). The government concedes that this testimony was critical to its case: its opposition affirmatively asserts that "Agent Wood's testimony about Aguilar's [alleged] statements to him was obviously highly probative," Opp. 45, refuting any claim that its admission somehow was harmless. Courts rarely find it harmless when a purported confession improperly comes into evidence, because "confession[s are] like no other evidence" and "have a profound impact on the jury, so much so that [courts] may justifiably doubt [jurors'] ability to put them out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). That is precisely why the improper admission of Agent Wood's testimony was so unfairly prejudicial in violation of Rule 403 despite its purported probative value. *See* Mot. 73–76; *contra* Opp. 45. A new trial therefore is warranted on this ground even if the Court believes that other evidence supports the jury's verdict.

Because Agent Wood's testimony was improperly admitted for all the reasons detailed in the opening brief—which the government's opposition does not address—the Court should grant Mr. Aguilar a new trial.

## VIII. THE ECUADOR-RELATED EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

Mr. Aguilar's opening brief already dismantled the government's best Ecuador-related evidence, explaining why it could not fill the holes in the government's case. *See* Mot. 80. The government's counterargument that Mr. Aguilar supposedly failed to evaluate the evidence "as a whole," Opp. 12, merely rehashes theories that Mr. Aguilar already has debunked.

For example, the government again points to use of aliases, but overlooks that Mr. Aguilar often signed emails with his real name.  Trial Tr. 2487:22–2490:19 (Hanst cross) (discussing GX 1231, GX 1263, GX 1270, and DX 661).  The government also points to coded language as evidence of guilt, but Antonio Pere's supposed coded language with Mr. Aguilar—that he "worked with" Mr. Arias—is no red flag of, or code word for, bribery.  Trial Tr. 1058:25–1059:10 (A. Pere cross).  The government cites recordings discussing future payments as evidence of Mr. Aguilar's guilt, but cannot explain why, at the March 2020 recorded lunch, Antonio Pere said he "*think*[*s*]" he had told Mr. Aguilar they "paid [Arias] for his services."  Trial Tr. 1359:16–23 (A. Pere cross) (emphasis added).  Nor can the government explain away Antonio Pere's admission that, had he told Mr. Aguilar he had, in fact, mentioned bribes to Mr. Arias before that lunch, Mr. Aguilar "probably" would have responded that he "didn't know that at the time."  Trial Tr. 1353:9–16 (A. Pere cross).  If Antonio Pere really had told Mr. Aguilar of the payments to Mr. Arias, surely he would have asserted it as he worked undercover to gather evidence against Mr. Aguilar to minimize his substantial criminal exposure.

The government tries to highlight Mr. Aguilar's purportedly false exculpatory statements at the airport—further showing the harm resulting from their improper admission, *see supra* § VII—but as Mr. Aguilar has explained, denying knowledge of a coconspirator is not enough to sustain a conviction under controlling precedent.  *See Lorenzo*, 534 F.3d at 159–62 (reversing and remanding conspiracy conviction despite false exculpatory statement disclaiming knowledge of coconspirator).  And although Antonio Pere claimed Mr. Aguilar suggested paying in Euros, the simpler explanation is that the *Pere brothers asked* to be paid their consulting fees in Euros because they (unlike Mr. Aguilar) knew that Mr. Arias was living in Portugal at the time.  Trial Tr. 381:2, 339:21.  Given all the holes in the government's case, the conclusory cooperator testimony that

the government cites in which the Pere brothers and Mr. Arias merely point to Mr. Aguilar in the courtroom and assert that they conspired with him, *see, e.g.*, Trial Tr. 633:21–23 (A. Pere direct); Trial Tr. 1513:10–14 (E. Pere direct); Trial Tr. 91:7–12 (Arias direct), is both incredible and of little weight.  It therefore is not enough to sustain these convictions.

Moreover, the government never tries to distinguish this case from *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), which has a strikingly similar fact pattern.  In *Biaggi*, the Court of Appeals reversed where a defendant was convicted for aiding and abetting his father's bribery offense because there was no evidence he was *told* the purpose of the stock he held for his father. *Id.* at 681.  Even if knowledge of the bribery offense were "inferable from circumstances" because of the outsize value of the stock, that speculation was not sufficient to sustain the son's conviction. *Id.*  So too here.  It is undisputed that the Pere brothers never told Mr. Aguilar that they were bribing Ecuadorian officials before the Vitol fuel oil deal was signed.  At best, the evidence here "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *Lorenzo*, 534 F.3d at 159–62 (emphasis added) (reversing conspiracy conviction and instructing district court to acquit despite "ample evidence" of the conspiracy, false exculpatory statement disclaiming knowledge of coconspirator, and recorded conversations with coconspirator because there was no evidence defendants knew suitcases contained illegal substance).

In addition, a very recent decision from the Supreme Court further shows that the Ecuador-related convictions cannot stand, and thus that an acquittal (or at least a new trial) is warranted. *See, e.g., United States v. Full Play Grp., S.A.*, No. 15 Cr. 252 (PKC), 2023 WL 5672268, at *24–27 (E.D.N.Y. Sept. 1, 2023) (granting judgment of acquittal when recent Supreme Court precedent clarified that the statute at issue "d[id] not criminalize the conduct alleged" and thus "the evidence at trial was insufficient to sustain Defendants' convictions under that statute").

32

In *Snyder v. United States*, decided just a few weeks ago, the Supreme Court held that a federal domestic bribery statute analogous to the FCPA, 18 U.S.C. § 666, criminalizes only "bribes" to *induce* official action, and does not reach mere "gratuities" paid *after* action is taken. No. 23-108, 603 U.S. ___, 2024 WL 3165518, at *3, *6 (U.S. June 26, 2024). *Snyder*'s logic applies with full force to the FCPA. Both are *bribery* statutes that require "corrupt" mens rea, unlike the federal gratuities statute. *Compare Snyder*, 2024 WL 3165518, at *6 (explaining that the federal domestic bribery statute, 18 U.S.C. § 201(b), like Section 666, "makes it a crime for federal officials to corruptly accept a payment in return for being influenced in an official act," while the federal domestic gratuities statute "[b]y contrast . . . contains no express *mens rea* requirements"), *with* 15 U.S.C. §§ 78dd-2(a), 78dd-3(a) (FCPA likewise requires "corrupt[]" intent). *See also* DOJ & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, Ch. 2 (2d ed. 2020) (discussing the "FCPA['s] anti-bribery provisions" charged against Mr. Aguilar); *id.* at 111 n.165 (mentioning gratuities only once, in the context of "facilitating payments" that the FCPA does not criminalize). The FCPA's use of "[t]he term 'corruptly' therefore signals that [it] is a bribery statute"—not a gratuities statute. *Snyder*, 2024 WL 3165518, at *10. Because the evidence adduced at trial showed, at most, that Mr. Aguilar paid Ecuadorian officials gratuities *after* securing the fuel oil deal (rather than bribes paid before then to induce or secure that deal), and never joined any prior agreement to pay bribes to secure that deal, *Snyder* further compels dismissal here. *See, e.g.*, GX 6000 (summary chart of alleged payments to Mr. Arias starting in December 2018, nearly two years after the fuel oil deal was signed); *supra* at 30–32.

The Court should therefore enter judgments of acquittal on all Counts because no rational jury could find beyond a reasonable doubt that Mr. Aguilar knowingly and corruptly bribed, conspired to bribe, or conspired to launder money in connection with bribing Ecuadorian officials.

33

## CONCLUSION

For all these reasons, and all those set out in Mr. Aguilar's opening brief, the Court should, following oral argument, grant judgments of acquittal or order a new trial on all Counts.

Respectfully submitted,

Dated:  July 11, 2024

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:  _/s/  Daniel R. Koffmann_
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
danielkoffmann@quinnemanuel.com

**CLARK SMITH VILLAZOR LLP**

Rodney C. Villazor
Michelle E. Lee
666 Third Avenue, 21st Floor
New York, NY 10017
(212) 377-0850
rodney.villazor@csvllp.com
michelle.lee@csvllp.com

Michael T. Packard
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 212-7100
michaelpackard@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

cc:  Counsel of Record (via ECF)